Law Offices of Gita B. Kapur & Associates
Gita B. Kapur, Esq. (CA SBN 223754)
617 S. Olive St., Suite 1000
Los Angeles, CA 90014
Tel: (213) 327-0455; Fax: (213) 327-0707
Email: gita.kapur@gitakapurlaw.com

Attorney for Petitioner,
Eunha Oh

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

| | |
|---|---|
| EUNHA OH,<br>Petitioner,<br><br>v.<br><br>ERNESTO SANTACRUZ JR., Acting Director, Los Angeles Field Office, Immigration and Customs Enforcement, Enforcement and Removal Operations; DAVID J. VENTURELLA, Acting Director, Immigration and Customs Enforcement; MARKWAYNE MULLIN, Secretary of U.S. Department of Homeland Security, U.S. Department of Homeland Security; TODD BLANCHE, U.S. Attorney General; WARDEN, Adelanto ICE Processing Center,<br>Respondents. | Case No.:<br><br>**DECLARATION OF EUNHA OH IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS** |

DECLARATION OF EUNHA OH

IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

I, EUNHA OH, declare as follows:

1. I am the Petitioner in this case. I make this declaration from my own personal knowledge, except where I say that something is based on information given to me by others, and if called as a witness I could and would testify competently to these facts.
2. I do not read or speak English. This declaration was prepared with the assistance of my attorneys and was read to me in its entirety and translated to me in the Korean language before I signed it. Everything in it is true to the best of my knowledge and memory.
3. My name is Eunha Oh. I was born on April 6, 1987 in North Korea. I am a citizen of South Korea. My DHS number is A208-839-580.
4. I was arrested on August 20, 2026. I have been detained at the Adelanto ICE Processing Center since the early morning of August 21, 2026.
5. I have never been arrested for a crime, charged with a crime, or convicted of a crime, in the United States or in any other country.
6. I grew up in North Korea. There was never enough food. People fought with each other over food and money. The government did not give us rice or money to live on.

7. To survive, I sometimes sold Chinese products in the local market in North Korea. The government did not allow this. Officials who patrolled the market stopped me more than once, threw away what I was selling, and struck me for earning money in a way the government did not allow. I was never arrested, never charged with any offense, and never brought before any court in North Korea. There was no lawful way for me to support myself and my family.

8. In about 2010, I married Lee Seung Chul in North Korea. We have one daughter. She is now about sixteen years old, and I believe she is still in North Korea. I have had no contact with my daughter or my husband since I left the country. I do not know whether they are alive.

9. My husband and I fought, and I went to live at my parents' home in North Korea. Shortly after, my father passed away suddenly, leaving behind heavy debts that my mother and I were unable to repay.

10. I left North Korea in 2012 and went to China, where I lived for about three years.

11. China does not give legal status to North Koreans who escape. It treats us as economic migrants and sends us back, and people who are sent back are punished. There was no way for me to become lawful there.

12. In China, I could not work legally, and I could not get identification. I was sexually harassed and assaulted by Chinese men, but I could not go to the police for help

about anything. If the Chinese authorities had found me, I would have been sent back to North Korea, and people who are sent back are punished or killed.

13. Since that time, I have suffered from depression. I have taken medication for it. The medication I was taking before my arrest is medication I obtained in South Korea. I had been taking it regularly and it helped me.

14. I kept that medication at my apartment in Los Angeles. My boyfriend, Benjamin Min-Ho Moon has seen it there and can confirm it.

15. I could not fix my status in China, so I left and made my way to South Korea. I entered South Korea on April 9, 2015.

16. When I arrived, the South Korean government held me for about six months in an enclosed protection facility. During that time, they investigated whether I was a spy for North Korea and they taught me about South Korean culture and how to live in South Korea. After those six months, I was released into the general public and granted South Korean citizenship.

17. Life in South Korea was very difficult for me mainly because I could not find steady work.

18. My biggest obstacle to finding work was my North Korean accent. Whenever I called about even a simple part-time job, employers knew where I was from the second they heard my voice, and the rejection was immediate.

19. Because I could not get a permanent job, and had a hard time getting even part-time work, it was very hard for me to pay my rent.

20. One time I did get a job at a Korean restaurant. The other employees discriminated against me. They ignored me and bullied me because of my accent and because I was from North Korea.

21. My depression continued during this time. I attended church in South Korea.

22. In 2016, I attempted to enter the United States as a visitor under the visa waiver program, but I was refused admission. During that encounter, I identified a person in the United States as my point of contact. That person was engaged in prostitution. However, I did not engage in prostitution myself. I never admitted under oath that I had engaged in prostitution during the ten-year period preceding November 14, 2016. To the extent Form I-213 states that I made such an admission, that statement is inaccurate.

23. At the end of September 2025, I came to the United States. I traveled to Mexico and then crossed on foot somewhere near San Diego, California. I do not know the exact place. I did not have a visa and I was not inspected by any immigration officer.

24. Since I arrived in September 2025, until August 20, 2026, I had never had any contact with ICE, Customs and Border Protection, or any other immigration officer in this country.

25. I want to apply for asylum in the United States because of what happened to me in North Korea, because of what happened to me in China, and because of how I was treated in South Korea for being North Korean.

26. In November 2025, a friend introduced me to a man named Tak Byung Jin in Los Angeles, California. Mr. Tak told me he was a paralegal. Later, in February 2026, he told me he had become a lawyer.

27. I paid Mr. Tak about $16,000 in November 2025 for help with my asylum application and for what he described to me as a path to citizenship.

28. Mr. Tak told me that my asylum application had been filed in November of 2025. I believed him. I have since learned from my current attorneys that U.S. Citizenship and Immigration Services did not actually receive my application until July 10, 2026.

29. I couldn't write my own asylum application because my English is very limited. Mr. Tak wrote it for me in English, which I cannot read. He simply gave me the signature page of the application, told me to sign it, and said he would take care of everything else.

30. My attorneys have told me that the application Mr. Tak filed says that I entered the United States on a tourist visa. That is not true. I did not tell him that. I do not know why he wrote it. I entered on foot near San Diego without a visa and without being inspected, exactly as I have described above.

31. My attorneys have also told me that when they asked Mr. Tak to send them my asylum declaration, he sent them a declaration belonging to a completely different person.

32. I have never had an asylum interview. My biometrics had not been taken before August 20, 2026, that is why I went to the appointment where I was arrested.

33. Since 2025, when I first arrived, I have rented an apartment at 918 S. Oxford Avenue, PH 4, Los Angeles, California 90006. The lease is in my own name. That is my home, and it is still available to me.

34. I understand that the address on my USCIS notices is 621 S. Western Avenue, G02, Los Angeles, California. That is an address Mr. Tak put on the application. I believe that address is Mr. Tak's office address. If I am released, I will file a Form EOIR-33 with the Immigration Court giving my correct address within five days.

35. Benjamin Min-Ho Moon is my boyfriend. He was born in the United States and is a United States citizen. We have been together for about three months. He has a home in Las Vegas, Nevada, and we have spent much of our time together there. He has also stayed with me at my apartment in Los Angeles. My own apartment in Los Angeles remains available to me, and if I am released I am prepared to live either there or with Benjamin in Las Vegas, whichever this Court prefers.

36. Benjamin has helped me a great deal financially. He is the person who drove me to my USCIS biometrics appointment.

37. I have close friends in Los Angeles, including Andrew Chen, who is a United States citizen. Some of them appear in the photographs my attorneys submitted to the Immigration Court with my bond request.

38. I attend church in Los Angeles, California. My pastor, Duan Kwon, knows me and has written a letter for me.

39. I have never used a false name. I have never given a false name or a false address to any government agency. I have used my own name the entire time I have been in the United States.

40. I received a notice from USCIS telling me to come to the Application Support Center at 3747 South La Brea Avenue in Los Angeles on August 20, 2026 at 11:00 a.m. to give my fingerprints for my asylum application. The notice warned that if I did not come, my asylum application could be treated as abandoned.

41. I intended to go and I went. Benjamin drove me in his car. We arrived at about 10:30 a.m., half an hour early.

42. We went into the building together and went through the security check. Benjamin did not come with me into the interview area, and he was not present when I was arrested.

43. I checked in. I gave my biometrics appointment notice and my passport to a female staff member. She was in plain clothes. She took both of my documents and went into a room with them.

44. I was told to sit and wait. I waited in a chair for about thirty minutes.

45. A different person, a man in plain clothes who seemed to me to be a worker at the office, came out and called my name. I went to him and he took me to another room.

46. When he opened the door to that room, there were three men inside, sitting on chairs. They were all wearing the same clothing: the tops were dark blue, almost black, and the pants were dark ivory or dark brown. I do not remember seeing any logo or badge on their clothing.

47. The three men told me that I was an illegal alien and that they had to take me. They spoke only English. There was a Korean translator on the telephone. They asked me my name and I told them.

48. No one showed me a warrant. No one showed me any paper at all in that room. No one read me any rights. I did not sign anything there.

49. I told them that I smoke, and I asked if I could bring my electronic cigarette. They said no. They had taken my bag and were holding it. When I tried to reach into my bag for the electronic cigarette, they said no and would not let me touch my bag.

50. They put handcuffs on me, in front of my body.

51. They started to take me out of the room. I was frightened and ashamed that the people waiting outside would see me in handcuffs. I asked them to give me

something to cover the handcuffs. What they gave me was too small to cover them. I covered the handcuffs with my own shirt.

52. They would not let me speak to Benjamin. He was there and I was not allowed to say anything to him. They took me straight out to a car in the parking lot.

53. The car was a black SUV. It had no logo or markings on it.

54. The three men kept my passport and my biometrics appointment notice. I never got them back that day.

55. They drove me to downtown Los Angeles. I do not know exactly where. The drive took about twenty minutes.

56. There, they took my fingerprints.

57. They gave me a document and asked me to sign it. The document was in English. There was a Korean translator on the telephone, but no one explained to me what the document actually was or what it meant. I did not understand it, so I did not sign it. I still do not know what it was.

58. They then took me to a different room. That room was really cold. I stayed there for about ten or eleven hours.

59. At first, I was just sitting on the floor. At about 8:30 p.m. they gave me a mattress and a plastic blanket.

60. During all of that time, no one told me that I could call a lawyer. No one told me that I could call the Korean consulate. No one told me that I could ask a judge to let me out on bond. I was not allowed to call anyone.

61. At about 11:00 p.m., they took me from downtown Los Angeles to Adelanto. I arrived at Adelanto at about 4:00 a.m. on August 21, 2026.

62. Shortly after I arrived at Adelanto on the morning of August 21, 2026, I spoke with a nurse and informed her that I have one daughter. About seven days later, I met with a doctor, who went over my medical history, and I again stated that I have one daughter. I do not recall that any ICE officer asked me whether I have children, whether I am married, or whether I have a spouse. To my knowledge, I was never asked those questions by ICE. Thus, I do not know why Form I-213 notes that I have no children.

63. The only paper I ever signed was at Adelanto, and it was about my being detained there. No one at Adelanto showed me any other document or explained anything else to me.

64. At no time on August 20 or August 21, 2026, or at any time since, has any officer told me that I had the right to ask an Immigration Judge to review my custody. I learned that I could ask for bond only after my attorneys got in touch with me.

65. On September 15, 2026, there was a hearing about whether I could be released on bond. I appeared by video from inside the Adelanto facility.

66. I did not testify at the hearing. No one asked me any questions, and I did not say anything about myself, about my apartment, about Benjamin, or about my asylum case.

67. I do not speak or read English. No Korean interpreter interpreted the hearing for me, and I was not able to follow what was said during it. Following the hearing, Benjamin spoke with my attorney and learned that my bond had been denied, which he then relayed to me. On September 17, 2026, I spoke with attorney Su Kim, who further explained the decision to me.

68. I have not received any medication for my depression since I was taken into custody on August 20, 2026.

69. On September 1, 2026 and September 11, 2026, I submitted written forms asking for my depression medication. The staff told me they would make an appointment for me with a doctor. As of today, I have not heard anything further, and I have not seen a doctor.

70. I cannot sleep. I asked for a sleeping pill, and the staff told me they cannot give sleeping pills.

71. I have had ongoing stomach problems and constipation. I asked for medication and received it about three days later, but it has not helped.

72. The unit is very cold. I asked for an extra set of clothing on August 28, 2026, and I did not receive it until September 8, 2026. I wear all of my clothing at night so that

I can stay warm. I have not been able to wash my sweatshirt during the day because it takes too long to dry, and I need it at night. Other detainees fill plastic bottles with hot water and sleep with them to stay warm.

73. I have been given one towel. It is very dirty and stained. I have to wash it and use it again, over and over.

74. On the evening of September 13, 2026, after I took a shower, I went to the restroom to wash my feet with warm water because my feet get cold. Another detainee, a woman I know as Goena, reported me to an officer.

75. The officer called out my bed number loudly, in front of more than one hundred people, and told me to go clean the restroom. I asked the officer why I could not wash my feet, since the restroom is where everyone brushes their teeth, washes their face, washes socks and underwear, and washes dishes. The officer said that I could not understand English, that I had psychological problems, and that I needed to take medication. I went back to the restroom and cleaned the sink area with soap.

76. I grew up in North Korea, where the conditions were very bad, so it is hard for me to complain about anything here. But I am not well. I am not sleeping, I am not receiving my medication, and being spoken to that way in front of everyone was humiliating.

77. I want to pursue my asylum case.

78. I did not run from immigration authorities. I went to the appointment the government told me to go to, on the day and at the hour it told me to be there, because I wanted my asylum case to go forward. But I was arrested and detained when I appeared for my biometrics appointment.

79. My attorneys told me that Form I-213 records that I was offered and declined incentivized voluntary departure. I do not recall being offered voluntary departure or being asked whether I wished to accept it. I want to stay and present my case.

80. If this Court releases me, I will live wherever this Court directs, either at my own apartment at 918 S. Oxford Avenue, PH 4, Los Angeles, California 90006, or with Benjamin Moon at his home at 3850 W. Nevso Drive, Unit 405, Las Vegas, Nevada 89103. Benjamin has agreed to serve as my third-party custodian at either address.

81. I promise this Court that I will attend every hearing in my case. I will go to every appointment ICE gives me. I will file my Form EOIR-33 within five days and I will tell the Court and ICE any time my address changes. I will follow every condition this Court sets.

82. My apartment, my friends, my church, and my asylum case are all in Los Angeles. I have nowhere else in the United States to go, and no family here other than the people I have described.

I am currently detained at the Adelanto ICE Processing Center and am unable to sign and verify this declaration in person because in-person legal visits could not be arranged prior to filing.

All facts stated herein are within my personal knowledge, except as to those matters stated on information and belief, the sources of which are identified in the relevant paragraphs, and as to those matters, I believe them to be true. I have authorized the filing of this declaration and the petition on my behalf.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 17, 2026, at Adelanto, California.

/s/ Eunha Oh
EUNHA OH, Petitioner

## CERTIFICATE OF TRANSLATION

I, Su Kim, declare as follows:

1. I am an attorney licensed to practice law in the State of California (CA SBN 265648). I am an attorney with the Law Offices of Gita B. Kapur & Associates. I am not counsel of record in this action; Gita B. Kapur, Esq., appears as counsel of record for Petitioner.
2. I am fluent in both the English and Korean languages and am competent to translate between them.
3. On September 17, 2026, I read the foregoing Declaration of Eunha Oh to Ms. Oh in its entirety, paragraph by paragraph, translating each paragraph contemporaneously into the Korean language as I read it. Ms. Oh confirmed that she understood each paragraph and that its contents are true and correct to the best of her knowledge, and she explicitly authorized the filing of the petition and declaration on her behalf.
4. Ms. Oh was unable to execute a wet signature prior to filing due to restrictions on immediate in-person legal visitation at the Adelanto ICE Processing Center.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 17, 2026, at Los Angeles, California.

Su Kim, Esq. (CA SBN 265648)