# INDEX OF EXHIBITS


**Ex. A** South Korean Passport – Page 1

**Ex. B** Certificate of North Korean Defector Registration with Certified Translation – Pages 2-3

**Ex. C** DHS Submission of Documents (FBI Identity History Summary) – Pages 5-7

**Ex. D** DHS Submission of Documents (Form I-213 and Form I-831 continuation pages) – Pages 8-11

**Ex. E** Form I-797C, Notice of Action (I-589 receipt), dated July 23, 2026 (Receipt No. LGL2690070268) – Page 12

**Ex. F** Form I-797C, ASC Appointment Notice, dated July 28, 2026 (appointment 8/20/2026, 11:00 a.m., 3747 S. La Brea Ave., Los Angeles, CA 90016) – Page 13

**Ex. G** Order of the Immigration Judge (custody redetermination denied), dated September 15, 2026 – Pages 14-15

**Ex. H** Declaration of Robert Genovese – Pages 16-21

**Ex. I** EOIR Automated Case Information – Pages 22-24

**Ex. J** Notice to Appear, Form I-862, dated August 20, 2026 – Pages 25-27

**Ex. K** Respondent's Motion for Bond Determination and Proposed Order (refiled Sept. 3, 2026), with evidentiary submission – Pages 28-135

# EXHIBIT A

이 여권을 소지한 대한민국 국민이 아무 지장 없이 통행할 수 있도록 하여 주시고 필요한 모든 편의와 보호를 베풀어 주실 것을 관계자 여러분께 요청합니다.

대한민국 외교부장관

The Ministry of Foreign Affairs of the Republic of Korea requests all whom it may concern to permit the bearer, a national of the Republic of Korea, to pass freely without delay or hindrance and to provide every possible assistance and protection in case of need.



여권 소지인의 서명
Signature of bearer eunha oh

여권 PASSPORT

대한민국 REPUBLIC OF KOREA



종류/Type: PM
국가코드/Country code: KOR
여권번호/Passport No.: M403S8898
성/Surname: OH
이름/Given names: EUNHA
한글 성명: 오은하
생년월일/Date of birth: 06 4월/APR 1987
성별/Sex: F
국적/Nationality: REPUBLIC OF KOREA
발행 관청/Authority: MINISTRY OF FOREIGN AFFAIRS
발급일/Date of issue: 20 9월/SEP 2024
기간만료일/Date of expiry: 20 9월/SEP 2034



PMKOROH<<EUNHA<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<
M403S88980KOR8704061F3409202944698 9V20558266

01

# EXHIBIT B

Timestamp Verified
Original
2025-11-13
04:47:22 [partially illegible]
Government Time Stamp Authority

Document Verification Number: 1762-9768-4741-7084

No. 20251113-CA-005

## Certificate of North Korean Defector Registration

| | | | | |
|---|---|---|---|---|
| Personal Information | Name | Oh, Eunha | Gender | Female |
| | Date of Birth | April 6, 1987 | Date of Entry | April 9, 2015 |
| | | | Date of Protection Decision | July 21, 2015 |

This is to certify that the above-mentioned person is registered as a North Korean defector pursuant to the provision of Article 8 of the North Korean Defectors Protection and Settlement Support Act.

November 13, 2025

Minister of Unification [stamped]

*This certificate was issued online, and its authenticity can be verified through the Internet-issued Document Verification menu on Government24 (gov.kr) (up to 90 days from the date of issuance). Additionally, authenticity can be verified using the barcode at the bottom of the document (via the Government24 app or a document verification program for scanners).

문서확인번호 : 1762-9768-4741-7084

제 20251113-CA-005 호

# 북한이탈주민등록확인서

| | | | | |
|---|---|---|---|---|
| 인적 사항 | 성 명 | 오은하 | 성 별 | 여 |
| | 생년월일 | 1987년 04월 06일 | 입 국 일 | 2015년 04월 09일 |
| | | | 보호결정일 | 2015년 07월 21일 |

상기인은 「북한이탈주민의 보호 및 정착지원에 관한 법률」 제8조의 규정에 의거 북한이탈주민으로 등록된 자임을 확인합니다.

2025 년 11 월 13 일

통일부장관

◆ 본 증명서는 인터넷으로 발급되었으며, 정부24(gov.kr)의 인터넷발급문서진위확인 메뉴를 통해 위·변조 여부를 확인할 수 있습니다. (발급일로부터 90일까지) 또한 문서 하단의 바코드로도 진위확인(정부24 앱 또는 스캐너용 문서확인 프로그램)을 하실 수 있습니다.

# CERTIFICATE OF TRANSLATION

I, Su Kim, hereby certify that I am competent to translate from the Korean language into the English language, and that the attached document is an accurate and complete translation of the original document titled "Certificate of North Korean Defector Registration."

Su Kim
617 S. Olive St., Suite 1000
Los Angeles, CA 90014

# EXHIBIT C

THIS INTERSTATE IDENTIFICATION INDEX RESPONSE IS THE RESUL
T OF YOUR
RECORD REQUEST FOR FBI/A9C94RJKE. THE FOLLOWING WILL RESPO
ND TO YOUR
AGENCY:
[redacted]
END
CR.WVFBINF00
00:00 09/15/2026 45653
00:00 09/15/2026 13187 VTICE1967
*WWWXDSPCX8
TXT
HDR/2L01WWWXDSPCX8
ATN/KMKURIAN
********************** CRIMINAL HISTORY RECORD *********
**************

**************************** Introduction **************
**************

This rap sheet was produced in response to the following r
equest:

[redacted]

| | |
|---|---|
| Request Id | WWWXDSPCX8 |
| Purpose Code | C |
| Attention | KMKURIAN |

The information in this rap sheet is subject to the follow
ing caveats:

This record is based only on the FBI number in your reques
t-UCN:
A9C94RJKE Because additions or deletions may be made at an
y time, a new
copy should be requested when needed for subsequent use.(U
S;
2026-09-15)

All entries contained in this FBI record are based on fing
erprint
comparisons and pertain to the same individual.(US; 2026-0
9-15)

The use of this record is regulated by law. It is provided
for official
use only and may be used only for the purpose requested.(U
S;
2026-09-15)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - -
* FEDERAL DEOXYRIBONUCLEIC ACID (DNA) INDICATOR * * * * DN
A NOT IN
CODIS - COLLECT DNA * * * - - - - - - - - - - - - - - - -
- - - - - - -
- - - - - - - - - - - - - -(US; 2026-09-15)

**************

Subject Name(s)

OH, EUNHA

Subject Description

FBI Number
[redacted]

Miscellaneous Numbers
208839580 AR

Sex Race
Female Asian

Height Weight Date of Bi
rth
4'11" 110 1987-04-06

Hair Color Eye Color Fingerprin
t Pattern
Brown Brown WUWUWUWUWU
WUWUWUWUWU (Other)

Place of Birth Citizenship
North Korea South Korea

Fingerprint Images
(No Fingerprint Image Transmitted
Comment:)
Fingerprint Image Available FBI-CJIS DIV-CLRKSBG CLARKS
BURG WVFBINF00
Capture Date 2026-08-20
(No Fingerprint Image Transmitted
Comment:BSI: 40970757505)

Photo Images
Photo Image Available FBI-CJIS DIV-CLRKSBG CLARKSB
URG WVFBINF00
Available Image Other
Capture Date 2026-08-20
(No Photo Image Transmitted
Comment:BSI: 40970757504)

************************* CRIMINAL HISTORY ************
**************

============================== Cycle 001 ================
==============
Earliest Event Date 2026-08-20
---------------------------------------------------------
--------------
Arrest Date 2026-08-20
Arrest Case Number 11181518229
Arresting Agency CAICE2400 US DHS ERO LOS ANGELES
[redacted] Name OH,EUNHA

Uploaded on: 09/15/2026 at 12:32:53 AM (Pacific Daylight Time) Base City: LOS

Charge Literal 212A6AI ALIEN PRESENT WITHOUT ADMI
SSION OR
PAROLE - (PWAS)
Severity Unknown

************************ INDEX OF AGENCIES ************
**************

| | |
|---|---|
| Agency | US DHS ERO; CAICE2400; |
| Agency Telephone | 213 830-4925 |
| Agency Email Address | |
| Address | 300N LOS ANGELES ST B 118<br>LOS ANGELES, CA 90012 |

* * * END OF RECORD * * *

# EXHIBIT D

**U.S. Department of Homeland Security**

# Record of Deportable/Inadmissible Alien

Family Name (CAPS): OH, EUNHA
First:
Middle:

Sex: F | Hair: BRO | Eyes: BRO | Cmplxn: LBR

Country of Citizenship:
Passport Number and Country of Issue:
File Number: LOS2608001811 / 208 839 580

Height: 59 | Weight: 110 | Occupation: UNR

U.S. Address:

Scars and Marks:

Date, Place, Time, and Manner of Last Entry:
Passenger Boarded at:

F.B.I. Number: [redacted]
☒ Single ☐ Divorced ☐ Married ☐ Widower ☐ Separated

Number, Street, City, Province (State) and Country of Permanent Residence:

Method of Location/Apprehension: NCA

Date of Birth: 04/06/1987 Age: 39
Date of Action: 08/20/2026
Location Code: LOS/LOS

At/Near:
Date/Hour: 08/20/2026 11:20

City, Province (State) and Country of Birth:
AR ☐ Form: (Type and No.) Lifted ☐ Not Lifted ☐

By:

NIV Issuing Post and NIV Number:
Social Security Account Name:

Status at Entry:
Status When Found:

Date Visa Issued:
Social Security Number:

Length of Time Illegally in U.S.:

Immigration Record:
Criminal Record:

Name, Address, and Nationality of Spouse (Maiden Name, if Appropriate): LEE, SEUNG CHUL NATIONALITY: NORTH KOREA

Number and Nationality of Minor Children: None

Father's Name, Nationality, and Address, if Known: OH, SEONG NAM NATIONALITY: NORTH KOREA

Mother's Present and Maiden Names, Nationality, and Address, if Known: JU, CHUN SIL NATIONALITY: NORTH KOREA

Monies Due/Property in U.S. Not in Immediate Possession: None Claimed
Fingerprinted? ☐ Yes ☐ No
Systems Checks: See Narrative
Charge Code Words(s): See Narrative

Name and Address of (Last)(Current) U.S. Employer:
Type of Employment:
Salary: Hr
Employed from/to:

Narrative (Outline particulars under which alien was located/apprehended. Include details not shown above regarding time, place and manner of last entry, attempted entry, or any other entry, and elements which establish administrative and/or criminal violation. Indicate means and route of travel to interior.)

[redacted]

Left Index fingerprint



[redacted]

[redacted]

FAMILY INFORMATION
-------------------
Father:OH, SEONG NAM is a citizen of NORTH KOREA.
Mother:JU, CHUN SIL is a citizen of NORTH KOREA.
Spouse:LEE, SEUNG CHUL is a citizen of NORTH KOREA.
Child:Subject does not have children or dependents.

IMMIGRATION RECORD
-------------------
History was expected but not provided ...(CONTINUED ON I-831)

J15507 DANGIOLILLO
Deportation Officer

Alien has been advised of communication privileges ________ (Date/Initials)
(Signature and Title of Immigration Officer)

Distribution:

Received: (Subject and Documents) (Report of Interview)

Officer: J15507 DANGIOLILLO

on: August 20, 2026 (time)

Disposition:

Examining Officer: MENDOZA-MAZARIEGOS, 9307

Form I-213 (Rev. 08/01/07)

U.S. Department of Homeland Security | Continuation Page for Form I-213

| Alien's Name | File Number | Date |
|---|---|---|
| OH, EUNHA | [redacted] | 08/20/2026 |

SUBJECT HEALTH STATUS
----------------------
The subject claims good health. But takes anti-depression meds

CURRENT ADMINISTRATIVE CHARGES
-------------------------------
08/20/2026 - 212a6Ai - ALIEN PRESENT WITHOUT ADMISSION OR PAROLE - (PWAs)

RECORDS CHECKED
---------------
[redacted]

ARRESTING AGENTS
-----------------
I 21577 GUTIERREZ JRM 12295 VILLAGRANAC. 9834 GUTIERREZLEO ALMADAJ 3572 ESPINOZAS 05703 AGUILAR

ARRESTED AT/NEAR
-----------------
3747 LA BREA AVE, LOS ANGELES, CALIFORNIA, UNITED STATES

RECORD OF DEPORTABLE/EXCLUDABLE ALIEN:
--------------------------------------
Name: OH, Eunha
A 208 839 580

FBI: A9C94RJKE

DOB: 04/06/1987

COB: North Korea

DNA: F5171763

ENCOUTER IMFORMATION:

On August 20, 2026, Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) Los Angeles Team 1, along with the Application Support Center (ASC), conducted an enforcement action operation at 3747 South La Brea Avenue, Los Angeles CA 90016, where OH, Eunha, A# 208 839 580 was scheduled for an interview related to a pending Asylum Application, Form I-589 Application with United States Citizenship and Immigration Services (USCIS). Records checks indicated OH is a citizen of South Korea and national of North Korea by virtue of birth. OH is not in possession of a valid immigration document allowing her to be or remain in the United States legally.
At approximately 1100 hours, a female individual was observed entering the office building. Based on available photographs and physical descriptions, the individual was believed to be OH. After entering the building and completing the security check-in process, OH was seated in the common waiting area for her appointment.

At approximately 1110 hours, OH was escorted to a private room by ASC Officers, where ERO Officers displaying approved ICE badges were staged for the apprehension.

| Signature | Title |
|---|---|
| | Deportation Officer |

2 4

U.S. Department of Homeland Security

Continuation Page for Form I-213

| Alien's Name | File Number | Date |
|---|---|---|
| OH, EUNHA | [redacted] | 08/20/2026 |

ERO Officers positively identified OH and questioned her regarding her immigration status. OH voluntarily stated that she was born in North Korea and is a citizen of South Korea. At approximately 1120 hours, ERO Officers placed OH under arrest and transported her to the Los Angeles Field Office for processing

CRIMINAL/ IMMIGRATION HISTORY:

OH is not a citizen or national of the United States. OH is a citizen of South Korea and national of North Korea by virtue of birth.

On November 14, 2016, OH was seeking admission as a WB/WT visitor for pleasure. OH entered through the Los Angeles International Airport port of entry in California. OH was denied admission by CBP and found to be inadmissible in accordance with section 212(a)(2)(D)(i) and 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (INA). OH also admitted under oath of engaging in prostitution within the past 10 years as of November 14, 2016.

On September 22, 2025, OH entered POE at San Diego. OH entered the United States without being admitted or paroled by US immigration Officers.

On July 10, 2026, OH filed an Asylum Application, Form I-589 with United States Citizenship and Immigration Services (USCIS)

OH has no criminal history.

On August 20, 2026, OH'S biometrics were taken.

On August 20, 2026, ERO Los Angeles arrested OH in the City of Los Angeles, CA and processed her as a Notice to Appear, Form I-862 pursuant to section 212(a)(6)(A)(i) of the INA.

OH will remain in ICE Custody pending a hearing with an Immigration Judge.

CHARGES OF REMOVABILITY:

OH makes no claim/appears to have no claim to USC or LPR status and is amenable to removal under section 212(a)(6)(A)(i) of the Immigration and Nationality Act (INA), as amended.

MITIGATING FACTORS:

OH claims no fear if returned to South Korea.

OH has no known personal or family circumstances precluding appropriate law enforcement action.

OH claims to have no medical issues.

OH has no known ties to the community precluding appropriate law enforcement action.

OH has no known evidence of rehabilitation precluding appropriate law enforcement action.

OH has no evidence of rehabilitation that was available, or made available to ICE.

OH was offered incentivized voluntary departure and OH refused.

| Signature | Title |
|---|---|
| | Deportation Officer |

3 4

U.S. Department of Homeland Security

Continuation Page for Form I-213

| Alien's Name | File Number | Date |
|---|---|---|
| OH, EUNHA | [redacted] | 08/20/2026 |

DISPOSITION:

ERO Los Angeles processed OH as a Notice to Appear I-862 pursuant to section 212 of the INA. OH will remain in ERO Los Angeles custody pending HER removal to South Korea

OTHER IDENTIFYING NUMBERS
-------------------------
ALIEN-208839580

| Signature | Title |
|---|---|
| | Deportation Officer |

4 4

# EXHIBIT E

Department of Homeland Security
U.S. Citizenship and Immigration Services

**Form I-797C, Notice of Action**

**THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.**

| NOTICE TYPE | | NOTICE DATE |
|---|---|---|
| Receipt | | 07/23/2026 |
| CASE TYPE | | USCIS ALIEN NUMBER |
| I589 - APPLICATION FOR ASYLUM AND FOR WITHHOLDING OF REMOVAL | | A208 839 580 |
| RECEIPT NUMBER | RECEIVED DATE | PAGE |
| LGL2690070268 | 07/10/2026 | 1 of 1 |
| | | DATE OF BIRTH |

EUNHA OH
621 S WESTERN AVE
G02
LOS ANGELES CA 90005

PAYMENT INFORMATION:
Application/Petition Fee: $100.00
Total Amount Received: $100.00
Total Balance Due: $.00

*** ACKNOWLEDGEMENT OF RECEIPT ***

Your complete Form I-589, Application for Asylum and for Withholding of Removal, was received and is pending as of 07/10/2026.

Having a pending asylum application with USCIS does not preclude the Department of Homeland Security (DHS) from placing you into removal proceedings. If you wish to leave the United States while your asylum application is pending, you must obtain advance parole or, for Temporary Protected Status (TPS) recipients, approval of Form I-512T, Authorization for Travel by a Noncitizen to the United States (sometimes referred to as MTINA TPS travel authorization), from USCIS or you may be considered to have abandoned your asylum application. You must report a change of address to USCIS within 10 days of moving by following the instructions on the How to Change Your Address webpage (https://www.uscis.gov/addresschange). Changing your address with the U.S. Postal Service will not change your address with USCIS.

BIOMETRICS APPOINTMENT AND ASYLUM INTERVIEW NOTICES:

You will receive a notice informing you when you and those listed on your application as a spouse or child dependent must appear at an Application Support Center (ASC) for biometrics collection. You will also receive a notice informing you when you and those listed on your application as a spouse or child dependent must appear for an asylum interview. Those notices will contain instructions for what to bring to your ASC appointment and what to bring to your asylum interview.

**WARNING: Failure to appear at the ASC for biometrics collection or for your asylum interview may affect your eligibility for employment authorization and may also result in the dismissal of your asylum application or referral of your asylum application to an immigration judge.**

ANNUAL ASYLUM FEE:

If your asylum application remains pending for 365 days or more, you must pay the Annual Asylum Fee as of the one-year anniversary of your filing and each year thereafter that your asylum application remains pending on such day of the calendar year. For more information, reference https://www.uscis.gov/i-589.

EMPLOYMENT AUTHORIZATION:

You may file a Form I-765, Application for Employment Authorization, based on your pending asylum application 150 days after you filed your asylum application. You are not eligible to receive an Employment Authorization Document (EAD) until your asylum application has been pending for at least another 30 days, for a total of 180 days. 8 CFR 208.7(a)(1). The 150-day waiting period and the 180-day eligibility period, commonly referred to as the 180-Day Asylum EAD Clock, do not include delays that you request or cause while your asylum application is pending with an asylum office or with the Immigration Court. 8 CFR 208.7(a)(2).

Delays requested or caused by the applicant may include:

- A request to transfer a case to a new asylum office or interview location, including when the transfer is based on your change of address;
- A request to reschedule an interview for a later date;
- Failure to appear at an interview or biometrics appointment;
- Failure to provide a competent interpreter at an interview (if required);
- A request to provide additional evidence at or after an interview;
- The submission of large volumes of evidence immediately before an interview that requires a reschedule; and
- Failure to receive and acknowledge an asylum decision in person (if required).

Applicant(s):

| Alien Number | Name |
|---|---|
| A208 839 580 | OH, EUNHA |

Please see the additional information on the back. You will be notified separately about any other cases you filed.

**USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.**

Los Angeles Asylum Office
U.S. CITIZENSHIP & IMMIGRATION SVC
P.O. Box 2003
Tustin CA 92781-2003
**USCIS Contact Center: www.uscis.gov/contactcenter**

*If this is an interview or biometrics appointment notice, please see the back of this notice for important information.*



Form I-797C 10/13/21

# EXHIBIT F

Department of Homeland Security
U.S. Citizenship and Immigration Services

**Form I-797C, Notice of Action**

**THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.**

| ASC Appointment Notice | APPLICATION/PETITION/REQUEST NUMBER<br>LGL2070070268 | | | NOTICE DATE<br>07/28/2026 |
|---|---|---|---|---|
| CASE TYPE<br>I589 - APPLICATION FOR ASYLUM AND FOR WITHHOLDING OF REMOVAL | | ACCOUNT NUMBER | USCIS A#<br>A208 839 580 | CODE<br>3 |

EUNHA OH
621 S WESTERN AVE
G02
LOS ANGELES CA 90005

**PLEASE READ THIS ENTIRE NOTICE CAREFULLY.** To process your application, petition, or request, the U.S. Citizenship & Immigration Services (USCIS) must collect your biometrics. Please appear at the below Application Support Center (ASC) at the date and time specified.

**WARNING:** Unless USCIS excuses you based on good cause, failure to appear at this biometrics appointment will result in an applicant-caused delay that will impact your eligibility for employment authorization based on your pending asylum application. If you fail to appear at this appointment as scheduled, USCIS may: (1) dismiss your asylum application, if you are in lawful immigration status or paroled; or (2) refer your application to an immigration judge, if you are not in lawful immigration status or paroled. If you fail to appear at this appointment as scheduled, and you are currently in removal proceedings, an immigration judge may deem your asylum application abandoned.

| APPLICATION SUPPORT CENTER | DATE AND TIME OF APPOINTMENT |
|---|---|
| USCIS LA BREA<br>3747 South LaBrea Ave<br>Los Angeles CA 90016 | 08/20/2026<br>11:00AM |

**WHEN YOU APPEAR AT THE ASC FOR BIOMETRICS SUBMISSION, YOU MUST BRING:**

1. **THIS APPOINTMENT NOTICE,** and
2. **PHOTO IDENTIFICATION** (e.g. passport, valid driver's license, national ID, military ID, State-issued photo ID, or USCIS-issued photo ID). If you do not have photo identification, please expect a delay.

Only those necessary to assist with transportation or completion of the biometrics worksheet should accompany you to your ASC appointment. If you have open wounds, bandages, or casts when you appear for biometrics submission, USCIS may reschedule your ASC appointment if we determine your injuries may interfere with your biometrics submission. Please do not visit a USCIS office if you are sick or feel symptoms of being sick. Follow the instructions on this notice to reschedule your appointment.

You may bring cell phones or electronic devices, but they must be turned off during biometrics collection. No one may photograph or record at an ASC.

For more information regarding your ASC appointment, visit https://www.uscis.gov/forms/filing-guidance/preparing-for-your-biometric-services-appointment.

If you have questions regarding this notice, please call the USCIS Contact Center at 1-800-375-5283 (TTY 800-767-1833).

**NOTE:** If an ASC closes due to inclement weather or unforeseen circumstances, USCIS will automatically reschedule your ASC appointment for the next available date and time. For the latest information on the status of an office, visit https://www.uscis.gov/about-us/uscis-office-closings. Please check this page on the day of your ASC appointment. If USCIS reschedules your ASC appointment, you will receive a new ASC appointment notice.

You must update your address within 10 days if you move. For instructions, visit https://www.uscis.gov/addresschange. If you are in removal proceedings, you must also notify the Executive Office for Immigration Review (EOIR or Immigration Court) within five working days of any change of address or telephone number by filing a completed Form EOIR-33, Alien's Change of Address/Phone Number Form/Immigration Court. For instructions, visit https://www.justice.gov/eoir/form-eoir-33-eoir-immigration-court-listing.

**WARNING:** Failure to update your mailing address with USCIS, and, if applicable, EOIR may result in dismissal of your asylum application, referral of your asylum application to an immigration judge, or if you are already in removal proceedings, an entry of a removal order in your absence if you fail to appear at a hearing before an immigration judge.

USCIS may use your biometrics to obtain the criminal history records of the Federal Bureau of Investigation (FBI), for identity verification, to determine eligibility, to create immigration documents (for example, Permanent Resident Card, Employment Authorization Document), or any purpose authorized by the Immigration and Nationality Act. You may obtain a copy of your own FBI record using the procedures outlined at 28 CFR 16.30-16.34. For more information, please visit www.fbi.gov/services/cjis/compact-council/guiding-principles-noncriminal-justice-applicants-privacy-rights. For information regarding how the FBI will use your fingerprints, please visit www.fbi.gov/services/cjis/compact-council/privacy-act-statement.

If you cannot attend your scheduled appointment, you may request to reschedule at https://my.uscis.gov/account/biometrics/overview or by calling the USCIS Contact Center at 1-800-375-5283 (TTY 800-767-1833). You must make your request before the date and time of the original appointment, and you must establish good cause for rescheduling. If you fail to make a request before your scheduled appointment or fail to establish good cause, and you do not appear at your appointment, USCIS may consider your application, petition, or request abandoned and, as a result, it may be denied. For more information about rescheduling, see https://www.uscis.gov/forms/filing-guidance/preparing-for-your-biometric-services-appointment.

If you cannot leave your home/hospital due to a serious ongoing medical condition, you may request a mobile biometrics appointment by following the instructions on the back of this notice under "Notice for People with Disabilities," or by visiting uscis.gov/accommodationsinfo.

For questions about this notice call 1-800-375-5283. For questions about your application, contact the Asylum Office or Immigration Court with jurisdiction over your case.

If this is an interview or biometrics appointment notice, please see the back of this notice for important information.



Form I-797C 10/13/21

# EXHIBIT G

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**ADELANTO IMMIGRATION COURT**

Respondent Name:
OH, EUNHA

To:
kapur, gita beri
617 S. Olive St., Suite 1000
Los Angeles, CA 90014

A-Number:
208-839-580
Riders:
In Custody Redetermination Proceedings

Date:
09/15/2026

## ORDER OF THE IMMIGRATION JUDGE

The respondent requested a custody redetermination pursuant to 8 C.F.R. § 1236. After full consideration of the evidence presented, the respondent's request for a change in custody status is hereby ordered:

☑ Denied, because
flight risk.

☐ Granted. It is ordered that Respondent be:
- ☐ released from custody on his own recognizance.
- ☐ released from custody under bond of $
- ☐ other:

☐ Other:

Immigration Judge: Brent, Jonathan 09/15/2026

| | | | | | |
|---|---|---|---|---|---|
| Appeal: | Department of Homeland Security: | ☑ | waived | ☐ | reserved |
| | Respondent: | ☐ | waived | ☑ | reserved |

Appeal Due: 10/15/2026

**Certificate of Service**

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Alien | [ ] Alien c/o custodial officer | [ E ] Alien atty/rep. | [ E ] DHS

Respondent Name : OH, EUNHA | A-Number : 208-839-580

Riders:

Date: 09/15/2026 By: Rangel, Kimberly, Court Staff

# EXHIBIT H

DECLARATION OF ROBERT GENOVESE, ESQ

I, ROBERT GENOVESE, declare as follows:

1. I am an attorney licensed to practice law in the State of California (CA SBN 321598). I am an attorney with the Law Offices of Gita B. Kapur & Associates, the firm representing Petitioner Eunha Oh. I make this declaration from my own personal knowledge, and if called as a witness I could and would testify competently to the matters stated here.

2. I represented Ms. Oh at her custody redetermination hearing before Immigration Judge Jonathan Brent of the Adelanto Immigration Court on September 15, 2026. I was present for the entire hearing.

3. The statements in this declaration are based on my personal knowledge, on my contemporaneous handwritten notes taken during the hearing, and on my recollection. I took those notes in real time as the hearing proceeded and have retained them. Where I quote the court or opposing counsel in this declaration, I quote from those notes; where I describe the substance of a ruling without quotation, I do so from recollection informed by those notes.

4. No official transcript of the September 15, 2026 hearing has been prepared or made available to Petitioner as of the date of this declaration. I will request the Digital Audio Recording of the hearing from the Adelanto Immigration Court and will supplement this declaration, and the record, promptly upon receipt. I submit this declaration to place before the Court an account of what occurred at that hearing.

5. The hearing was held on September 15, 2026 before Judge Brent. I appeared by Webex. Ms. Oh appeared by video from inside the Adelanto ICE Processing Center. She was not physically present in the courtroom.

6. At the outset of the hearing, the court asked whether interpretation was waived for purposes of that hearing only. I waived interpretation for that hearing. Ms. Oh does not speak or read English. No Korean interpreter interpreted the proceedings to her. She gave no testimony, was asked no questions, and did not address the court.

7. Ms. Oh did not testify. No witness was examined. The matter proceeded on the parties' written submissions and on argument of counsel.

8. The Department's evidentiary submission — the Form I-213 with its continuation pages and the FBI Identity History Summary — was filed at 12:32 a.m. on the

morning of the hearing. The Department's filing bears the ECAS stamp "Uploaded on: 09/15/2026 at 12:32:53 AM (Pacific Daylight Time)." I received it on the morning of the hearing. It was the first time I had seen the Form I-213, which contained the Department's assertion regarding a November 14, 2016 encounter at Los Angeles International Airport.

9. I argued that Ms. Oh's warrantless arrest violated INA § 287(a)(2), 8 U.S.C. § 1357(a)(2), and 8 C.F.R. § 287.8(c)(2), because those provisions permit a warrantless arrest only where the officer has reason to believe the person is likely to escape before a warrant can be obtained.

10. I argued that the Form I-213 the Department had submitted described a planned enforcement operation conducted at a USCIS Application Support Center at an appointment Ms. Oh had been directed to attend; that the form recorded no warrant of arrest; and that it recorded no basis for believing that Ms. Oh was likely to escape before a warrant could be obtained. I further identified specific features of the Form I-213: that the "Forms (Type and No.)" field bore no notation of a Form I-200; that the narrative contained no notation that Ms. Oh was likely to escape; that the method of location and apprehension was coded "NCA"; that the form bore no signature of the arresting officer; that the section captioned "Alien has been advised of communication privileges" was not marked; and that several fields were left blank. Each of those features appears on the face of the Form I-213 at EOIR 4 of the Department's Submission of Documents.

11. I stated on the record that I had seen no Form I-200 warrant of arrest and no Form I-286 Notice of Custody Determination in this case, and that neither appeared in ECAS. I asked whether any such document existed. The Department did not produce a Form I-200 or a Form I-286 at the hearing, and neither has been produced since.

12. I have searched the ECAS record in this matter for a Form I-200, Warrant for Arrest of Alien, and a Form I-286, Notice of Custody Determination. I conducted that search on September 17, 2026 and again on September 18, 2026. Neither document appears in the ECAS record. I have also reviewed the complete file transmitted to this office and every document that has been served on Ms. Oh or on counsel, and neither document appears in either. To my knowledge, no Form I-200 and no Form I-286 has been issued, served, or produced in this matter at any time.

13. On August 31, 2026, this office filed a Motion for Bond Determination with the Adelanto Immigration Court. On September 3, 2026, the court rejected that filing on the ground that no Notice of Entry of Appearance had been accepted and that the Form EOIR-28 submitted with the motion was incomplete. I corrected the Form EOIR-28 and refiled the motion the same day, September 3, 2026, together with a ninety-two-page evidentiary submission bearing the ECAS stamp "Uploaded on: 09/03/2026 at 04:14:27 PM."

14. I argued that no custody determination had been made or communicated within forty-eight hours of Ms. Oh's arrest, as 8 C.F.R. § 287.3(d) contemplates. I also asked the court to give the Form I-213 limited weight because it contained internally contradictory statements, including that Ms. Oh claimed no medical issues while the same form recorded that she takes antidepressant medication, and that she claimed no fear of return to South Korea although she had affirmatively filed a Form I-589 and was apprehended at a biometrics appointment in support of it.

15. I argued that the arrest and the ensuing detention violated the Fourth and Fifth Amendments, and that because the detention was unlawful in its inception the burden of justifying continued custody should rest on the Department rather than on Ms. Oh.

16. I argued that the court should consider Ms. Oh's financial circumstances and the availability of alternatives to detention, citing *Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017). I stated that Ms. Oh had not been afforded any opportunity for alternatives to detention.

17. I cited *Perez Cruz v. Barr*, 926 F.3d 1128 (9th Cir. 2019), in support of the proposition that an unlawful warrantless immigration arrest has consequences for the evidence obtained through it. When the court asked whether that case held that bond could be granted as a remedy for a constitutional violation, I answered that it did not, and I stated that I raised the circumstances of the apprehension in order to preserve the issue for the record.

18. The Department objected to portions of Ms. Oh's evidentiary submission: to the declarations of her pastor and her friend, on the ground that the declarants were unavailable for cross-examination, and to the photographs of Ms. Oh with friends, on the grounds of lack of foundation and authentication. The court admitted the exhibit over those objections, stating that the objection went to the weight the

evidence should be given rather than to its admissibility. Counsel for the Department did not concede the facts underlying my argument. The Department argued that even assuming the facts were as I had described them, the absence of a warrant was not an egregious violation and would have no bearing on the custody decision.

19. Judge Brent asked me more than once to identify authority establishing that a constitutional violation in the course of an arrest bears on a custody redetermination, or that it would shift the burden to the Department. I told the court that I raised the circumstances of Ms. Oh's apprehension in order to preserve the issue for the record. When the court asked whether I was mounting an as-applied challenge to the constitutionality of INA § 236, I answered that I was not.

20. I understood the court's question to ask whether I was challenging the constitutionality of the statute itself. I answered: "No, Your Honor, I'm not saying that. This is a 236. We agree with that. We're not challenging that. I'm just saying, just by the way she was being arrested, Your Honor, that there's a due process violation happening in her case." I did not intend to disclaim, and did not disclaim, any contention that the process Ms. Oh actually received was constitutionally inadequate as applied to her circumstances.

21. Judge Brent ruled that the lawfulness of the arrest did not affect his custody decision. He stated that he was "finding that even if there were to be an egregious violation of the Constitution, that does not bear on the Court's decision . . . insofar as the court can see."

22. Judge Brent ruled that the burden of proof rested on Ms. Oh rather than on the Department.

23. Judge Brent delivered an oral decision applying the factors set out in *Matter of Guerra,* 24 I&N Dec. 37 (BIA 2006). As I recall that decision, informed by my contemporaneous notes, the court found in substance:

24. that Ms. Oh had not established a fixed address, because the only residence offered was that of her sponsor in Las Vegas, Nevada, and because it was not clear that she had resided with him previously;

25. that her period of residence in the United States, approximately one year, was short;

26. that she had not established family ties in the United States;

27. that there was no showing of employment history;

28. that her entry without inspection weighed against her as an immigration violation

29. that the duration of her relationship with her proposed sponsor left the court unpersuaded that he would ensure her appearance;

30. that the declarations submitted by Ms. Oh's pastor and her friend, while favorable to her, did not establish community ties, that the pastor's declaration did not identify the church by name or location, and that in any event those ties were in Los Angeles while the sponsor letter placed Ms. Oh in Las Vegas; and

31. that although Ms. Oh had filed a Form I-589, nothing had been submitted to show the nature of that claim or to indicate that it was cognizable.

32. The court concluded that Ms. Oh presented such a flight risk that no amount of bond would be appropriate, and denied bond.

33. The court did not address Ms. Oh's ability to pay a bond.

34. The court did not address any alternative to detention, including release to a third-party custodian, reporting requirements, or electronic monitoring. The court denied bond outright rather than setting an amount.

35. The court did not make any finding as to whether Ms. Oh's arrest or her continued detention was lawful.

36. The written order issued by the court is a one-page EOIR form order. The box marked "Denied, because" is checked, and the blank line following it reads, in its entirety, "flight risk." The written order contains no findings of fact and does not state the reasons the court gave orally. It also states no burden of proof, identifies no bond amount, and makes no finding as to any condition of release. It recites only that "[t]he respondent requested a custody redetermination pursuant to 8 C.F.R. § 1236" and that the request is denied "[a]fter full consideration of the evidence presented."

37. The Department waived appeal. I reserved appeal on Ms. Oh's behalf. The appeal deadline is October 15, 2026. The court's written order so reflects.

38. On September 16, 2026, I accessed the EOIR Automated Case Information system for A-number 208-839-580. It reflects a master calendar hearing scheduled for

October 6, 2026 before the Adelanto Immigration Court, and no individual calendar hearing is scheduled.

39. On September 16, 2026, I searched the member records of the State Bar of California for an attorney named Tak Byung Jin. The search returned no attorney admitted to practice under that name.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 18 at Los Angeles, California.

/s/ Robert Genovese
ROBERT GENOVESE, ESQ. (CA SBN 321598)
Law Offices of Gita B. Kapur & Associates

# EXHIBIT I

An official website of the United States government
Here's how you know

EOIR Automated Case Information

**Court Closures Today** September 16, 2026

Please check https://www.justice.gov/eoir-operational-status for up to date closures.

Home > **OH, EUNHA (208-839-580)**

# Automated Case Information

## Name: OH, EUNHA | A-Number: 208-839-580 | Docket Date: 8/24/2026

## Next Hearing Information

Your upcoming **MASTER** hearing is **INTERNET-BASED** on **October 6, 2026** at **1:00 PM**.

**JUDGE**

Brent, Jonathan Masaji.

**WEBEX ADDRESS**

https://eoir.webex.com/meet/IJ.Brent

## Court Decision and Motion Information

*This case is pending.*

## BIA Case Information

No appeal was received for this case.

## Court Contact Information

If you require further information regarding your case, or wish to file additional documents, please contact the immigration court.

**COURT ADDRESS**

10250 RANCHO RD, SUITE 201A
ADELANTO, CA 92301

**PHONE NUMBER**

(760) 561-6500

Legal Policies & Disclaimers

Social Media

Budget & Performance

Office of the Inspector General

No FEAR Act

For Employees

EOIR Freedom of Information Act (FOIA)

USA.gov

Contact EOIR

EOIR Home

Justice.gov

Immigration Court Online Resource

Contact Technical Support

This site is protected by hCaptcha:

hCaptcha Privacy Policy

hCaptcha Terms of Service

---

Department of Justice | Executive Office for Immigration Review
*5107 Leesburg Pike, Suite 2600, Falls Church, VA 22041*

EOIR Automated Case Information

24

# EXHIBIT J

DEPARTMENT OF HOMELAND SECURITY

**NOTICE TO APPEAR**

DOB: 04/06/1987

Event No: LOS2608001811

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID: 403406916

FINS: 1216175262

File No: 208 839 580

In the Matter of:

Respondent: EUNHA OH currently residing at:

10400 Rancho Rd Adelanto, CALIFORNIA 92301 — (760) 561-6100

(Number, street, city, state and ZIP code) — (Area code and phone number)

☐ You are an arriving alien.

☒ You are an alien present in the United States who has not been admitted or paroled.

☐ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of NORTH KOREA and a citizen of SOUTH KOREA;

3. You entered the United States at or near San Diego, on or about September 22, 2025;

4. You were not then admitted or paroled after inspection by an Immigration Officer.ORAt that time you arrived at a time or place other than as designated by the Attorney General.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

212(a)(6)(A)(i) of the Immigration and Nationality Act, as amended, in that you are an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to: ☐ 8CFR 208.30 ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

10400 RANCHO RD, ADELANTO, CALIFORNIA 923012237. ADELANTO DETENTION FAC. EAST

*(Complete Address of Immigration Court, including Room Number, if any)*

on October 6, 2026 *(Date)* at 8:00 am *(Time)* to show why you should not be removed from the United States based on the charge(s) set forth above.

9307 MENDOZA-MAZARIEGOS - SDDO

*(Signature and Title of Issuing Officer)*

Date: August 20, 2026

Los Angeles, California

*(City and State)*

EOIR — 1 of 3

25

## Notice to Respondent

**Alien Registration:** This Notice to Appear serves as evidence of your alien registration pursuant to INA § 262. If you are 18 years or older, failure to carry this Notice to Appear, or other evidence of alien registration as provided in 8 C.F.R. § 264.1(b), on your person at all times is a criminal offense pursuant to INA § 264(e), for which you may be subject to a criminal penalty of $5,000 and imprisonment of up to 30 days.

**Notification to the Department of Homeland Security (DHS) of Change of Address:** All aliens aged 14 years or older, and all parents and legal guardians of aliens under the age of 14, must report a change of address to U.S. Citizenship and Immigration Services, a component of DHS, within 10 days of moving, pursuant to INA § 265(a). Failure to notify DHS of your change of address is a criminal offense pursuant to INA § 266(b), for which you may be subject to a criminal penalty of $5,000 and imprisonment of up to 30 days. More information is available online at **https://www.uscis.gov/addresschange**. **This obligation is in addition to your obligation to notify the Immigration Court of your change of address**.

**Representation:** If you choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to INA §§ 240(b)(4)(A) and 292. Unless you request otherwise in writing, no hearing will be scheduled earlier than 10 days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost is provided with this notice.

**Conduct of the hearing:** At your hearing you will be given the opportunity to admit or deny any or all of the allegations in this Notice to Appear, including that you are inadmissible or deportable. You will be advised by the immigration judge of any relief from removal for which you may appear eligible, including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge. At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross-examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at **www.uscis.gov/i-589**. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to INA § 208(a)(2)(B).

**Notification to the Immigration Court of Change of Address:** You are required to notify the Immigration Court, in writing, of your full mailing address and telephone number (if any). You must also immediately notify the Immigration Court whenever you change your address or telephone number during the course of this proceeding by using Form EOIR-33/IC, Change of Address/Contact Information Form. Notices of hearing will be mailed to this address. If you file a Form EOIR-33/IC with the Immigration Court, you must serve a copy on the ICE Office of the Principal Legal Advisor. If you change your address or telephone number during the course of this proceeding and do not submit Form EOIR-33/IC, the Immigration Court shall not be required to provide you with written notice of your hearing. **This obligation is in addition to your obligation to notify DHS of your change of address.**

**Failure to Appear:** If you fail to attend the hearing at the date, time, and place designated on this notice, or any date, time, or place later directed by the Immigration Court, the immigration judge shall order you removed in your absence upon determining that you were provided written notice and are removable. If you are arrested by ICE after being ordered removed in your absence by the immigration judge pursuant to INA § 240(b)(5), you will be required to pay a minimum fee of $5,000, adjusted for inflation, or a greater amount as established by the Secretary of Homeland Security.

**Mandatory Duty to Depart the United States:** If you become subject to a final order of removal as defined in 8 C.F.R. § 1241.1, you must depart the United States within 90 days of the order. If you do not depart, you may be subject to a civil penalty under INA § 274D(a) of $500 per day, adjusted for inflation, and imprisonment of up to 4 years (or 10 years if you belong to certain specified classes described in INA § 237(a)(1)(E), (2), (3), or (4)). If you are granted voluntary departure, you must comply with the terms of the voluntary departure order. If you fail to voluntarily depart within the time provided, you will be subject to a final order of removal, may be ineligible for certain immigration benefits for a period of 10 years from the date you overstayed the order, and may be subject to a civil penalty from $1,000 to $5,000, adjusted for inflation. For additional information, refer to the order granting voluntary departure, as well as INA § 240B(d).

**Sensitive Locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in INA § 239(e)(1), such action complied with 8 U.S.C. § 1367.

**Request for Prompt Hearing**

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before:

_______________ (Signature of Respondent)

Date: _______________

_______________ (Signature and Title of Immigration Officer)

**Certificate of Service**

This Notice To Appear was served on the respondent by me on August 20, 2026, in the following manner and in compliance with section 239(a)(1) of the Act.

☒ in person ☐ by certified mail, returned receipt # ___________ requested ☐ by regular mail

☐ Attached is a credible fear worksheet.

☒ Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the KOREAN language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

Refused to sign
(Signature of Respondent if Personally Served)

J15507 DANGIOLILLO - Deportation Officer
(Signature and Title of officer)

**Privacy Act Statement**

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

# EXHIBIT K

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**

Respondent Name:
OH, EUNHA

Address:
10400 RANCHO ROAD
ADELANTO, CA 92301

A-Number:
208-839-580

REJECTION NOTICE

Date: 09/03/2026

**REJECTED FILING**
**NOTICE TO ATTORNEY OR REPRESENTATIVE**

This notice is to inform you that the document(s) received by the Immigration Court on 08/31/2026 is/are being rejected for the reasons given below. When re-filing the corrected document(s) other than initiation documents, please attach this rejection notice. A copy of the corrected filing must also be served on the opposing party.

Document(s) being rejected:
motion for bond Eunha.pdf, SGITAFull-626083117382.pdf, e28 for gk.pdf

Rejection Reason(s)
1. No Notice of Entry of Appearance

Rejection Explanation:
The E28 Form is not filled out completely.

**Certificate of Service**

This document was served:
Via: [ ] Mail [ ] Personal Service [X ] Electronic Service
To: [X ] Alien [ ] Alien c/o custodial officer [ ] Alien's atty/rep. [ ] DHS
By: RangelK, [ ] Court Staff [ ] Immigration Judge
Date: 09/03/2026

**LAW OFFICES OF GITA B. KAPUR & ASSOCIATES**
**GITA B. KAPUR, ESQ. (CA SBN 223754)**
**SU YEON KIM, ESQ. (CA SBN 265648)**
**EMILY HALL, ESQ. (CA SBN 362448)**
**ROBERT GENOVESE, ESQ. (CA SBN 321598)**
**617 S. Olive St., Suite 1000**
**Los Angeles, CA 90014**
**Tele: (213) 327-0455 Fax: (213) 327-0707**

**Attorneys for Respondent**
**EUNHA OH,**

**DETAINED**

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**ADELANTO, CALIFORNIA**

| | | |
|---|---|---|
| **In the Matter(s) of:** | ) | |
| | ) | |
| | ) | |
| **EUNHA OH,** | ) | **File No: 208-839-580** |
| | ) | |
| | ) | |
| **In removal proceedings** | ) | |
| | ) | |
| | ) | |
| | ) | |

**Immigration Judge:**
**BRENT**

**Next Master Hearing:**
**October 06, 2026 at 1:00pm**

**RESPONDENT'S MOTION FOR BOND DETERMINATION AND PROPOSED ORDER**

Respectfully Submitted,
/S/ Gita B. Kapur, Esq.

LAW OFFICES OF GITA B. KAPUR & ASSOCIATES
GITA B. KAPUR, ESQ. (CA SBN 223754)
SU YEON KIM, ESQ. (CA SBN 265648)
EMILY HALL, ESQ. (CA SBN 362448)
ROBERT GENOVESE, ESQ. (CA SBN 321598)
617 S. Olive St., Suite 1000
Los Angeles, CA 90014
Tele: (213) 327-0455 Fax: (213) 327-0707

Attorneys for Respondent,
EUNHA OH,

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
ADELANTO, CALIFORNIA

| | |
|---|---|
| In The Matter(s) of<br><br>EUNHA OH,<br><br>Respondent | A# 208-839-580<br><br>RESPONDENT'S MOTION FOR BOND DETERMINATION AND PROPOSED ORDER |

TO ALL PARTIES AND TO THE HONORABLE IMMIGRATION JUDGE OF THE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW:

Pursuant to INA § 236(a), 8 U.S.C. § 1226(a), and 8 C.F.R. §§ 1003.19 and 1236.1(d), Respondent Eunha Oh respectfully requests that this Court set this matter for a custody redetermination hearing and release her on a reasonable bond and on such conditions of supervision as the Court deems appropriate.

Ms. Oh entered the United States without inspection on September 22, 2025. She has no criminal history of any kind, has never failed to appear for any obligation, and has a United States citizen sponsor who has come forward to house her and to serve as her third-party custodian. She was not arrested while attempting to cross the border; she was arrested approximately eleven months after her entry, in the interior of the United States, while appearing — exactly as required — for a scheduled biometrics appointment connected to her own pending application for relief. Under controlling Ninth Circuit precedent decided since the Board's decision in *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025), aliens in Ms. Oh's position are detained under INA § 236(a), not § 235(b)(2)(A), and are eligible for bond. *See Rodriguez Vazquez v. Bostock,* No. 25-6842, 2026 U.S. App. LEXIS 22798 (9th Cir. July 30, 2026). She is not a danger, and she is not a flight risk.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

Ms. Oh is a thirty-nine-year-old native of North Korea and citizen of South Korea, born April 6, 1987. She left North Korea in 2012, resided in China for approximately three years, and arrived in South Korea in 2015, where she obtained South Korean citizenship. She last entered the United States without inspection at or near San Diego, California, on or about September 22, 2025. (Notice to Appear, Form I-862, ¶ 3.) She has remained in the United States continuously since that time and had no encounter with any immigration enforcement authority and was never arrested, detained, or questioned by any immigration officer, until the events described below.

Ms. Oh filed affirmatively Form I-589, Application for Asylum and for Withholding of Removal, which was received by U.S. Citizenship and Immigration Services on July 10, 2026. Her application remains pending.

On August 20, 2026, Ms. Oh appeared, as scheduled, for a biometrics appointment at USCIS ASC, 3747 S. La Brea Ave, Los Angeles, in connection with her pending application. She was accompanied to the appointment by her sponsor, Benjamin Moon, who was not permitted to enter the building with her. She was taken into custody by immigration officers during that appointment. She was held briefly at a facility in downtown Los Angeles before being transferred that same night to the Adelanto ICE Processing Center, where she has remained detained continuously since.

On August 20, 2026, the Department of Homeland Security served Ms. Oh with a Notice to Appear, charging her as removable under INA § 212(a)(6)(A)(i) as an alien present in the United States without having been admitted or paroled. (I-862 at 1.) The Department did not check the box on the Notice to Appear identifying her as "an arriving alien"; it checked, instead, the box identifying her as "an alien present in the United States who has not been admitted or paroled." (Id.) Proceedings were commenced under the general removal provisions of INA § 240; the box indicating that the Notice to Appear issued following a credible-fear determination under INA § 235(b)(1) was left unchecked. (Id.)

Ms. Oh has never been arrested, charged with, or convicted of any crime, in the United States or elsewhere. She has no prior order of removal or voluntary departure, and no history of any other immigration violation.

Ms. Oh's proposed sponsor, Benjamin Moon, is a United States citizen who resides at 3850 W. Nevso Drive, Unit 405, Las Vegas, Nevada, where he has been the tenant of record since November 2025. He has been employed as a Senior Account Executive at Alexander & Tom, Inc. since September 2023. Mr. Moon has submitted a declaration under penalty of perjury offering Ms. Oh a private, rent-free room in his home; committing to serve as her third-party

custodian; committing to personally transport her to every hearing, check-in, and attorney appointment; committing to ensure that a Form EOIR-33 is filed within five days of her release; and committing to ensure her compliance with every order of this Court and of the Department of Homeland Security. (Declaration of Benjamin Moon ¶¶ 8, 9, 15.) Mr. Moon's residence, employment, and income are documented by his current lease, a utility bill in his name at that address, and his 2023, 2024, and 2025 federal income tax returns and 2025 Form W-2.

Andrew Chen, who has known Ms. Oh for approximately one year, has submitted a declaration describing her as a kind, responsible, and dependable person who has formed meaningful ties within her community and who he believes will comply with her legal obligations.

Duan Kwon, Ms. Oh's pastor, has submitted a declaration attesting to her character. He describes her as a beautiful soul practicing a life in service of the Lord's embrace and expresses that she has the support of her community, demonstrating the strong ties she has formed since she has settled in the United States.

## II.

## MS. OH IS DETAINED UNDER INA § 236(a) AND IS ELIGIBLE FOR BOND UNDER CONTROLLING NINTH CIRCUIT PRECEDENT

### A. Rodriguez Vazquez v. Bostock Controls and Forecloses Matter of Yajure Hurtado in This Circuit.

In *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025), the Board held that any alien present in the United States without having been inspected and admitted remains an "applicant for admission" under INA § 235(a)(1) indefinitely, and is therefore subject to mandatory

detention under the catchall provision of § 235(b)(2)(A), regardless of how long the alien has resided in the interior of the United States or the circumstances of the alien's later arrest. That decision no longer states the law of this Circuit. In *Rodriguez Vazquez v. Bostock*, No. 25-6842, 2026 U.S. App. LEXIS 22798 (9th Cir. July 30, 2026), the Ninth Circuit — sitting in direct review of the same statutory question — squarely held that aliens present without admission who are apprehended in the interior of the United States are not subject to mandatory detention under 8 U.S.C. § 1225(b)(2)(A), and are instead subject to the discretionary bond scheme of 8 U.S.C. § 1226(a). *Id.* The court affirmed a class-wide judgment to that effect for a class of unadmitted aliens apprehended in the interior who, like Ms. Oh, were not subject to expedited removal under § 1225(b)(1) and were not subject to mandatory detention as criminal aliens under § 1226(c). Id. at *23.

Ms. Oh falls squarely within the category of aliens covered by *Rodriguez Vazquez*'s holding: she entered without inspection, was apprehended in the interior of the United States (at a USCIS facility, not at or near the border), was not processed through expedited removal, and has no criminal history that would subject her to mandatory detention under § 1226(c). The court's reasoning applies with full force: the term "applicant for admission" in § 1225(a)(1) is a "fictive legal status" and "term of art," not a description of an alien in a perpetual state of "seeking admission," and an alien who has already completed an unlawful entry and is later encountered in the interior is not "seeking admission" within the meaning of § 1225(b)(2)(A). Id. at *33–45 (relying on *Torres v. Barr*, 976 F.3d 918, 927–28 (9th Cir. 2020) (en banc)). *Torres* itself remains independently binding Ninth Circuit en banc authority for the proposition that "applicant for admission" does not place an alien in a perpetual state of seeking entry.

Immigration Judges are required to follow the law of the circuit in which the venue lies, even where it conflicts with contrary Board precedent. *See Matter of Garcia,* 28 I&N Dec. 693, 696 (BIA 2023). Because *Rodriguez Vazquez* directly and precedentially resolves the question *Yajure Hurtado* purported to answer, and reaches the opposite conclusion, this Court should follow *Rodriguez Vazquez*, find that Ms. Oh is detained under § 236(a), and proceed to the merits of her bond request.

Ms. Oh recognizes that the Fifth and Eighth Circuits have reached the contrary conclusion, *see Buenrostro-Mendez v. Bondi,* 166 F.4th 494 (5th Cir. 2026); *Avila v. Bondi,* 170 F.4th 1128 (8th Cir. 2026), but those decisions do not state the law of this Circuit. They are also now the minority position. Six other circuits have reached the same conclusion as the Ninth — four of them before *Rodriguez Vazquez* was decided, and two since. *See Barbosa da Cunha v. Freden*, 175 F.4th 61 (2d Cir. Apr. 28, 2026); *Hernandez Alvarez v. Warden, Fed. Det. Ctr. Miami*, 175 F.4th 1258 (11th Cir. May 6, 2026); *Lopez-Campos v. Raycraft,* 175 F.4th 713 (6th Cir. May 11, 2026); *Santillan Quiroz v. Mullin*, 180 F.4th 1226 (10th Cir. June 30, 2026); *Rojas v. Olson*, No. 25-3127, 2026 WL 2198315 (7th Cir. July 30, 2026); *Guerrero Orellana v. Moniz,* Nos. 25-2152, 26-1094, 2026 WL 2352042 (1st Cir. Aug. 13, 2026).

Most recently, the Third Circuit reached the same conclusion and expressly declined to defer to the Board's contrary construction: "Because courts must conduct their own statutory analysis, *see Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024) . . . we will not defer to the Board of Immigration Appeals' recent interpretation of § 1225(b)(2)(A) . . . ." *Buele Morocho v. Warden Phila. FDC*, Nos. 26-1150 & 26-1454, slip op. at 6, n.8 (3d Cir. Aug. 28, 2026) (precedential)

**B. The Laken Riley Act Confirms, Rather Than Undermines, This Conclusion.**

The Laken Riley Act amended § 1226(c) to require mandatory detention of aliens inadmissible under § 1182(a)(6)(A) — that is, aliens present without admission, like Ms. Oh — who have also committed certain enumerated crimes. Pub. L. No. 119-1, § 2, 139 Stat. 3 (2025) (codified at 8 U.S.C. § 1226(c)(1)(E)). As *Rodriguez Vazquez* explained, this amendment "strongly suggests that the broader § 1226(a) covers inadmissible aliens present in the United States" generally — because if such aliens were already subject to mandatory detention under § 1225(b)(2)(A), the Laken Riley Act's carve-out for those who additionally commit qualifying crimes would be superfluous. 2026 U.S. App. LEXIS 22798, at *60–61. Ms. Oh has no criminal history of any kind and is therefore not subject to mandatory detention under § 1226(c)(1)(E); she remains within § 1226(a)'s discretionary bond framework.

**C. In the Alternative, Continued Detention Without Any Bond Hearing Would Violate Due Process.**

Should this Court nonetheless conclude that it lacks jurisdiction under *Matter of Yajure Hurtado*, Respondent preserves, in the alternative, the argument that continued mandatory detention without any individualized custody review violates the Due Process Clause of the Fifth Amendment, particularly given the substantial equities present here. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The Supreme Court has granted certiorari to consider whether the Due Process Clause requires an individualized bond hearing when detention under 8 U.S.C. § 1226(c) becomes unreasonably prolonged and, if so, what burden of proof the Government must bear. *Genalo v. Black,* No. 25-886 (U.S. cert. granted June 15, 2026). A Fifth Circuit panel likewise concluded that due process prohibits detention under 8 U.S.C. § 1225(b)(2)(A) beyond 90 days without an individualized bond hearing, but the Fifth Circuit subsequently vacated the panel

opinion when it sua sponte granted rehearing en banc; the district-court judgments also remain stayed pending en banc review. *Sosnava Rodriguez v. Ortega*, No. 26-50183, slip op. at 13-14 (5th Cir. July 2, 2026), vacated on reh'g en banc, No. 26-50183 (5th Cir. July 10, 2026). Respondent relies on *Sosnava Rodriguez* solely for the persuasive force of its due-process analysis and preserves this constitutional claim for prompt habeas review under 28 U.S.C. § 2241 should this Court decline to follow *Rodriguez Vazquez v. Bostock*.

**D. If the Court Disagrees, Respondent Requests Specific Findings to Facilitate Immediate Review.**

In the event this Court determines that *Matter of Yajure Hurtado* rather than *Rodriguez Vazquez v. Bostock* governs this case, Respondent respectfully requests that the Court's order specifically state the statutory and regulatory basis for that determination, and specifically address why *Rodriguez Vazquez* does not control, so as to facilitate immediate review of Ms. Oh's continued detention in federal court. Respondent further requests an alternative finding on whether Respondent would otherwise warrant bond under Matter of Guerra.

## III. MERITS

## LEGAL STANDARD

On a custody redetermination under § 236(a), the Respondent must establish to the satisfaction of the Immigration Judge that she is not a danger to persons or property, not a threat to the national security, and not a flight risk; the Immigration Judge then has broad discretion in deciding the factors that he or she may consider. *Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006); see also *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1197 (9th Cir. 2022) (a § 1226(a)

detainee is released on bond upon showing, by a preponderance of the evidence, that she is not a flight risk or a danger to the community). *Guerra* identifies nine non-exhaustive factors: (1) whether the alien has a fixed address in the United States; (2) length of residence; (3) family ties, and whether they may entitle the alien to reside permanently in the United States in the future; (4) employment history; (5) record of appearance in court; (6) criminal record, including the extensiveness, recency, and seriousness of the offenses; (7) history of immigration violations; (8) any attempts to flee prosecution or otherwise escape from authorities; and (9) manner of entry. Id. at 40.

The existence of a valid, reliable, and credible sponsor is relevant to the determination of flight risk. *Matter of Dobrotvorskii*, 29 I&N Dec. 211 (BIA 2025). (vacating a bond grant where the record contained no letter from the proposed sponsor expressly committing to support the respondent and to ensure her appearance). The record here contains exactly what *Dobrotvorskii* found missing: a sworn declaration from Mr. Moon expressly committing to house Ms. Oh, to serve as her third-party custodian, and to transport her to every hearing and check-in. (Declaration of Benjamin Moon ¶¶ 8, 9, 15; Tab A.)

## IV.

## ARGUMENT

**A. Venue Is Proper, and Ms. Oh Is Not Subject to Mandatory Detention Under § 236(c).**

INA § 236(c) requires detention of aliens removable on specified criminal and security grounds. Ms. Oh falls within none of them: she has no convictions, no pending charges, and no criminal ground of removability has been alleged. Venue is proper because she is detained at Adelanto. 8 C.F.R. § 1003.19(c)(1).

**B. Ms. Oh Is Not a Danger to the Community.**

The dangerousness inquiry turns on criminal history and its recency, extent, and seriousness. *Guerra*, 24 I&N Dec. at 40. Here there is nothing to weigh. Ms. Oh has no convictions, no pending charges, and no arrests, and the Department has alleged no violent, threatening, abusive, or dishonest conduct of any kind. Affirmatively, Mr. Moon declares that Ms. Oh has "always kept her word," has "never been dishonest," and has "never been violent, threatening, or even angry." (Declaration of Benjamin Moon ¶ 3.) Andrew Chen, who has known her for approximately one year, describes her similarly as "kind, responsible, respectful, and dependable." (Declaration of Andrew Chen.)

**C. Ms. Oh Is Not a Flight Risk.**

Family ties, sponsorship, and manner of entry — *Guerra* factors 3 and 9 — favor release. Ms. Oh will reside with Mr. Moon, a United States citizen who has offered her stable, rent-free housing and who has committed under penalty of perjury to serve as her third-party custodian, to personally transport her to every court date and appointment, and to ensure her compliance with every condition this Court imposes. (Declaration of Benjamin Moon ¶¶ 8, 9, 15.) Her manner of entry, while unlawful, involved no fraudulent documents, no criminal conduct beyond the entry itself, and no prior order of removal.

Her record of appearance and absence of any evasion — *Guerra* factors 5, 7, and 8 — favor release strongly, and on facts stronger than the ordinary case: Ms. Oh has never failed to appear for anything, and the single encounter with immigration authorities in her history occurred precisely because she appeared, unprompted and as required, for her own scheduled biometrics appointment in connection with her own pending application. She has never used an alias, never given a false name or address to any agency, and has taken no step to evade

authorities at any point since her entry. A person attempting to avoid detection or to flee does not appear voluntarily for a government biometrics appointment tied to her own immigration case.

Ms. Oh also has a pending application for relief — an affirmatively filed Form I-589 — which gives her an affirmative reason to appear at every hearing. *Guerra* factor 3.

**D. The Court Should Set a Bond Ms. Oh Can Pay, and May Impose Conditions of Supervision.**

A bond that cannot be paid does not secure appearance; it continues detention by another name. Counsel requests that the Court consider Ms. Oh's and her sponsor's actual financial circumstances and the availability of alternative conditions in setting any amount. See *Hernandez v. Sessions*, 872 F.3d 976, 990–994 (9th Cir. 2017). The statutory minimum is $1,500. 8 U.S.C. § 1226(a)(2)(A). Mr. Moon has committed to contribute toward Ms. Oh's bond. Ms. Oh requests a bond at the low end of the range the Court considers appropriate and consents to any reasonable conditions of release, including release to Mr. Moon as third-party custodian, the filing of a Form EOIR-33 within five days of release and of any later change of address, periodic reporting to the Department at whatever interval it directs, and participation in the Intensive Supervision Appearance Program or a comparable program including telephonic or GPS monitoring.

**V.**

**CONCLUSION**

Detention under § 236(a) serves two purposes: protecting the public and securing appearance. Neither requires Ms. Oh's continued detention. She has carried her burden on both prongs, and her appearance can be secured by a bond she and her sponsor can pay, a third-party custodian, and reasonable conditions of supervision. Respondent respectfully requests that this

Court set this matter for a custody redetermination hearing at the earliest available date and release her on a reasonable bond and on such conditions as the Court deems appropriate.

Dated: 9/3, 2026

Respectfully Submitted,

Gita B. Kapur, Esq.
Attorney for Respondent

**United States Department of Justice**
**Executive Office for Immigration Review**
**Immigration Court**
**Adelanto, California**

In the Matters of:Eunha Oh
File No: 208-839-580

**ORDER OF THE IMMIGRATION JUDGE**

Upon consideration of RESPONDENT'S MOTION FOR BOND DETERMINATION AND PROPOSED ORDER it is HEREBY ORDERED that the motion be [ ] GRANTED [ ] DENIED because:

___ DHS does not oppose the motion.
___ The Respondent does not oppose the motion.
___ A response to the motion has not been filed
___ Good cause has been established for the motion.
___ The Court agrees with the reasons in the opposition to the motion.
___ The motion is untimely per ____________________.
___ Other:

Deadlines:

___ The application(s) for relief must be filed by ________________.
___ The Respondent must comply with DHS biometrics instructions by __________.

________________ ________________________
Date Immigration Judge

---

Certificate of Service

This document was served by: [ ] Mail [ ] Personal Service
To: [ ] Alien [ ] Alien c/o Custodial Officer [ ] Alien's Atty/Rep [ ] DHS

Date:_______________ By: Court Staff:_________

**CERTIFICATE OF SERVICE**

**In the Matter of: Eunha Oh**
**File Number: A 208-839-580**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am over the age of eighteen (18) and a resident of the State of California, and am not a party to this action. My business address is: 617 S. Olive St., Suite 1000, Los Angeles, CA 90014.

On 9/3 2026, I served the foregoing document described as **RESPONDENT'S MOTION FOR BOND DETERMINATION AND PROPOSED ORDER** on the trial attorney in this action by ECAS and both parties are participating in ECAS

DEPARTMENT OF HOMELAND SECURITY
OFFICE OF CHIEF COUNSEL
10250 Rancho Road
Adelanto, CA 92301

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed at Los Angeles, California on 9/3, 2026.

Gita B. Kapur, Esq.

LAW OFFICES OF GITA B. KAPUR & ASSOCIATES
GITA B. KAPUR, ESQ. (CA SBN 223754)
ROBERT JOHN GENOVESE, ESQ. (CA SBN 321598)
EMILY JENNIFER HALL, ESQ. (CA SBN 362448)
617 S. Olive Street, Suite 1000
Los Angeles, CA 90014
Tel. (213) 327-0455 Fax (213)327-0707

**DETAINED**

Attorneys for Respondent(s)
EUNHA OH,

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**ADELANTO, CALIFORNIA**

| | |
|---|---|
| In the Matter(s) of: ) | |
| EUNHA OH, ) | File No(s): A# 208-839-580 |
| In removal proceeding ) | |

Immigration Judge:
TBD

Next Bond Hearing:
TBD

**RESPONDENTS EVIDENCE IN SUPPORT OF BOND REQUEST**

# TABLE OF CONTENTS

**TAB** **PAGES**

## A. SUPPORTING DOCUMENTATION

**Eunha Oh (Respondent)**
I-589 Receipt.....01
I-589 Asylum Fee Payment Receipt.....02
I-589 Biometric Appointment Notice.....03

**Benjamin Min-Ho Moon (Respondent's Boyfriend) USC, SPONSOR**
Declaration in Support of Eunha Oh.....04-07
U.S. Passport.....08
Nevada Driver License.....09-10
Alexander & Tom Inc. Earning Statement.....11
NAA Lease Agreement.....12-63
NVEnergy Statement.....64-65
U.S. Individual Income Tax, 2025.....66-67
W-2 Wage and Tax Statement, 2025.....68
U.S. Individual Income Tax, 2024.....69-70
W-2 Wage and Tax Statement, 2024.....71
U.S. Individual Income Tax, 2023.....72-73
W-2 Wage and Tax Statement, 2023.....74

**Duan Kwon (Respondent's Pastor) USC**
Declaration.....75
U.S. Permanent Resident Card.....76
Credentials of Ministry.....77

**Andrew Chen (Respondent's Friend) USC**
Declaration.....78
U.S. Passport.....79

## B. BIOGRAPHICAL INFORMATION

Korean Passport.....80

## C. PHOTOGRAPHS

Photos of Respondent with Friends.....81-86

# SUPPORTING DOCUMENTATION

**Form I-797C, Notice of Action**

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.**

| | | |
|---|---|---|
| Receipt Number<br>IOE5715280806 | USCIS Online Account Number<br>050304158020 | Case Type<br>I589 - APPLICATION FOR ASYLUM AND FOR WITHHOLDING OF REMOVAL |
| | | Applicant A208 839 580<br>OH. EUNHA |
| Received Date<br>07/10/2026 | Priority Date | |
| Notice Date<br>07/23/2026 | Page<br>1 of 1 | |

OH. EUNHA
621 S WESTERN AVE
LOS ANGELES CA 90005

**Notice Type: USCIS Account Access Notice**
**Online Access Code: F9DD0-00F2-7CEBB**

***Welcome to USCIS!***

Thank you for your recent submission. We have created a USCIS Online Account for you. With this account you can:

- check the status of your case.
- sign up to receive email notifications and text messages.
- manage your account preferences and contact information.

**Log on and confirm your account within 90 days.**

To access your account, please follow the steps below:

1. Visit us online at *https://my.uscis.gov/account*
2. Select **"Create a new account"** on the right side of the screen, and follow the on-screen instructions for creating a new account in order to login to the system.
3. Select **"Add a paper-filed case."**
4. Enter your **"USCIS case receipt number"** and select **"Add case."**
5. Enter your **"Online Access Code"** (found on the upper right side of this notice) and your **"Date of birth"** in the fields provided.
6. Select **"Confirm case."**

**NOTE: Your Online Access Code will expire 90 days from the notice date listed at the top of this letter. We will continue processing your application regardless of whether you access your USCIS Online Account. We strongly encourage you to confirm your USCIS Online Account as soon as possible and then use it in the future as your preferred method for interacting with USCIS. If you do not access your account before your code expires and you wish to access your account, you will need to request that we reset your access code. If you have questions about how to confirm your USCIS Online Account or to request that we reset your access code, please visit the USCIS Contact Center at uscis.gov/contactcenter.**

Please see the additional information on the back. We will notify you separately about any other cases you have filed.

**USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.**

Asylum Vetting Center
U.S. CITIZENSHIP & IMMIGRATION SVC
401 West Peachtree Street NW
Suite 2500
Atlanta GA 30308

**USCIS Contact Center: www.uscis.gov/contactcenter**

If this is an interview or biometrics appointment notice...

Department of Homeland Security
U.S. Citizenship and Immigration Services

**Form I-797C, Notice of Action**

# THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.

| | | |
|---|---|---|
| NOTICE TYPE<br>Receipt | | NOTICE DATE<br>07/23/2026 |
| CASE TYPE<br>I589 - APPLICATION FOR ASYLUM AND FOR WITHHOLDING OF REMOVAL | | USCIS ALIEN NUMBER<br>A208 839 580 |
| RECEIPT NUMBER<br>LGL2690070268 | RECEIVED DATE<br>07/10/2026 | PAGE<br>1 of 1 |
| | | DATE OF BIRTH |

EUNHA OH
621 S WESTERN AVE
G02
LOS ANGELES CA 90005

PAYMENT INFORMATION:
Application/Petition Fee: $100.00
Total Amount Received: $100.00
Total Balance Due: $.00

*** ACKNOWLEDGEMENT OF RECEIPT ***

Your complete Form I-589, Application for Asylum and for Withholding of Removal, was received and is pending as of 07/10/2026.

Having a pending asylum application with USCIS does not preclude the Department of Homeland Security (DHS) from placing you into removal proceedings. If you wish to leave the United States while your asylum application is pending, you must obtain advance parole or, for Temporary Protected Status (TPS) recipients, approval of Form I-512T, Authorization for Travel by a Noncitizen to the United States (sometimes referred to as MTINA TPS travel authorization), from USCIS or you may be considered to have abandoned your asylum application. You must report a change of address to USCIS within 10 days of moving by following the instructions on the How to Change Your Address webpage (https://www.uscis.gov/addresschange). Changing your address with the U.S. Postal Service will not change your address with USCIS.

BIOMETRICS APPOINTMENT AND ASYLUM INTERVIEW NOTICES:

You will receive a notice informing you when you and those listed on your application as a spouse or child dependent must appear at an Application Support Center (ASC) for biometrics collection. You will also receive a notice informing you when you and those listed on your application as a spouse or child dependent must appear for an asylum interview. Those notices will contain instructions for what to bring to your ASC appointment and what to bring to your asylum interview.

**WARNING: Failure to appear at the ASC for biometrics collection or for your asylum interview may affect your eligibility for employment authorization and may also result in the dismissal of your asylum application or referral of your asylum application to an immigration judge.**

ANNUAL ASYLUM FEE:

If your asylum application remains pending for 365 days or more, you must pay the Annual Asylum Fee as of the one-year anniversary of your filing and each year thereafter that your asylum application remains pending on such day of the calendar year. For more information, reference https://www.uscis.gov/i-589.

EMPLOYMENT AUTHORIZATION:

You may file a Form I-765, Application for Employment Authorization, based on your pending asylum application 150 days after you filed your asylum application. You are not eligible to receive an Employment Authorization Document (EAD) until your asylum application has been pending for at least another 30 days, for a total of 180 days. 8 CFR 208.7(a)(1). The 150-day waiting period and the 180-day eligibility period, commonly referred to as the 180-Day Asylum EAD Clock, do not include delays that you request or cause while your asylum application is pending with an asylum office or with the Immigration Court. 8 CFR 208.7(a)(2).

*Delays requested or caused by the applicant may include:*

- A request to transfer a case to a new asylum office or interview location, including when the transfer is based on your change of address;
- A request to reschedule an interview for a later date;
- Failure to appear at an interview or biometrics appointment;
- Failure to provide a competent interpreter at an interview (if required);
- A request to provide additional evidence at or after an interview;
- The submission of large volumes of evidence immediately before an interview that requires a reschedule; and
- Failure to receive and acknowledge an asylum decision in person (if required).

Applicant(s):

| Alien Number | Name |
|---|---|
| A208 839 580 | OH, EUNHA |

Please see the additional information on the back. You will be notified separately about any other cases you filed.

USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.

Los Angeles Asylum Office
U.S. CITIZENSHIP & IMMIGRATION SVC
P.O. Box 2003
Tustin CA 92781 -2003
USCIS Contact Center: www.uscis.gov/contactcenter

~ 002

If this is an interview or biometrics appointment notice, please see the back of this notice for important information.

Department of Homeland Security
U.S. Citizenship and Immigration Services

**Form I-797C, Notice of Action**

# THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.

| ASC Appointment Notice | APPLICATION/PETITION/REQUEST NUMBER<br>LGL2021070268 | | NOTICE DATE<br>07/28/2026 |
|---|---|---|---|
| CASE TYPE<br>I589 - APPLICATION FOR ASYLUM AND FOR WITHHOLDING OF REMOVAL | ACCOUNT NUMBER | USCIS A#<br>A208 839 580 | CODE<br>3 |

EUNHA OH
621 S WESTERN AVE
G02
LOS ANGELES CA 90005



**PLEASE READ THIS ENTIRE NOTICE CAREFULLY.** To process your application, petition, or request, the U.S. Citizenship & Immigration Services (USCIS) must collect your biometrics. Please appear at the below Application Support Center (ASC) at the date and time specified.

**WARNING:** Unless USCIS excuses you based on good cause, failure to appear at this biometrics appointment will result in an applicant-caused delay that will impact your eligibility for employment authorization based on your pending asylum application. If you fail to appear at this appointment as scheduled, USCIS may: (1) dismiss your asylum application, if you are in lawful immigration status or paroled; or (2) refer your application to an immigration judge, if you are not in lawful immigration status or paroled. If you fail to appear at this appointment as scheduled, and you are currently in removal proceedings, an immigration judge may deem your asylum application abandoned.

| APPLICATION SUPPORT CENTER | DATE AND TIME OF APPOINTMENT |
|---|---|
| USCIS LA BREA<br>3747 South LaBrea Ave<br>Los Angeles CA 90016 | 08/20/2026<br>11:00AM |

**WHEN YOU APPEAR AT THE ASC FOR BIOMETRICS SUBMISSION, YOU MUST BRING:**

1. **THIS APPOINTMENT NOTICE,** and
2. **PHOTO IDENTIFICATION** (e.g. passport, valid driver's license, national ID, military ID, State-issued photo ID, or USCIS-issued photo ID). If you do not have photo identification, please expect a delay.

Only those necessary to assist with transportation or completion of the biometrics worksheet should accompany you to your ASC appointment. If you have open wounds, bandages, or casts when you appear for biometrics submission, USCIS may reschedule your ASC appointment if we determine your injuries may interfere with your biometrics submission. Please do not visit a USCIS office if you are sick or feel symptoms of being sick. Follow the instructions on this notice to reschedule your appointment.

You may bring cell phones or electronic devices, but they must be turned off during biometrics collection. No one may photograph or record at an ASC.

For more information regarding your ASC appointment, visit https://www.uscis.gov/forms/filing-guidance/preparing-for-your-biometric-services-appointment.

If you have questions regarding this notice, please call the USCIS Contact Center at 1-800-375-5283 (TTY 800-767-1833).

**NOTE:** If an ASC closes due to inclement weather or unforeseen circumstances, USCIS will automatically reschedule your ASC appointment for the next available date and time. For the latest information on the status of an office, visit https://www.uscis.gov/about-us/uscis-office-closings. Please check this page on the day of your ASC appointment. If USCIS reschedules your ASC appointment, you will receive a new ASC appointment notice.

You must update your address within 10 days if you move. For instructions, visit https://www.uscis.gov/addresschange. If you are in removal proceedings, you must also notify the Executive Office for Immigration Review (EOIR or Immigration Court) within five working days of any change of address or telephone number by filing a completed Form EOIR-33, Alien's Change of Address/Phone Number Form/Immigration Court. For instructions, visit https://www.justice.gov/eoir/form-eoir-33-eoir-immigration-court-listing.

**WARNING:** Failure to update your mailing address with USCIS, and, if applicable, EOIR may result in dismissal of your asylum application, referral of your asylum application to an immigration judge, or if you are already in removal proceedings, an entry of a removal order in your absence if you fail to appear at a hearing before an immigration judge.

USCIS may use your biometrics to obtain the criminal history records of the Federal Bureau of Investigation (FBI), for identity verification, to determine eligibility, to create immigration documents (for example, Permanent Resident Card, Employment Authorization Document), or any purpose authorized by the Immigration and Nationality Act. You may obtain a copy of your own FBI record using the procedures outlined at 28 CFR 16.30-16.34. For more information, please visit: www.fbi.gov/services/cjis/compact-council/guiding-principles-noncriminal-justice-applicants-privacy-rights. For information regarding how the FBI will use your fingerprints, please visit www.fbi.gov/services/cjis/compact-council/privacy-act-statement.

If you cannot attend your scheduled appointment, you may request to reschedule at https://my.uscis.gov/account/biometrics/overview or by calling the USCIS Contact Center at 1-800-375-5283 (TTY 800-767-1833). You must make your request before the date and time of the original appointment, and you must establish good cause for rescheduling. If you fail to make a request before your scheduled appointment or fail to establish good cause, and you do not appear at your appointment, USCIS may consider your application, petition, or request abandoned and, as a result, it may be denied. For more information about rescheduling, see https://www.uscis.gov/forms/filing-guidance/preparing-for-your-biometric-services-appointment.

If you cannot leave your home/hospital due to a serious ongoing medical condition, you may request a mobile biometrics appointment by following the instructions on the back of this notice under "Notice for People with Disabilities," or by visiting uscis.gov/accommodationsinfo.

For questions about this notice call 1-800-375-5283. For questions about your application, contact the Asylum Office or Immigration Court with jurisdiction over your case.

If this is an interview or biometrics appointment notice, please see the back of this notice for important information.

Form I-797C 10/13/21

003

## DECLARATION OF BENJAMIN MOON IN SUPPORT OF BOND

**In the Matter of Eunha Oh, A# 208-839-580**

I, Benjamin Moon, declare as follows:

1. I am over eighteen years of age and competent to make this declaration. I am a citizen of the United States. I reside at 3850 W Nevso Drive, Unit 405, Las Vegas, Nevada 89103. I make this declaration of my own personal knowledge in support of the request of Eunha Oh (A#208-839-580), who is detained at the Adelanto ICE Processing Center (East Facility), for release on bond. If called to testify, in person or by telephone or video, I would testify to the facts set out below, and I am available to appear at her bond hearing. Copies of my passport and my driver's license are included as part of the bond packet.
2. I have known Eunha Oh for approximately three months; she is my girlfriend. We met at a music festival held in Las Vegas, Nevada, and began dating within the week after we met. Since then we have been together almost every day, with the exception of a few days here and there. She has stayed with me at my home in Las Vegas, and we have shared our everyday lives together. She has been the best girlfriend I have ever had, and she has supported me emotionally and made me a better person. I last saw her in person on Sunday August 30, 2026, when I visited her at the Adelanto ICE Processing Center. Photographs of the two of us together are included as part of the bond packet.
3. In the time I have known her, Ms. Oh has always kept her word and has never broken a commitment she made to me. She has never been dishonest with me, and she has never been violent, threatening, or even angry. She has not been involved in any unlawful conduct. She is an incredibly sweet and kind person.

### HER IMMIGRATION HISTORY AND RECORD OF APPEARING

4. Ms. Oh entered the United States on September 22, 2025, without inspection. She has remained in the United States continuously since that time.
5. Ms. Oh has an asylum case pending with immigration. I personally drove her to what I understood to be a biometrics appointment, at which she was taken into immigration custody.

6. Ms. Oh has never failed to appear for any hearing, check-in, or appointment. She has never been arrested, never been charged with any crime, and has never been the subject of any court order other than in these immigration proceedings. She has never told me that she would consider leaving the area, using a different name, or avoiding any authority.
7. Ms. Oh has not discussed with me the specific reasons for her immigration case, as those details are private to her. She has expressed to me that she wants to remain safely in the United States, and we intend to build a life together here.

**HER PROPOSED RESIDENCE**

8. Ms. Oh was residing in 918 S. Oxford Ave., PH 4, Los Angeles , CA 90006 before her detention; however, we spent our time together primarily at my home in Las Vegas, Nevada. She is not able to return to that residence because she will live with me so I can provide emotional support and make sure she attends all her court hearings. I am offering her a home with me because of our relationship and because I trust her. I understand that when she is released her address of record will change to 3850 W. Nevso Drive, Unit 405, Las Vegas, Nevada 89103, and I will make certain that a Form EOIR-33 reporting the new address is filed with the Immigration Court within five (5) days, and that the Department of Homeland Security is notified.
9. Housing. If Ms. Oh is released on bond, she will live with me at my home at 3850 W. Nevso Drive, Unit 405, Las Vegas, Nevada 89103, for as long as her immigration case is pending and for as long thereafter as she needs. My home is a one-bedroom luxury apartment that I rent. I currently live there alone, and a private bedroom will be available to her now and will remain available to her. There is no lease or homeowners' association restriction that would prevent her from living there, no other household member's consent is required, and she will not be required to pay rent.
10. Food and daily support. I will provide her with meals, household necessities, and other daily support at my own expense for as long as she resides with me.
11. I am employed as a Senior Account Executive at Alexander & Tom, Inc., where I have worked since September 2023. The total income reported on my 2025 federal income tax return was $106,351. My monthly earnings are approximately $5,600, which I receive by direct deposit. My federal income tax return, Form W-2, and other

supporting financial documents are included as part of the bond packet. I am able to support an additional person in my household without financial hardship and without any recourse to public benefits.

**HER EMPLOYMENT AND COMMUNITY TIES**

12. Ms. Oh is not currently employed.
13. Because I am aware that she is not employed, her move to my home will not affect any employment of hers. I own a reliable vehicle, and I will provide her with transportation as needed.
14. Ms. Oh is a Christian who follows the Christian faith.

**MY COMMITMENT TO ENSURING HER APPEARANCE**

15. I take full personal responsibility for ensuring that Ms. Oh appears at every future immigration proceeding and appointment. Specifically, I commit to the following:

(a)I will personally transport Ms. Oh to every Immigration Court hearing, every ICE check-in or reporting appointment, and every appointment with her attorney, and I will remain with her until each is concluded. I own a reliable vehicle and I am able to make these trips.

(b)If I am ever unable to drive her, I will arrange and pay for her transportation and will confirm with her attorney in advance that she has a way to get there.

(c)I am willing to contribute financially toward her transportation costs, legal fees, and filing costs, so that no financial obstacle prevents her from appearing or from pursuing her case.

(d)I will serve as her primary point of contact, keep a written calendar of every hearing date and reporting obligation, and personally remind her of each one in advance.

(e)I understand that 3850 W Nevso Drive, Unit 405, Las Vegas, Nevada 89103 will be her address of record with the Immigration Court and the Department of Homeland Security. I will accept mail addressed to her there and deliver it to her immediately.

(f)If she ceases to reside in my home for any reason, I will notify her attorney and the Immigration Court in writing within five (5) days, and I will ensure a Form EOIR-33 is filed.

(g)I will assist her in complying with every condition the Court or the Department imposes on her release, and I will make my home available for any required home visit.

(h)I understand that the Court must be satisfied not only that she will attend her hearings but that she will comply with whatever the Court ultimately orders. I will make certain that she complies with every order, ruling, and directive of the Immigration Court and the Department of Homeland Security, including any reporting or surrender requirement, whatever the outcome of her case may be. I will not assist her in avoiding any obligation, and I would not allow my home to be used for that purpose.

16. I am willing to contribute toward her bond, and I am willing to serve as her third-party custodian.
17. I understand that I am making these commitments to a court of the United States, that Ms. Oh's release may depend on them, and that I am making them under penalty of perjury. I intend to honor them in full, and I am prepared to appear and testify to everything stated here.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 8/31/26, 2026, at Las Vegas, Nevada.

[signature]

Benjamin Moon
3850 W. Nevso Drive, Unit 405, Las Vegas, Nevada 89103
301-693-5860 | benjamin.moon1@gmail.com


We the People
Of the United States,
in Order to form a more perfect Union,
establish Justice, insure domestic Tranquility,
SIGNATURE OF BEARER / SIGNATURE DU TITULAIRE / FIRMA DEL TITULAR
3
PASSPORT
PASSEPORT
PASAPORTE
USA
UNITED STATES OF AMERICA
Type / Type / Tipo
Code / Code / Código
Passport No. / No. du Passeport / No. de Pasaporte
P
USA
554630907
Surname / Nom / Apellidos
MOON
Given Names / Prénoms / Nombres
BENJAMIN MIN-HO
Nationality / Nationalité / Nacionalidad
UNITED STATES OF AMERICA
Date of birth / Date de naissance / Fecha de nacimiento
05 Jun 1984
Place of birth / Lieu de naissance / Lugar de nacimiento
PENNSYLVANIA, U.S.A.
M
Date of issue / Date de délivrance / Fecha de expedición
04 Jan 2017
Date of expiration / Date d'expiration / Fecha de caducidad
03 Jan 2027
Endorsements / Mentions Spéciales / Anotaciones
SEE PAGE 27
USA
P<USAMOON<<BENJAMIN<MIN<HO<<<<<<<<<<<<<<<<<<<<<
5546309075USA8406055M2701035760620943<115152


NEVADA USA
1864
DRIVER LICENSE
BATTLE BORN
4d DL NO. 1707582526
3 DOB 06/05/1984
1 MOON
2 BENJAMIN MIN-HO
8 10050 CAPE MAY ST
LAS VEGAS, NV 89141-8696
9 CLASS C
9a END NONE
12 REST NONE
4a ISS
07/19/2023
4b EXP
06/05/2031
15 SEX M
16 HGT 5'-08"
17 WGT 165 lbs
18 EYES BRO
19 HAIR BLK
06/05/84
5 DD 000178334100759684149

21 0021553361701
DOB 06/05/1984
ISS 07/19/2023

CLASS: C-CARS/VANS/PICKUPS; MAY TOW A VEH < 10,000 LBS

ENDORSEMENTS: None

RESTRICTIONS: None

Card Version:
05/24/2021

Uploaded on: 09/03/2026 at 04:14:27 PM (Pacific Daylight Time) Base City: ADL

ALEXANDER & TOM INC
3500 Boston St Ste 225
Baltimore MD 21224

1808-6228
ORG1:200 Staffers
EE ID: 90 DD

Payrolls by Paychex, Inc.

BENJAMIN MOON
3850 W NEVSO DR
APT 405
LAS VEGAS NV 89103

NON-NEGOTIABLE

NON-NEGOTIABLE

**PERSONAL AND CHECK INFORMATION**
Benjamin Moon
3850 W Nevso Dr
Apt 405
Las Vegas, NV 89103
**Employee ID:** 90

**Home Department:** 200 Staffers

**Pay Period:** 08/02/26 **to** 08/15/26
**Check Date:** 08/21/26 **Check #:** 906

**NET PAY ALLOCATIONS**

| *DESCRIPTION* | *THIS PERIOD ($)* | *YTD ($)* |
|---|---|---|
| Check Amount | 0.00 | 0.00 |
| Chkg 619 | 2803.92 | 19079.98 |
| Savg 296 | 0.00 | 33577.31 |
| **NET PAY** | **2803.92** | **52657.29** |

**TIME OFF** (Based on Policy Year)

| *DESCRIPTION* | *AMT TAKEN* | *TOTAL BAL* |
|---|---|---|
| Vacation | 112.00 hrs | 8.00 hrs |
| *DESCRIPTION* | *AMT TAKEN* | *TOTAL BAL* |
| Sick | 8.00 hrs | 32.00 hrs |

**EARNINGS**

| *BASIS OF PAY* | *DESCRIPTION* | *HRS/UNITS* | *RATE* | *CURRENT ($)* | *YTD HRS/UNITS* | *YTD ($)* |
|---|---|---|---|---|---|---|
| | Personal | | | | M24.0000 | |
| | Salary | M76.0000 | | 3846.15 | M1260.0000 | 62500.05 |
| | Bonus | | | | | 8000.00 |
| | Holiday | | | | M36.0000 | |
| | Sick | M4.0000 | | | M8.0000 | |
| | Vacation | | | | M32.0000 | |
| | **Total Hours** | 80.0000 | | | 1360.0000 | |
| | **Total Hrs Worked** | 76.0000 | | | 1284.0000 | |
| | **Gross Earnings** | | | 3846.15 | | 70500.05 |

**OTHER ITEMS**
*Do not increase Net Pay*

| *DESCRIPTION* | *HRS/UNITS* | *RATE* | *CURRENT ($)* | *YTD HOURS* | *YTD ($)* |
|---|---|---|---|---|---|
| SafeHarborNon-el | | | 153.84 | | 2500.08 |

**WITHHOLDINGS**

| *DESCRIPTION* | *FILING STATUS* | *CURRENT ($)* | *YTD ($)* |
|---|---|---|---|
| Social Security | | 230.40 | 4322.64 |
| Medicare | | 53.88 | 1010.94 |
| Fed Income Tax | SMS | 435.63 | 8604.15 |
| **TOTAL** | | 719.91 | 13937.73 |

**DEDUCTIONS**

| *DESCRIPTION* | *CURRENT ($)* | *YTD ($)* |
|---|---|---|
| 401k EE | 192.31 | 3124.97 |
| S125 Med | 130.01 | 780.06 |
| **TOTAL** | 322.32 | 3905.03 |

| **NET PAY** | *THIS PERIOD ($)* | *YTD ($)* |
|---|---|---|
| | **2803.92** | **52657.29** |

*Payrolls by Paychex, Inc.*

**0031 1808-6228** Alexander & Tom Inc • 3500 Boston St Ste 225 • Baltimore MD 21224 • (410) 499-4063

EOIR 14 of 92
Exh. 2 - Adm.



011

# APARTMENT LEASE CONTRACT
## COVER SHEET

NATIONAL APARTMENT ASSOCIATION
We Lead the Way Home

This Cover Sheet is annexed to, and made part of the Apartment Lease Contract, dated 11/24/2025 ("Lease"), between you, the resident(s) as listed below and us. The terms "you" and "your" refer to all residents. The terms "we," "us," and "our" refer to the owner listed below.

### PARTIES

**Residents**
Benjamin Moon

**Occupants**

**Owner**
CRP/CALIDA PALMS VENTURE, LLC

### LEASE DETAILS

**A. Apartment** (Par. 1)
Street Address: 3850 W. Nevso Dr
Apartment No. 405 City: Las Vegas State: NV Zip: 89103

**B. Initial Lease Term.** Begins: 11/29/2025 Ends at 11:59 p.m. on: 11/28/2026

**C. TOTAL MONTHLY PERIODIC RENT** (Par. 6):
You are responsible for the following mandatory monthly charges, the total of which shall be known as the total monthly periodic rent.

| | | |
|---|---|---|
| Base Rent | $ 1635.00 | (Par. 6) |
| Parking Fee (per vehicle) | $ | (Parking Addendum) |
| Total Monthly Animal Rent ($ 0.00 per animal) | $ 0.00 | (Animal Addendum) |
| Electric | $ | (Utility Addendum) |
| Natural Gas | $ | (Utility Addendum) |
| Water | $ Variable | (Utility Addendum) |
| Sewer/Wastewater | $ 35.00 | (Utility Addendum) |
| Trash | $ 30.00 | (Utility Addendum) |
| Utility Billing Administrative Fee | $ 5.50 | (Utility Addendum) |
| Garage Rent | $ | (Enclosed Garage Addendum) |
| Carport Rent | $ | (Enclosed Garage Addendum) |
| Storage Unit Rent | $ | (Enclosed Garage Addendum) |
| Washer/Dryer Rent | $ | (Washer and Dryer Addendum) |
| Other Cable | $ 110.00 | |
| Other Membership Fee | $ 65.00 | |
| Other Valet Trash | $ 25.00 | |
| Other Water Heating | $ 20.00 | |
| Other | $ | |
| **Total Monthly Periodic Rent:** | $ 1810.00 | |

*This total monthly periodic rent amount excludes monthly charges for electric, natural gas, and water on the basis that the applicable public utility is unable to contract with the tenant directly for such utility provided to the dwelling unit, and, in the case of water utilities, the dwelling unit is subject to a master metered water system. A fee for these applicable utilities equal to the amount of the monthly bill for the cost of services provided in the dwelling unit shall be charged separately from the total monthly periodic rent amount indicated above.

The names and telephone numbers of the public utility providers for the applicable utilities are as follows:

Electric Company: Nevada Energy
Phone: 800-331-3103

Gas Company: Southwest Gas Corporation
Phone: 877-860-6020

Water Company: Las Vegas Valley Water District
Phone: 800-252-2011

EOIR 15 of 92

012

Exh. 2 - Adm.



© 2025, National Apartment Association, Inc. - 10/2025, Nevada

**D. One-Time Fees**
You are responsible for the following one-time fees.

| | | |
|---|---|---|
| Total Animal Fee ($ ______ per animal) | $ | (Animal Addendum) |
| Parking Fee (per vehicle) | $ | (Parking Addendum) |
| Utility: New Account Fee | $20.00 | (Utility Addendum) |
| Utility: Final Bill Fee | $5.00 | (Utility Addendum) |
| Other | $ | |
| Other | $ | |
| Other | $ | |
| Other | $ | |
| Other | $ | |

**E. Additional Charges Per Occurrence**
You are responsible for the following fees charged per occurrence.

| | | |
|---|---|---|
| Prorated Rent | $113.33 | (Par. 6) |
| Online Portal Payment Fee | $ | (Par. 6) |
| Portal Payment (ACH) Flat Fee | $0.00 | (Par. 6) |
| Portal Payment (Debit) Flat Fee | $9.99 | (Par. 6) |
| Portal Payment (Credit) Flat Fee | $ | (Par. 6) |
| Portal Payment (Debit) Percentage Fee | $ | (Par. 6) |
| Portal Payment (Credit) Percentage Fee | $ 3 | (Par. 6) |
| Late Fee (flat fee) | $ | (Par. 6) |
| Late Fee (percentage) | $ 5.0 | (Par. 6) |
| Returned Check or Rejected Payment/Non-Sufficient Funds (NSF) Fee | $100.00 | (Par. 6) |
| Reletting Charge | $1810.00 | (Par. 11) |
| Access Device Replacement: Card | $ | (Remote Control, Card, Code Access Gate Addendum) |
| Access Device Replacement: Remote Control | $ | (Remote Control, Card, Code Access Gate Addendum) |
| Animal Violation (per animal) | $100 | (Animal Addendum) |
| Daily Animal Violation Charge (per animal) | $10 | (Animal Addendum) |
| Other After Hours Lockout Srvc -if available | $100.00 | |
| Other Electric Vacant Recovery Fee | $50.00 | |
| Other | $ | |
| Other | $ | |
| Other | $ | |

**F. Deposits**
You are responsible for the following deposits, which will be refundable in accordance with the terms of the Lease.

| | | |
|---|---|---|
| Security Deposit | $500.00 | (Par. 4) |
| Total Animal Deposit ($ 0.00 per animal) | $ 0.00 | (Animal Addendum) |
| Carport Deposit | $ | (Enclosed Garage Addendum) |
| Garage Deposit | $0.00 | (Enclosed Garage Addendum) |
| Storage Deposit | $ | (Enclosed Garage Addendum) |
| Satellite TV Deposit | $0.00 | (Satellite Addendum) |
| Other | $ | |
| Other | $ | |
| Other | $ | |
| Other | $ | |
| Other | $ | |

**G. Rent Concessions**
You are being provided with the following concessions. If the concession is recurring, it has been factored into your total monthly periodic rent amount.

| | |
|---|---|
| ☐ One-Time Concession | $0.00 |
| ☐ Monthly Discount/Concession | $0.00 |
| ☒ Other Discount/Concession | $500.00 |

*See the Rent Concession Addendum for additional details.*

**H. Special Provisions**
See below and any additional addenda attached.

EOIR 16 of 92

Exh. 2 - Adm.

© 2025, National Apartment Association, Inc. - 10/2025, Nevada



013

**Special Provisions** (continued)

**Total Due at Lease Signing:** $ ☒ N/A

**Total Due at Move-In:** $ ☐ N/A

**Lease Contract Controls.** This Cover Sheet may not include all fees and expenses you may incur throughout your tenancy. The provisions of this Cover Sheet are intended to supplement the Lease Contract and all addenda (together, the "Lease Contract") and are specifically subject to the provisions thereof. In the event of any conflict between the provisions of the Lease Contract and the provisions of this Cover Sheet, the provisions of the Lease Contract shall control.

| Resident or Residents Signatures | Date Signed |
|---|---|
| Benjamin Moon | 11/24/2025 |

| Owner or Owner's Authorized Representative | Date Signed |
|---|---|
| | |



© 2025, National Apartment Association, Inc. - 10/2025, Nevada

# APARTMENT LEASE CONTRACT

NATIONAL APARTMENT ASSOCIATION
We Lead the Way Home

Date of Lease Contract: November 24, 2025
(when the Lease Contract is filled out)

***This is a binding document. Read carefully before signing.***

## Moving In — General Information

**1. PARTIES.** This Lease Contract (sometimes referred to as the "lease") is between *you*, the resident(s) *(list all people signing the Lease Contract):*

Benjamin Moon

and *us*, the owner: CRP/CALIDA PALMS VENTURE, LLC

*(name of apartment community or title holder).* You've agreed to rent Apartment No. 405 at 3850 W. Nevso Dr *(street address)* in Las Vegas *(city)*, Nevada, 89103 *(zip code)* (the "apartment" or the "premises") for use as a private residence only. The terms "you" and "your" refer to all residents listed above. The terms "we," "us," and "our" refer to the owner listed above (or any of owner's successors' in interest or assigns). Written or electronic notice to or from our managers constitutes notice to or from us. If anyone else has guaranteed performance of this Lease Contract, a separate Lease Contract Guaranty for each guarantor is attached.

Disclosure Notice: Name and address of the person or company authorized to manage the premises: PPMS 3850 West Nevso Dr Las Vegas, NV 89103

Name and address of the person or company authorized to receive service of process, demands, and notices: PPMS 3850 West Nevso Dr Las Vegas, NV 89103

Name of principal or corporate owner: CRP/CALIDA PALMS VENTURE, L.L.C.

In case of emergency, the telephone number to contact is: (702) 202-2440.

**2. OCCUPANTS.** The apartment will be occupied only by you and *(list all other occupants not signing the Lease Contract):*

No one else may occupy the apartment. Persons not listed above must not stay in the apartment for more than 3 consecutive days without our prior written consent, and no more than twice that many days in any one month. If the previous space isn't filled in, two days per month is the limit.

**3. LEASE TERM.** The initial term of the Lease Contract begins on the 29th day of November, 2025 and ends at 11:59 pm the 28th day of November, 2026.

**Renewal.** This Lease Contract will automatically renew month-to-month unless either party gives at least 60 days written notice of termination or intent to move-out as required by paragraph 45 (Move-Out Notice). If the number of days isn't filled in, at least 30 days notice is required.

**4. SECURITY DEPOSIT.** Unless modified by addenda, the total security deposit at the time of execution of this Lease Contract for all residents in the apartment is $ 500.00, due on or before the date this Lease Contract is signed. You may be responsible for additional security deposits if you rent an enclosed garage, carport, storage unit, install a satellite dish or antenna, or keep animals in the dwelling.

**5. KEYS.** You will be provided 2 apartment key(s), 1 mailbox key(s), 1 FOB(s), and/or ______ other access device(s) for access to the building and amenities at no additional cost at move-in. If the key, FOB, or other access device is lost or becomes damaged during your tenancy or is not returned or is returned damaged when you move out, you will be responsible for the costs for the replacement and/or repair of the same.

**6. MAXIMUM TOTAL MONTHLY PERIODIC RENT AND CHARGES.** You will pay $ 1810.00 * per month (the "Total Monthly Periodic Rent"), payable in advance and without demand:

- ☐ at the on-site manager's office, or
- ☒ at our online payment site or portal, or
- ☒ at Electronic Money Order Location

If payment at the on-site manager's office is authorized, we accept the following payment types: ☐ personal check, ☐ money order, ☐ cashier's check. Cash payments are not acceptable without our prior written permission. We may at our option, require at any time that you pay the Total Monthly Periodic Rent and other sums in cash, certified funds, or via one personal check rather than multiple checks. At our discretion, we may convert any and all checks via the Automated Clearing House (ACH) system for the purposes of collecting payment. Upon your request, we will provide you with a signed receipt for all payments.

If payment at our online payment site or portal is authorized, the following processing fees are applicable for available payment types: ACH $ 0.00, Debit ☒ a flat rate of $ 9.99 or ☐ ______% of the payment amount, Credit ☐ a flat rate of $ ______ or ☒ 3 % of the payment amount. These fees are charged by the payment processor and are subject to change at the processor's sole discretion. In the event of a change to these fees, we will provide advance written notice of the fee change whenever possible.

The Total Monthly Periodic Rent amount above includes the following mandatory monthly charges:

| | |
|---|---|
| Base Rent | $ 1635.00 |
| Parking Fee (per vehicle) | $ |
| Total Monthly Animal Rent | $ 0.00 |
| Electric | $ |
| Natural Gas | $ |
| Water | $ Variable |
| Sewer/Wastewater | $ 35.00 |
| Trash | $ 30.00 |
| Utility Billing Administrative Fee | $ 5.50 |
| Garage Rent | $ |
| Carport Rent | $ |
| Storage Unit Rent | $ |
| Washer/Dryer | $ |
| Other Cable | $ 110.00 |
| Other Membership Fee | $ 65.00 |
| Other Valet Trash | $ 25.00 |
| Other Water Heating | $ 20.00 |
| Other | $ |

EOIR 18 of 92

015

Exh. 2 - Adm.



© 2025, National Apartment Association, Inc. - 10/2025, Nevada

*The Total Monthly Periodic Rent may exclude monthly charges for electric, natural gas, and/or water on the basis that the applicable public utility is unable to contract with the tenant directly for such utility provided to the dwelling unit, and, in the case of water utilities, the dwelling unit is subject to a master metered water system. A fee for these applicable utilities equal to the amount of the monthly bill for the cost of services provided in the dwelling unit shall be charged separately from the total monthly periodic rent amount indicated above. The name and telephone number of the public utility provider for any applicable utility is as follows:

Electric Company: **Nevada Energy**
Phone: **800-331-3103**

Gas Company: **Southwest Gas Corporation**
Phone: **877-860-6020**

Water Company: **Las Vegas Valley Water District**
Phone: **800-252-2011**

Prorated total monthly periodic rent of $ **113.33** is due for the remainder of *(check one)*: ☒ 1st month or ☐ 2nd month, on **11/29/2025**. Otherwise, you must pay your total monthly periodic rent on or before the first day of each month (due date). You must not withhold or offset this payment unless authorized by statute. The total monthly periodic rent payment is not considered accepted if the payment/ACH is rejected, does not clear, or is stopped for any reason. If you do not pay the total monthly periodic rent on or before the due date, you will be in default. If you do not pay the total monthly periodic rent on or before the **4th** day of the month, you'll pay a late charge. (A late fee cannot be charged before the 4th day of the month). Your late charge will be *(check one)*: ☐ a flat rate of $ ________ or ☒ **5.0** % of the total monthly periodic rent payment. (The overall late fee cannot exceed 5% of the total monthly periodic rent). You'll also pay a charge of $ **100.00** for each returned check or rejected electronic payment, in addition to the late charge. If you become delinquent on the total monthly periodic rent payment, all remedies under this Lease Contract will be authorized, and we'll also have all other remedies for such violation.

**7. UTILITIES.** We'll pay for the following items, if checked:
☐ water ☐ gas ☐ electricity ☐ master antenna
☐ wastewater ☐ trash ☐ cable TV
☐ other ________

You'll pay for all other utilities, related deposits, and any charges, fees, or services on such utilities. You must not allow utilities to be disconnected—including disconnection for not paying your bills—until the lease term or renewal period ends. Cable channels that are provided may be changed during the lease term if the change applies to all residents. Utilities may be used only for normal household purposes and must not be wasted. If your electricity is ever interrupted, you must use only battery-operated lighting.

If any utilities are submetered for the apartment, or prorated by an allocation formula, we will attach an addendum to this Lease Contract in compliance with state agency rules or local ordinance.

**8. INSURANCE.** We do not maintain insurance to cover your personal property or personal injury. We are not responsible to any resident, guest, or occupant for damage or loss of personal property or personal injury from (including but not limited to) fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane, negligence of other residents, occupants, or invited/uninvited guests or vandalism unless otherwise required by law.

In addition, we urge all tenants, and particularly those residing in coastal areas, areas near rivers, and areas prone to flooding, to obtain flood insurance. Renter's insurance may not cover damage to your property due to flooding. A flood insurance resource which may be available includes the National Flood Insurance Program managed by the Federal Emergency Management Agency (FEMA).

We ☐ require ☒ do not require you to get your own insurance for losses to your personal property or injuries due to theft, fire, water damage, pipe leaks and the like. If no box is checked, renter's insurance is not required.

Additionally, you are *(check one)* ☒ required to purchase personal liability insurance ☐ not required to purchase personal liability insurance for damages and losses to our property caused by your conduct (or that of your occupants and guests) including, but not limited to, fire and water damage. If no box is checked, personal liability insurance is not required. If required, failure to maintain personal liability insurance throughout your tenancy, including any renewal periods and/or lease extensions, is an incurable breach of this Lease Contract and may result in the termination of tenancy and eviction and/or any other remedies as provided by this Lease Contract or state law.

**9. LOCKS AND LATCHES.** Keyed lock(s) will be rekeyed after the prior resident moves out. The rekeying will be done before you move into your apartment.

You may at any time ask us to change or rekey locks or latches during the Lease Term. We must comply with those requests, but you must pay for them, unless otherwise provided by law.

**Payment for Rekeying, Repairs, Etc.** You must pay for all repairs or replacements arising from misuse or damage to devices by you or your, occupants, or guests during your occupancy. You may be required to pay in advance if we notify you within a reasonable time after your request that you are more than 30 days delinquent in reimbursing us for repairing or replacing a device which was misused or damaged by you, your guest or an occupant; or if you have requested that we repair or change or rekey the same device during the 30 days preceding your request and we have complied with your request. Otherwise, you must pay immediately after the work is completed.

## Special Provisions and "What If" Clauses

**10. SPECIAL PROVISIONS.** The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Lease Contract and will supersede any conflicting provisions of this printed Lease form.

**See Additional Special Provisions**

See any additional special provisions.

**11. EARLY MOVE-OUT.** You'll be liable to us for a reletting charge of $ **1810.00** (not to exceed 100% of the highest total monthly periodic rent during the lease term) if you:
(1) fail to give written move-out notice as required in paragraph 45 (Move-Out Notice); or
(2) move out without paying the total monthly periodic rent in full for the entire lease term or renewal period; or
(3) move out at our demand because of your default; or
(4) are judicially evicted.

The reletting charge is not a cancellation fee and does not release you from your obligations under this Lease Contract. See Paragraph 45 (Move-Out Notice).

**Not a Release.** The reletting charge is not a lease cancellation fee or buyout fee. It is an agreed-to liquidated amount covering only part of our damages, that is, our time, effort, and expense in finding and processing a replacement. These damages are uncertain and difficult to ascertain–particularly those relating to inconvenience, paperwork, advertising, showing apartments, utilities for showing, checking prospects, office overhead, marketing costs, and locator-service fees. You agree that the reletting charge is a reasonable estimate of such damages and that the charge is due whether or not our reletting attempts succeed. If no amount is stipulated, you must pay our actual reletting costs so far as they can be determined. The reletting charge does not release you from continued liability for: the future or past-due total monthly periodic rent; charges for cleaning, repairing, repainting, or unreturned keys; or other sums due.

**12. REIMBURSEMENT.** You must promptly reimburse us for loss, damage, government fines, or cost of repairs or service in the apartment community due to a violation of the Lease Contract or rules, improper use, or negligence by you or your guests or occupants. **Unless the damage or wastewater stoppage is due to our negligence, we're not liable for—and you must pay for—repairs, replacement costs, and damage to the following that result from your or your invitees, guests, or occupants' negligence or intentional acts: (1) damage to doors, windows, or screens; (2) damage from windows or doors left open; and (3) damage from wastewater stoppages caused by improper objects in lines exclusively serving your apartment.** We may require payment at any time, including advance payment of repairs for which you're liable. Delay in demanding sums you owe is not a waiver.



© 2025, National Apartment Association, Inc. - 10/2025, Nevada

**13. PROPERTY LEFT IN APARTMENT. All property left in the apartment is (unless exempt under state statute) subject to disposal if found to be abandoned under Nevada law.** For this purpose, "apartment" excludes common areas but includes interior living areas and exterior patios, balconies, attached garages, and storerooms for your exclusive use.

**Removal After Surrender, Abandonment, or Eviction.** We, our agent, or law officers may remove and/or store all property remaining in the apartment or in common areas (including any vehicles you or any occupant or guest owns or uses) if you are judicially evicted or if you surrender or abandon the apartment (see definitions in paragraph 50 - Deposit Return, Surrender, And Abandonment). Upon your request, you will be provided reasonable access to your property during the 5 days after an eviction lockout to retrieve essential personal effects (i.e., medication, baby formula, basic clothing and care items).

**Storage.** We or our agents will store property removed after judicial eviction, surrender, or abandonment of the apartment for a period of thirty (30) days after the abandonment, eviction, or end of the rental period. Except for essential personal effects (i.e., medication, baby formula, basic clothing and care items) subject to retrieval in the 5 days after an eviction lockout, we do have the ability to charge and collect the reasonable and actual costs of inventory, moving, and storage before releasing any property to you after your move-out.

**Redemption.** If we or our agent have removed and stored property as authorized by the state statute, you may redeem the property by paying the reasonable and actual charges for packing, removing, and storing. We may return redeemed property at the place of storage, the management office, or the apartment (at our option). We or our agent may require payment by cash, money order, or certified check. These redemption obligations do not apply to essential personal effects (i.e., medication, baby formula, basic clothing and care items) subject to retrieval in the 5 days after an eviction lockout.

**Disposition or Sale.** After complying with the notification and storage procedures for disposal of personal property abandoned or left on the premises, we or our agent may dispose of or sell personal property which was abandoned or left in the apartment in order to recover the reasonable and actual costs of packing, removing, and storing the property. We or our agent will make a reasonable effort to locate you and notify you of our intention to dispose of the property as provided by law. Notice will be mailed to you at your present address, and if that address is unknown, then at your last known address. Automobiles will be disposed of in accordance with Chapter 487 of the Nevada Revised Statutes.

**14. FAILING TO PAY FIRST MONTH'S TOTAL MONTHLY PERIODIC RENT.** If you don't pay the first month's total monthly periodic rent when or before the Lease Contract begins you will be in default of this Lease Contract, unless the total monthly periodic rent is abated or your tenancy is terminated due to a delay in giving you possession. We also may end your right of occupancy and recover damages, the future total monthly periodic rent, reletting charges, attorney's fees, court costs, and other lawful charges in accordance with State statute. Our rights and remedies under paragraph 11 (Early Move-Out) and paragraph 32 (Default by Resident) apply under this paragraph.

**15. TOTAL MONTHLY PERIODIC RENT INCREASES AND LEASE CONTRACT CHANGES.** No Lease Contract changes are allowed before the initial Lease Contract term ends, except for changes allowed by any special provisions in paragraph 10 (Special Provisions), by a written addendum or amendment signed by you and us, or by reasonable changes of apartment rules allowed pursuant to applicable law. If neither party gives proper written notice, as required by paragraph 3 (Lease Term), to terminate your tenancy at the end of the initial lease term, this Lease Contract will automatically continue month-to-month until either we or you give the other party proper written notice, as required by paragraph 3 (Lease Term), to non-renew or terminate your month-to-month tenancy. We have the right to increase the total monthly periodic rent due by giving you notice of the total monthly periodic rent increase at least sixty (60) days in advance of the effective date of the increase. We must disclose the amount which represents property taxes paid by us and the remainder of that payment whenever the total monthly periodic rent changes or in July of each year. You may visit https://maps.clarkcountynv.gov/secroll/secroll.asp to obtain the property taxes paid by us in Clark County. For Washoe County please visit https://www.washoecounty.gov/assessor/cama/index.php. We have the right to adopt or modify rules or regulations concerning your use and occupancy of the premises in order to promote the convenience, safety or welfare of us, you, or the other residents; or to preserve the property from abusive use; or to make a fair distribution of services and facilities held out for the residents generally by giving written notice to you thirty (30) days in advance of the effective date of the new rules and regulations. The new modified Lease Contract will begin on the date stated in the notice (without necessity of your signature) unless you give us written move-out notice under paragraph 45 (Move-Out Notice).

**16. DELAY OF OCCUPANCY.** If occupancy is or will be delayed for construction, repairs, cleaning, or a previous resident's holding over, we're not responsible for the delay, except as otherwise provided by law. The Lease Contract will remain in force subject to: (1) abatement of the total monthly periodic rent until occupancy is delivered; and (2) your right to terminate the Lease Contract as set forth below. Termination notice must be in writing. After termination, you are entitled to a refund of all deposit(s), fees, charges, and the total monthly periodic rent paid. Periodic rent abatement or lease termination does not apply if delay is for cleaning or repairs that don't affect the habitability of the apartment or prevent you from occupying the apartment. If we have failed to deliver possession of the apartment to you as provided by law, you may terminate the Lease Contract by giving us at least five (5) day's written notice.

**17. DISCLOSURE RIGHTS.** If someone requests information on you or your rental history for law-enforcement, governmental, or business purposes, we may provide it.

## While You're Living in the Apartment

**18. COMMUNITY POLICIES OR RULES.** You and all guests and occupants must comply with any written apartment rules and community policies, including instructions for care of our property. Our rules are considered part of this Lease Contract. We may make reasonable changes to written rules upon thirty (30) day's written notice as stated in paragraph 15 (Total Monthly Periodic Rent Increases and Lease Contract Changes), if they are distributed and applicable to all units in the apartment community and does not affect the resident's obligation to pay the total monthly periodic rent, utilities, or other charges.

**19. LIMITATIONS ON CONDUCT.** The apartment and other areas reserved for your private use must be kept clean and free of trash, garbage, and other debris. Trash must be disposed of at least weekly in appropriate receptacles in accordance with local ordinances. Passageways may be used only for entry or exit. You agree to keep all passageways and common areas free of obstructions such as trash, storage items, and all forms of personal property. No person shall ride or allow bikes, skateboards, or other similar objects in the passageways. Any swimming pools, saunas, spas, tanning beds, exercise rooms, storerooms, laundry rooms, and similar areas must be used with care in accordance with apartment rules and posted signs. Glass containers are prohibited in all common areas. You, your occupants, or guests may not anywhere in the apartment community: use candles or use kerosene lamps or kerosene heaters without our prior written approval; cook on balconies or outside; or solicit business or contributions. Conducting any kind of business (including child care services) in your apartment or in the apartment community is prohibited–except that any lawful business conducted "at home" by computer, mail, or telephone is permissible if customers, clients, patients, or other business associates do not come to your apartment for business purposes and you have obtained all necessary local licensing and zoning approvals for your business. We may regulate: (1) the use of patios, balconies, and porches; (2) the conduct of furniture movers and delivery persons; and (3) recreational activities in common areas. You'll be liable to us for damage caused by you or any guests or occupants.

We may exclude from the apartment community guests or others who, in our judgment, have been violating the law, violating this Lease Contract or any apartment rules, or disturbing other residents, neighbors, visitors, or owner representatives. We may also exclude from any outside area or common area a person who refuses to show photo identification or refuses to identify himself or herself as a resident, occupant, or guest of a specific resident in the community.

You agree to notify us if you or any occupants are convicted of any felony, or misdemeanor involving a controlled substance, violence to another person or destruction of property. You also agree to notify us if you or any occupant registers as a sex offender in any state. Informing us of criminal convictions or sex offender registry does not waive our right to evict you.


© 2025, National Apartment Association, Inc. - 10/2025, Nevada

**20. PROHIBITED CONDUCT.** You, your occupants or guests, or the guests of any occupants, may not engage in the following activities: behaving in a loud or obnoxious manner; disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the apartment community; disrupting our business operations; manufacturing, delivering, possessing with intent to deliver, or otherwise possessing a controlled substance or drug paraphernalia; engaging in or threatening violence; possessing a weapon prohibited by state law; discharging a firearm in the apartment community; displaying or possessing a gun, knife, or other weapon in the common area in a way that may alarm others; storing anything in closets having gas appliances; tampering with utilities or telecommunications; bringing hazardous materials into the apartment community; or injuring our reputation by making bad faith allegations against us to others.

**21. PARKING.** We may regulate the time, manner, and place of parking cars, trucks, motorcycles, bicycles, boats, trailers, and recreational vehicles by anyone. We may have unauthorized or illegally parked vehicles towed under an appropriate statute. A vehicle is unauthorized or illegally parked in the apartment community if it:

(1) has a flat tire or other condition rendering it inoperable;
(2) is on jacks, blocks or has wheel(s) missing;
(3) is not registered in Nevada or any other state, or if no license plate and/or registration sticker is displayed;
(4) takes up more than one parking space;
(5) belongs to a resident or occupant who has surrendered or abandoned the apartment or who has been ordered to vacate by any appropriate authority;
(6) is parked in a marked handicap space without the legally required handicap insignia;
(7) is parked in space marked for manager, staff, or guest at the office;
(8) blocks another vehicle from exiting;
(9) is parked in a fire lane or designated "no parking" area;
(10) is parked in a space marked for other resident(s) or unit(s);
(11) is parked on the grass, sidewalk, or patio;
(12) blocks garbage trucks from access to a dumpster; or
(13) belongs to a resident and is parked in a visitor or retail parking space.

**22. RELEASE OF RESIDENT.** Unless you're entitled to terminate your tenancy under paragraph 10 (Special Provision), paragraph 16 (Delay of Occupancy), paragraph 31 (Responsibilities of Owner) or paragraph 45 (Move-Out Notice), or as otherwise provided under Nevada law regarding our failure to maintain the apartment in habitable condition, failure to deliver possession of the apartment, or other proper reason provided by law, you won't be released from this Lease Contract for any reason—including but not limited to voluntary or involuntary school withdrawal or transfer, voluntary or involuntary job transfer, marriage, separation, divorce, reconciliation, loss of co-residents, loss of employment, bad health, or death.

**23. MILITARY PERSONNEL CLAUSE.** All parties to this Lease Contract agree to comply with any federal law, including, but not limited to the Service Member's Civil Relief Act, or any applicable state law(s), if you are seeking to terminate this Lease Contract and/or subsequent renewals and/or Lease Contract extensions under the rights granted by such laws.

**24. RESIDENT SAFETY AND PROPERTY LOSS.** You and all occupants and guests must exercise due care for your own and others' safety and security, especially in the use of smoke and carbon monoxide detectors, keyed deadbolt locks, keyless bolting devices, window latches, and access control devices.

**Smoke and Carbon Monoxide Detectors.** We'll furnish smoke detectors and carbon monoxide detectors only if required by statute, and we'll test them and provide working batteries when you first take possession. After that, you must test the smoke detectors and the carbon monoxide detectors on a regular basis, and you must pay for and replace batteries as needed, unless the law provides otherwise. We may replace dead or missing batteries at your expense, without prior notice to you. You must immediately report smoke detector and carbon monoxide detector malfunctions to us. Neither you nor others may disable neither the smoke detectors nor the carbon monoxide detectors. If you damage or disable the smoke detector or remove a battery without replacing it with a working battery, you may be liable to us under state statute for the actual and reasonable cost or fair and reasonable value of the work to repair or restore the smoke detector or carbon monoxide detector to working condition. If you disable or damage the smoke detector, or fail to replace a dead battery or report malfunctions to us, you will be liable to us and others for any loss, damage, or fines from fire, smoke, or water.

**Casualty Loss.** We're not liable to any resident, guest, or occupant for personal injury or damage or loss of personal property from any cause, including but not limited to: fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, or vandalism unless otherwise required by law. We have no duty to remove any ice, sleet, or snow but may remove any amount with or without notice. During freezing weather, you must ensure that the temperature in the apartment is sufficient to make sure that the pipes do not freeze (the appropriate temperature will depend upon weather conditions and the size and layout of your unit). If the pipes freeze or any other damage is caused by your failure to properly maintain the heat in your apartment, you'll be liable for damage to our and other's property. If you ask our representatives to perform services not contemplated in this Lease Contract, you will indemnify us and hold us harmless from all liability for those services.

**Crime or Emergency.** Dial 911 or immediately call local medical emergency, fire, or police personnel in case of accident, fire, smoke, or suspected criminal activity or other emergency involving imminent harm. You should then contact our representative. Unless otherwise provided by law, we're not liable to you or any guests or occupants for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. We're not obliged to furnish security personnel, security lighting, security gates or fences, or other forms of security. If we provide any access control devices or security measures upon the property, they are not a guarantee to prevent crime or to reduce the risk of crime on the property. You agree that no access control or security measures can eliminate all crime and that you will not rely upon any provided access control or security measures as a warranty or guarantee of any kind. We're not responsible for obtaining criminal-history checks on any residents, occupants, guests, or contractors in the apartment community. If you or any occupant or guest is affected by a crime, you must make a written report to our representative and to the appropriate local law-enforcement agency. You must also furnish us with the law-enforcement agency's incident report number upon request.

**25. CONDITION OF THE PREMISES AND ALTERATIONS.** You accept the apartment, fixtures, and furniture as is, except for conditions which materially affect the health or safety of ordinary persons or which render the apartment uninhabitable. We disclaim all implied warranties. You'll be given an Inventory and Condition form on or before move-in. You must note on the form all defects or damage and return it to our representative. Otherwise, everything will be considered to be in a clean, safe, and good working condition.

You must use customary diligence in maintaining the apartment and not damaging or littering the common areas. Unless authorized by statute or by us in writing, you must not perform any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter our property. No holes or stickers are allowed inside or outside the apartment. But we'll permit a reasonable number of small nail holes for hanging pictures on sheetrock walls and in grooves of wood-paneled walls, unless our rules state otherwise. No water furniture, washing machines, additional phone or TV-cable outlets, alarm systems, or lock changes, additions, or rekeying is permitted unless statutorily allowed or we've consented in writing. You may install a satellite dish or antenna provided it complies with reasonable restrictions allowed by federal law. You agree not to alter, damage, or remove our property, including alarm systems, smoke and carbon monoxide detectors, furniture, telephone and cable TV wiring, screens, locks, and access control devices. When you move in, we'll supply light bulbs for fixtures we furnish, including exterior fixtures operated from inside the apartment; after that, you'll replace them at your expense with bulbs of the same type and wattage. Your improvements to the apartment (whether or not we consent) become ours unless we agree otherwise in writing.

You have the right to engage in the display of religious or cultural items, provided such display is in accordance with applicable law and any permissible and reasonable restrictions on the placement and manner of the display that we may have adopted. We may ask you to remove or relocate displays that are not in compliance with applicable law or our permissible restrictions. You acknowledge that a failure to remove or relocate non-compliance displays shall be a breach of the Lease.

**26. REQUESTS, REPAIRS, AND MALFUNCTIONS.** IF YOU OR ANY OCCUPANT NEEDS TO SEND A NOTICE OR REQUEST—FOR EXAMPLE, FOR REPAIRS, INSTALLATIONS, SERVICES, OR SECURITY-RELATED MATTERS—IT MUST BE SUBMITTED THROUGH EITHER THE ONLINE RESIDENT/MAINTENANCE PORTAL, OR SIGNED AND IN WRITING AND DELIVERED TO OUR

018


© 2025, National Apartment Association, Inc. - 10/2025, Nevada

DESIGNATED REPRESENTATIVE (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, or crime in progress). Our written notes on your oral request do not constitute a written request from you.

Our complying with or responding to any oral request regarding security or non-security matters doesn't waive the strict requirement for written notices under this Lease Contract. You must promptly notify us in writing of: water leaks; electrical problems; malfunctioning lights; broken or missing locks or latches; and other conditions that pose a hazard to property, health, or safety. We may change or install utility lines or equipment serving the apartment if the work is done reasonably without substantially increasing your utility costs. We may turn off equipment and interrupt utilities as needed to avoid property damage or to perform work. If utilities malfunction or are damaged by fire, water, or similar cause, you must notify our representative immediately.

If we believe that fire or catastrophic damage is substantial, or that performance of needed repairs poses a danger to you, we may terminate your tenancy within a reasonable time by giving you written notice. If your tenancy is so terminated, we'll refund the total prorated monthly periodic rent and all deposits, less lawful deductions. You may also have the right to vacate the premises immediately and notify us in writing within seven (7) days of your intention to terminate your tenancy, provided the fire or casualty were not caused by the deliberate or negligent acts of you, a member of your household, or another person on the premises with your consent.

**27. ANIMALS.** Unless otherwise provided under federal, state, or local law, no animals (including mammals, reptiles, birds, fish, rodents, and insects) are allowed, even temporarily, anywhere in the apartment or apartment Community unless we've so authorized in writing. You must remove an illegal or unauthorized animal within 24 hours of notice from us, or you will be considered in default of this Lease Contract. If we allow an animal as a pet, you must execute a separate animal addendum which may require additional deposits, rents, fees or other charges. An animal deposit is considered a general security deposit. We will authorize an assistance animal for a disabled person. When allowed by applicable laws, before we authorize an assistance animal, if the disability is not readily apparent, we may require a written statement from a qualified professional verifying the disability-related need for the assistance animal. If we authorize an assistance animal, we may require you to execute a separate animal and/or assistance animal addendum. Animal deposits, additional rents, fees or other charges will not be required for an assistance animal needed due to disability, including an emotional support or service animal, as authorized under federal, state, or local law. You must not feed stray or wild animals.

If you or any guest or occupant violates animal restrictions (with or without your knowledge), you'll be subject to charges, damages, eviction, and other remedies provided in this Lease Contract or as otherwise provided by law. If an animal has been in the apartment at any time during your term of occupancy (with or without our consent), we'll charge you for defleaing, deodorizing, and shampooing. Initial and daily animal-violation charges and animal-removal charges are liquidated damages for our time, inconvenience, and overhead (except for attorney's fees and litigation costs) in enforcing animal restrictions and rules.

**28. WHEN WE MAY ENTER.** Upon giving you any required notice, then we or our repairers, servicers, contractors, representatives or other persons listed in (2) below may peacefully enter the apartment at reasonable times during normal business hours upon giving you twenty four (24) hour advance written notice for the purposes listed in (2) below or as otherwise authorized by law. If nobody is in the apartment, such persons may enter peacefully and at reasonable times by duplicate or master key (or by breaking a window or other means when necessary in emergencies). We also have the right to enter your apartment without giving a 24 hour notice in case of an emergency.

(1) In addition to any notice required by law, we will attempt to provide you written notice of the entry by leaving a copy in a conspicuous place in the apartment immediately after the entry.

(2) We have the right to enter the apartment for any authorized reason recognized by law, including, but not limited to: responding to your request; making repairs or replacements; estimating repair or refurbishing costs; performing pest control; doing preventive maintenance; changing filters; testing or replacing smoke or carbon monoxide detectors batteries; retrieving unreturned tools, equipment or appliances; preventing waste of utilities; delivering, installing, reconnecting, or replacing appliances, furniture, equipment, or access control devices; removing or rekeying unauthorized access control devices; removing health or safety hazards (including hazardous materials); inspecting when immediate danger to person or property is reasonably suspected; allowing persons to enter as you authorized in your rental application (if you die, are incarcerated, etc.); allowing entry by a law officer with a search or arrest warrant, or in hot pursuit; showing apartment to prospective residents (after move-out or vacate notice has been given); or showing apartment to government inspectors for the limited purpose of determining housing and fire ordinance compliance by us and to lenders, appraisers, contractors, prospective buyers, or insurance agents.

**29. JOINT AND SEVERAL RESPONSIBILITY.** Each resident is jointly and severally liable for all lease obligations. If you or any guest or occupant violates the Lease Contract or rules, all residents are considered to have violated the Lease Contract. Our requests and notices (including sale notices) to any resident constitute notice to all residents and occupants. Notices and requests from any resident or occupant (including notices of lease termination, repair requests, and entry permissions) constitute notice from all residents. In eviction suits, each resident is considered the agent of all other residents in the apartment for service of process. Security-deposit refunds and deduction itemizations of multiple residents will comply with paragraph 50 (Deposit Return, Surrender, and Abandonment).

## Replacements

**30. REPLACEMENTS AND SUBLETTING.** Replacing a resident, subletting, assignment, or granting a right or license to occupy is allowed only when we expressly consent in writing. If departing or remaining residents find a replacement resident acceptable to us before moving out and we expressly consent, in writing, to the replacement, subletting, assignment, or granting a right or any license to occupy, then:

(1) a reletting charge will not be due;
(2) a reasonable administrative (paperwork) and/or transfer fee will be due, and a rekeying fee will be due if rekeying is requested or required; and
(3) the departing and remaining residents will remain liable for all lease obligations for the rest of the original lease term.

**Procedures for Replacement.** If we approve a replacement resident, then, at our option: (1) the replacement resident must sign this Lease Contract with or without an increase in the total security deposit; *or* (2) the remaining and replacement residents must sign an entirely new Lease Contract. Unless we agree otherwise in writing or unless otherwise provided by law, the departing resident will remain liable for the remainder of the original lease term–even if a new Lease Contract is signed.

## Responsibilities of Owner and Resident

**31. RESPONSIBILITIES OF OWNER.**
We'll act with customary diligence to:

(1) maintain fixtures, furniture, hot water, heating and A/C equipment;
(2) substantially comply with applicable federal, state, and local laws regarding safety, sanitation, and fair housing; and
(3) make all reasonable repairs, subject to your obligation to pay for damages for which you are liable.

If we violate any of the above, you may exercise your remedies under state statute. In addition to complying with any other requirements under state law:

(a) you must make a written request for repair or remedy of the condition and, you may be required to be current on the total monthly periodic rent at that time;
(b) after receiving the request, we will have the time provided by law to repair, considering the nature of the problem and the reasonable availability of materials, labor, and utilities; 019


© 2025, National Apartment Association, Inc. - 10/2025, Nevada

(c) If we haven't completed the repair within the time provided by law, or we haven't utilized our best efforts to complete the repair, you may have certain rights afforded by law to make repairs yourself or terminate your tenancy. If your tenancy is properly terminated, then security deposits and the total prorated monthly periodic rent will be refunded as required by law.

**32. DEFAULT BY RESIDENT.** You'll be in default if you or any guest or occupant violates any terms of this Lease Contract including but not limited to the following violations: (1) you don't pay the total monthly periodic rent or other amounts that you owe when due; (2) you or any guest or occupant violates the apartment rules, or fire, safety, health, or criminal laws, regardless of whether or where arrest or conviction occurs; (3) you abandon the apartment; (4) you give incorrect or false answers in a rental application; (5) you or any occupant is arrested, convicted, or given deferred adjudication for a felony offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia under state statute; (6) any illegal drugs or paraphernalia are found in your apartment; (7) you or any guest or occupant engages in any of the prohibited conduct described in paragraph 20 (Prohibited Conduct); or (8) you or any occupant, in bad faith, makes an invalid complaint to an official or employee of a utility company or the government based on a complaint that was caused primarily by the lack of reasonable care by you, a member of your household, or another person on the premises with your consent.

**Lease Renewal When A Breach or Default Has Occurred.** In the event that you enter into a subsequent Lease prior to the expiration of this Lease and you breach or otherwise commit a default under this Lease, We may, at our sole and absolute discretion, terminate the subsequent Lease, even if the subsequent Lease term has yet to commence. We may terminate said subsequent Lease by sending you written notice of our desire to terminate said subsequent Lease.

**Eviction.** If you default, we may end your right of occupancy by giving you written notice as provided by Nevada law. Notice will be delivered to you as required by Nevada law. Termination of your possession rights or subsequent reletting doesn't release you from liability for future totals of monthly periodic rent or other lease obligations. After giving notice to vacate or filing an eviction suit, we may still accept the total monthly periodic rent or other sums due; the filing or acceptance doesn't waive or diminish our right of eviction, or any other contractual or statutory right. Accepting money at any time doesn't waive our right to damages; unpaid past or future totals of monthly periodic rent or other sums; or to continue with eviction proceedings as permitted by State statute.

**Holdover.** You or any occupant, invitee, or guest must not hold over beyond the date contained in your move-out notice or our notice to vacate (or beyond a different move-out date agreed to by the parties in writing). If a holdover occurs, then: (1) the holdover total monthly periodic rent is due in advance on a daily basis and may become delinquent without notice or demand; (2) we may hold you liable for our actual damages; (3) you could be held liable by the next intended occupant of the apartment if you fail to vacate the premises; and (4) an action for possession, total monthly periodic rent, and/or actual damages will be initiated as a result of your unauthorized hold over.

**Other Remedies.** We may report unpaid amounts to credit agencies. If you default and move out early, you will pay us any amounts stated to be rental discounts in paragraph 10 (Special Provisions), in addition to other sums due. Upon your default, we have all other legal remedies, including lease termination and lockout under state statute. Unless a party is seeking exemplary, punitive, sentimental or personal-injury damages, the prevailing party may recover from the non-prevailing party attorney's fees and all other litigation costs. Late charges are liquidated damages for our time, inconvenience, and overhead in collecting the late total monthly periodic rent (but are not for attorney's fees and litigation costs). All unpaid amounts bear a reasonable amount of interest not to exceed 7% per annum from due date or such other interest rate as specified or allowed by Nevada law.

**Mitigation of Damages.** If you move out early, you'll be subject to paragraph 11 (Early Move-Out) and all other remedies. We'll exercise customary diligence to relet and mitigate damages. We'll credit all subsequent total monthly periodic rent that we actually receive from subsequent residents against your liability for the past-due and future total monthly periodic rent and other sums due.

**Remedies Cumulative.** Any remedies set forth herein shall be cumulative, in addition to, and not in limitation of, any other remedies available to Landlord under any applicable law.

## General Clauses

**33. ENTIRE AGREEMENT.** Neither we nor any of our representatives have made any oral promises, representations, or agreements. This Lease Contract is the entire agreement between you and us.

**34. NO AUTHORITY TO AMEND UNLESS IN WRITING.** Our representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate your tenancy or any part of it, unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives unless in writing.

**35. NO WAIVER.** No action or omission of our representative will be considered a waiver of any subsequent violation, default, or time or place of performance. Our not enforcing or belatedly enforcing written-notice requirements, rental due dates, liens, or other rights, isn't a waiver under any circumstances.

**36. NOTICE.** Except when notice or demand is required by statute, you waive any notice and demand for performance from us if you default. Written notice to or from our managers constitutes notice to or from us. Any person giving a notice under this Lease Contract should retain a copy of the memo, letter or fax that was given. Fax signatures are binding. All notices must be signed.

**37. MISCELLANEOUS.**

A. Exercising one remedy won't constitute an election or waiver of other remedies.
B. Unless prohibited by law or the respective insurance policies, insurance subrogation is waived by all parties.
C. All remedies are cumulative.
D. No employee, agent, or management company is personally liable for any of our contractual, statutory, or other obligations merely by virtue of acting on our behalf.
E. This Lease Contract binds subsequent owners.
F. Neither an invalid clause nor the omission of initials on any page invalidates this Lease Contract.
G. All provisions regarding our non-liability and non-duty apply to our employees, agents, and management companies.
H. This Lease Contract is subordinate or superior to existing and future recorded mortgages, at lender's option.
I. All lease obligations must be performed in the county where the apartment is located.
J. All discretionary rights reserved for us within this Lease Contract or any accompanying addenda are at our sole and absolute discretion.

**38. WAIVER OF JURY TRIAL.** TO MINIMIZE LEGAL EXPENSES AND, TO THE EXTENT ALLOWED BY LAW, YOU AND WE AGREE THAT A TRIAL OF ANY LAWSUIT BASED ON STATUTE, COMMON LAW, AND/OR RELATED TO THIS LEASE CONTRACT SHALL BE TO A JUDGE AND NOT A JURY.

**39. CONTACTING YOU.** By signing this lease, you are agreeing that we, our representative(s) or agent(s) may contact you. You agree that we may contact you using any contact information relating to your lease including any number (i) you have provided to us (ii) from which you called us, or (iii) which we obtained and through which we reasonably believe we can reach you. You agree we may use any means to contact you. This may include calls made to your cellular telephone using an automatic telephone dialing system, artificial or prerecorded voice messages, text messages, mail, e-mail, and calls to your phone or Voice over Internet Protocol (VoIP) service, or any other data or voice transmission technology. You agree to promptly notify us if you change any contact information you provide to us. You are responsible for any service provider charges as a result of us contacting you.

**40. OBLIGATION TO VACATE.** If we provide you with a notice to vacate, or if you provide us with a written notice to vacate or intent to move-out in accordance with paragraph 3 (Lease Term), and we accept such written notice, then you are required to vacate the Premises and remove all of your personal property therefrom at the expiration of the Lease term without further notice or demand from us.

.020


© 2025, National Apartment Association, Inc. - 10/2025, Nevada

**41. NOTICE: NRS 202.470 MAINTAINING OR PERMITTING NUISANCE: PENALTY.**
Every person who:
1. Shall commit or maintain a public nuisance, for which no special punishment is prescribed; or
2. Shall willfully omit or refuse to perform any legal duty relating to the removal of such nuisance; or
3. Shall let, or permit to be used, any building or boat, or portion thereof, knowing that it is intended to be, or is being used, for committing or maintaining any such nuisance, shall be guilty of a misdemeanor.

You have the right to engage in the display of the US Flag. You may report a nuisance, or other violation of building, safety, health code, or regulation to the Code Enforcement office of the municipality for which the premises is located.

**42. FORCE MAJEURE.** If we are prevented from completing performances of any obligations hereunder by an act of God, strikes, epidemics, war, acts of terrorism, riots, flood, fire, hurricane, tornado, sabotage, or other occurrence which is beyond the control of the parties, then we shall be excused from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law. Furthermore, if such an event damages the property to materially affect its habitability by some or all residents, we reserve the right to vacate any and all leases and you agree to excuse us from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

**43. PAYMENTS.** Payment of all sums is an independent covenant. At our option and without notice, we may apply money received (other than sale proceeds under paragraph 13 (Property Left in Apartment) or utility payments subject to governmental regulations) first to any of your unpaid obligations, then to the current total monthly periodic rent. All sums other than the total monthly periodic rent are due upon our demand. After the due date, we do not have to accept the total monthly periodic rent or any other payments, except as required by applicable law.

**44. ASSOCIATION MEMBERSHIP.** We represent that either: (1) we or; (2) the management company that represents us, is at the time of signing this Lease Contract or a renewal of this Lease Contract, a member of both the National Apartment Association and any affiliated state and local apartment (multi-housing) associations for the area where the apartment is located.

## When Moving Out

**45. MOVE-OUT NOTICE.** Before moving out, either at the end of the lease term, any extension of the lease term, or prior to the end of the lease term, you must give our representative advance written notice of your intention to vacate as required by paragraph 3 (Lease Term). If you move out prior to the end of the lease term, your notice does not act as a release of liability for the full term of the Lease Contract. You will still be liable for the entire Lease Contract term if you move out early (paragraph 22 - Release of Resident) except if you are able to terminate your tenancy under the statutory rights explained under paragraph 11 (Early Move-Out), paragraph 22 (Release of Resident), or any other applicable laws. All notices to vacate must be in writing and must provide the date by which you intend to vacate. If the notice does not comply with the time requirements of paragraph 3 (Lease Term), even if you move by the last date in the lease term, you will be responsible for an additional month's total monthly periodic rent. If you fail to vacate by the date set forth in your notice, your notice is void and you must submit a new written notice. If you fail to provide proper notice and vacate, we will have all remedies available under the Lease Contract and under applicable state law.

**46. MOVE-OUT PROCEDURES.** The move-out date can't be changed unless we and you both agree in writing. You won't move out before the lease term or renewal period ends unless the total monthly periodic rent for the entire lease term or renewal period is paid in full or you are otherwise permitted to move as provided by Nevada law. An improper early move-out may result in reletting charges and default under paragraph 11 (Early Move-Out) and paragraph 32 (Default by Resident). You're prohibited by law from applying any security deposit to the total monthly periodic rent. You won't stay beyond the date you are supposed to move out. All residents, guests, and occupants must vacate the apartment before the 30-day period for deposit refund begins. You must give us and the U.S. Postal Service, in writing, each resident's forwarding address.

**47. CLEANING.** You must thoroughly clean the apartment, including doors, windows, furniture, bathrooms, kitchen appliances, patios, balconies, garages, carports, and storage rooms. You must follow move-out cleaning instructions if they have been provided. If you don't clean adequately, you'll be liable for reasonable cleaning charges.

**48. MOVE-OUT INSPECTION.** You should meet with our representative for a move-out inspection. Our representative has no authority to bind or limit us regarding deductions for repairs, damages, or charges. Any statements or estimates by us or our representative are subject to our correction, modification, or disapproval before final refunding or accounting.

**49. SECURITY DEPOSIT DEDUCTIONS AND OTHER CHARGES.** You'll be liable for the following charges, if applicable: unpaid total monthly periodic rent; unpaid utilities; unreimbursed service charges; repairs or damages caused by negligence, carelessness, accident, or abuse, including stickers, scratches, tears, burns, stains, or unapproved holes; replacement cost of our property that was in or attached to the apartment and is missing; replacing dead or missing smoke and carbon monoxide detectors batteries; utilities for repairs or cleaning; trips to let in company representatives to remove your telephone or TV cable services or rental items (if you so request or have moved out); trips to open the apartment when you or any guest or occupant is missing a key; unreturned keys; missing or burned-out light bulbs; removing or rekeying unauthorized access control devices or alarm systems; agreed reletting charges; packing, removing, or storing property removed or stored under paragraph 13 (Property Left in Apartment); removing illegally parked vehicles; special trips for trash removal caused by parked vehicles blocking dumpsters; false security-alarm charges unless due to our negligence; animal-related charges under paragraph 6 (Maximum Total Monthly Periodic Rent and Charges) and paragraph 27 (Animals); government fees or fines against us for violation (by you, your occupants, or guests) of local ordinances relating to smoke and carbon monoxide detectors, false alarms, recycling, or other matters; late-payment and returned-check charges in the amount of $ 100.00 ; a charge (not to exceed $100) for owner/manager's time and inconvenience in our lawful removal of an animal or in any valid eviction proceeding against you, plus court costs and filing fees actually paid; and other sums due under this Lease Contract.

You'll be liable to us for: (1) charges for replacing all keys and access devices referenced in paragraph 5 (Keys) if you fail to return them on or before your actual move-out date; (2) the total monthly periodic rent if you have violated paragraph 32 (Default by Resident); and (3) a reletting fee if you have violated paragraph 11 (Early Move-Out).

**50. DEPOSIT RETURN, SURRENDER, AND ABANDONMENT.**
**Deposit Return and Forwarding Address.** You are required to provide us written notice of your forwarding address, on or before termination of this Lease Contract. We'll mail you, to the forwarding address you provide, your security deposit refund (less lawful deductions) and an itemized accounting of any deductions within the time frames and parameters set forth under state law. If you fail to provide us with your forwarding address in writing, as required above, we will process the security deposit in accordance with state law.

**Surrender.** You have surrendered the apartment when: (1) the move-out date has passed and no one is living in the apartment in our reasonable judgment; (2) you have removed all or substantially all of your property; and (3) all apartment keys and access devices listed in paragraph 5 (Keys) have been turned in where the total monthly periodic rent is paid.

**Abandonment.** You have abandoned the apartment when all of the following have occurred: (1) you have been absent from the apartment for at least fifteen (15) days; (2) you've been in default for non-payment of the total monthly periodic rent; and (3) you have not given us notice of your intent to be absent from the apartment during this period of time.

Surrender, abandonment, and judicial eviction end your right of possession for all purposes and gives us the immediate right to: clean up, make repairs in, and relet the apartment; determine any security deposit deductions; and remove property left in the apartment. Surrender, abandonment, and judicial eviction affect your rights to property left in the apartment (paragraph 13 - Property Left in Apartment), but do not affect our mitigation obligations (paragraph 32 - Default by Resident).

021


© 2025, National Apartment Association, Inc. - 10/2025, Nevada

## Severability, Originals and Attachments, and Signatures

**51. SEVERABILITY.** If any provision of this Lease Contract is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Lease Contract. The court shall interpret the lease and provisions herein in a manner such as to uphold the valid portions of this Lease Contract while preserving the intent of the parties.

**52. ORIGINALS AND ATTACHMENTS.** This Lease Contract has been executed in multiple originals, with original signatures. We will provide you with a copy of the Lease Contract. Your copy of the Lease Contract may be in paper format, in an electronic format at your request, or sent via e-mail if we have communicated by e-mail about this Lease. Our rules and community policies, if any, will be attached to the Lease Contract and provided to you at signing. When an Inventory and Condition form is completed, you should retain a copy, and we should retain a copy. Any addenda or amendments you sign as a part of executing this Lease Contract are binding and hereby incorporated into and made part of the Lease Contract between you and us. This lease is the entire agreement between you and us. You acknowledge that you are NOT relying on any oral representations. A copy or scan of this Lease Contract and related addenda, amendments, and agreements may be used for any purpose and shall be treated as an original.

**Date form is filled out** *(same as on top of page 1)*

11/24/2025

You are legally bound by this document.
Read it carefully before signing.

**Resident or Residents** *(all sign below)*

Benjamin Moon

**Owner or Owner's Representative** *(signing on behalf of owner)*

**Address and phone number of owner's representative for notice purposes**

3850 West Nevso Drive
Las Vegas, NV 89103
(702)202-2440

**Name and address of locator service** *(if applicable)*

**SPECIAL PROVISIONS (CONTINUED FROM PAGE 2)** Required monthly charges (not included in rent rate above) Technology Package $110 & Membership Fee $65. Rent payments will only be accepted on-line as outlined in paragraph 6 of this agreement. Any hard copy rent payments (checks) made to office may be assessed a $25.00 processing fee. Resident acknowledges and agrees that a $250 cleaning fee will be billed and collected at move-in. This one-time, non-refundable fee covers the cost of standard cleaning services upon move-out, allowing the resident to vacate without the obligation of deep cleaning the unit upon lease expiration. This fee is not a deposit and does not cover damages or excessive cleaning beyond normal wear and tear. The resident's security deposit remains separate and fully refundable, subject to any deductions for damages or outstanding charges per the lease agreement.


© 2025, National Apartment Association, Inc.

# ANIMAL ADDENDUM

*Becomes part of Lease Contract*

NATIONAL APARTMENT ASSOCIATION

***Please note: We consider animals a serious responsibility and a risk to each resident in the dwelling. If you do not properly control and care for your animal, you'll be held liable if it causes any damage or disturbs other residents.***

*In this document, the terms "you" and "your" refer to all residents listed below and all occupants or guests; and the terms "we," "us," and "our" refer to the owner named in the Lease Contract (not to the property manager or anyone else).*

**1. DWELLING DESCRIPTION.** 3850 W. Nevso Dr (*street address*), 405 (*unit no. if applicable*) in Las Vegas (*city*), Nevada, 89103 (*zip code*).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: November 24, 2025
Owner's name: CRP/CALIDA PALMS VENTURE, LLC

Residents (*list all residents*):
Benjamin Moon

The term of this Addendum is as follows:
Begins on November 29th, 2025 and ends on November 28th, 2026.

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. A. ☒ NO APPROVED ANIMALS.** If this box is checked, you are not allowed to have animals (including mammals, reptiles, birds, fish, rodents, and insects), even temporarily, anywhere in the dwelling or community unless we've authorized so in writing. We will authorize support and/or service animals for you, your guests, and occupants pursuant to the parameters and guidelines established by the Fair Housing Act, HUD regulatory guidelines, and any applicable state and/or local laws.

If you are found to have unauthorized animals in your unit, you may be subject to the following fees:

Initial charge of $ 100 per animal, (not to exceed $100 per animal) and, for every day the unauthorized animals are in the unit, a daily charge of $ 10 per animal (not to exceed $10 per day per animal).

**B. ☐ CONDITIONAL AUTHORIZATION FOR ANIMAL.** If this box is checked, you may keep the animal that is described below in the dwelling until the Lease Contract expires. But we may terminate this authorization sooner if your right of occupancy is lawfully terminated or if in our judgment you and your animal, your guests, or any occupant violate any of the rules in this Addendum.

**4. ANIMAL DEPOSIT.** An animal deposit of $ 0.00 will be charged per animal, unless stated otherwise in this Addendum. We *[check one]* ☒ will consider, or ☐ will not consider this additional security deposit the general security deposit for all purposes. The security deposit amount in the Security Deposit paragraph of the Lease Contract *[check one]* ☐ *does*, or ☒ *does not include* this additional deposit amount. Refund of the animal deposit will be subject to the terms and conditions set forth in the Lease Contract regardless of whether it is considered part of the general security deposit. The total animal deposit for your animal(s) is $ 0.00. It is not our policy to charge an animal deposit on support animals.

**5. MONTHLY ANIMAL RENT.** Your total monthly periodic rent (as stated in the Lease Contract) will include monthly pet rent of $ 0.00 per animal, unless stated otherwise in this Addendum. The total monthly animal rent for your animal(s) is $ 0.00.

**6. ADDITIONAL FEE.** You must also pay a one-time non-refundable fee of $ ______ per animal, unless stated otherwise in this Addendum, for the animal. The total additional fee for your animal(s) is $ ______. It is our policy to not charge this additional animal fee for support animals.

**7. LIABILITY NOT LIMITED.** The monthly animal deposit, animal rent, and additional animal fee under this Animal Addendum do not limit residents' liability for property damages, cleaning, deodorization, defleaing, replacements, or personal injuries.

**8. DESCRIPTION OF ANIMAL(S).** You may keep only the animal(s) described below. You may not substitute any other animal(s). Neither you nor your guests or occupants may bring any other animal(s)—mammal, reptile, bird, amphibian, fish, rodent, arachnid, or insect—into the dwelling or community.

Animal's name:
Type:
Breed:
Color:
Weight: Age:
City of license:
License no.:
Date of last rabies shot:
Housebroken?
Animal owner's name:

Animal's name:
Type:
Breed:
Color:
Weight: Age:
City of license:
License no.:
Date of last rabies shot:
Housebroken?
Animal owner's name:

EOIR 26 of 92

.023


© 2025, National Apartment Association, Inc. - 10/2025, Nevada

Animal's name: ______
Type: ______
Breed: ______
Color: ______
Weight: ______ Age: ______
City of license: ______
License no.: ______
Date of last rabies shot: ______
Housebroken? ______
Animal owner's name: ______

Animal's name: ______
Type: ______
Breed: ______
Color: ______
Weight: ______ Age: ______
City of license: ______
License no.: ______
Date of last rabies shot: ______
Housebroken? ______
Animal owner's name: ______

**9. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**10. EMERGENCY.** In an emergency involving an accident or injury to your animal, we have the right, but not a duty, to take the animal to the following veterinarian for treatment, at your expense.

Doctor: ______
Address: ______
City/State/Zip: ______
Phone: ______

**11. ANIMAL RULES.** You are responsible for the animal's actions at all times. You agree to abide by these rules:

- The animal must not disturb the neighbors or other residents, regardless of whether the animal is inside or outside the dwelling.
- Dogs, cats, and support animals must be housebroken. All other animals must be caged at all times. No animal offspring are allowed.
- Inside, the animal may urinate or defecate *only* in these designated areas: Litter Box
- Outside, the animal may urinate or defecate *only* in these designated areas: Designated Areas
- Animals may not be tied to any fixed object anywhere outside the dwelling, except in fenced yards (if any) for your exclusive use.
- You must not let an animal other than support animals into swimming-pool areas, laundry rooms, offices, clubrooms, other recreational facilities, or other dwellings.
- Your animal must be fed and watered inside the dwelling. Don't leave animal food or water outside the dwelling at any time, except in fenced yards (if any) for your exclusive use.
- You must keep the animal on a leash and under your supervision when outside the dwelling or any private fenced area. We or our representative may pick up unleashed animals and/or report them to the proper authorities. We may impose reasonable charges for picking up and/or keeping unleashed animals.
- Unless we have designated a particular area in your dwelling or on the grounds for animal defecation and urination, you are prohibited from letting an animal defecate or urinate *anywhere* on our property. You must take the animal off our property for that purpose. If we allow animal defecation inside the dwelling in this Addendum, you must ensure that it's done in a litter box with a kitty litter-type mix. If the animal defecates anywhere on our property (including in a fenced yard for your exclusive use), you'll be responsible for immediately removing the waste and repairing any damage. Despite anything this Addendum says, you must comply with all local ordinances regarding animal defecation.

**12. ADDITIONAL RULES.** We have the right to make reasonable changes to the animal rules from time to time so as to promote convenience, safety or welfare, preserve the property from abusive use, or make a fair distribution of services and facilities. Written thirty (30) day notice of such rule changes will be distributed to all residents and will become enforceable thereafter. We will not make any rule changes that alter existing animal-related fees or charges, impose new animal-related fees or charges, or remove your existing right under the Lease to have an animal.

**13. VIOLATION OF RULES.** If you, your guest, or any occupant violates any rule or provision of this Animal Addendum (based upon our judgment) and we give you written notice, you must permanently remove the animal from the premises within the time period specified in our notice. We also have all other rights and remedies set forth in the Lease Contract, including damages, eviction, and attorney's fees to the prevailing party to the extent allowed by law.

**14. COMPLAINTS ABOUT ANIMAL.** You must immediately and permanently remove the animal from the premises if we receive a reasonable complaint from a neighbor or other resident or if we, in our sole discretion, determine that the animal has disturbed neighbors or other residents.

**15. OUR REMOVAL OF ANIMAL.** In some circumstances, we may enter the dwelling and remove the animal as provided above in the case of an emergency or as otherwise provided by law. We can do this if, in our sole judgment, you have:

- abandoned the animal;
- left the animal in the dwelling for an extended period of time without food or water;
- failed to care for a sick animal; or
- violated our animal rules.

In doing this, we must follow the procedures of the Lease Contract, and we may board the animal or turn the animal over to a humane society or local authority. We'll return the animal to you upon request if we haven't already turned it


© 2025, National Apartment Association, Inc. - 10/2025, Nevada

over to a humane society or local authority. We don't have a lien on the animal for any purpose, but you must pay for reasonable care and kenneling charges for the animal. If you don't pick up the animal within the time provided by law, it will be considered abandoned.

**16. LIABILITY FOR DAMAGES, INJURIES, CLEANING, ETC.** You and all co-residents will be jointly and severally liable for the entire amount of all damages caused by the animal, including all cleaning, defleaing, and deodorizing. This provision applies to all parts of the dwelling, including carpets, doors, walls, drapes, wallpaper, windows, screens, furniture, appliances, as well as landscaping and other outside improvements. If items cannot be satisfactorily cleaned or repaired, you must pay for us to replace them completely. Payment for damages, repairs, cleaning, replacements, etc. are due immediately upon demand.

As owner of the animal, you're strictly liable for the entire amount of any injury that the animal causes to a person or anyone's property. You'll indemnify us for all costs of litigation and attorney's fees resulting from any such damage.

**17. MOVE-OUT.** When you move out, you'll pay for defleaing, deodorizing, and shampooing to protect future residents from possible health hazards, regardless of how long the animal was there. We—not you—will arrange for these services.

**18. JOINT AND SEVERAL RESPONSIBILITY.** Each resident who signed the Lease Contract must sign this Animal Addendum. You, your guests, and any occupants must follow all animal rules. Each resident is jointly and severally liable for damages and all other obligations set forth in this Animal Addendum, even if the resident does not own the animal.

**19. GENERAL.** You acknowledge that no other oral or written agreement exists regarding animals. Except for written rule changes under paragraph 9 above, our representative has no authority to modify this Animal Addendum or the animal rules except in writing. This Animal Addendum and the animal rules are considered part of the Lease Contract described above. It has been executed in multiple originals, one for you and one or more for us.

**This is a binding legal document. Read it carefully before signing.**

| **Resident or Residents** *(All residents must sign)* | **Owner or Owner's Representative** *(Signs below)* |
| --- | --- |
| Benjamin Moon | |
| | **Date of Signing Addendum** |

EOIR 28 of 92

Exh. 2 - Adm.

025



© 2025, National Apartment Association, Inc. - 10/2025, Nevada

# UTILITY ADDENDUM

This Utility Addendum is incorporated into the Lease Contract (referred to in this Addendum as "Lease Contract" or "Lease") dated November 24, 2025 between CRP/CALIDA PALMS VENTURE, LLC

("We" and/or "we" and/or "us) and Benjamin Moon

"You" and/or "you") of Apt. No. 405 located at 3850 W. Nevso Dr

(street address) in Las Vegas, NV 89103
and is in addition to all terms and conditions in the Lease. This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

1. Responsibility for payment of utilities, the method of metering or allocation *(if applicable)*, the cost, and whether the billings are included in Total Monthly Periodic Rent, will be as indicated below:

a) **Water** service to your dwelling will be paid by you as follows:
☐ directly to the utility provider. You must contract separately with the provider and obtain this service. The cost for this service is not included in the Total Monthly Periodic Rent.
☒ water bills will be billed by the service provider to us and then allocated to you based on the following formula(s): 8
The cost for this service *(check one)* ☐ is included in the Total Monthly Periodic Rent ☒ is not included in the Total Monthly Periodic Rent and you must pay these bills separately.
☐ If flat rate (4) is selected, the current flat rate is $ ______ per month.
☐ If any allocation (5-10) and maximum rate (11) is selected, the maximum rate is $ ______ per month.
☒ The 3rd party billing company if applicable Conservice

b) **Gas** service to your dwelling will be paid by you as follows:
☐ directly to the utility provider. You must contract separately with the provider and obtain this service. The cost for this service is not included in the Total Monthly Periodic Rent.
☐ gas bills will be billed by the service provider to us and then allocated to you based on the following formula(s): ______
The cost for this service *(check one)* ☐ is included in the Total Monthly Periodic Rent ☐ is not included in the Total Monthly Periodic Rent and you must pay these bills separately.
☐ If flat rate (4) is selected, the current flat rate is $ ______ per month.
☐ If any allocation (5-10) and maximum rate (11) is selected, the maximum rate is $ ______ per month.
☐ The 3rd party billing company if applicable ______

c) **Electric** service to your dwelling will be paid by you as follows:
☒ directly to the utility provider. You must contract separately with the provider and obtain this service. The cost for this service is not included in the Total Monthly Periodic Rent.
☐ electric bills will be billed by the service provider to us and then allocated to you based on the following formula(s): ______
The cost for this service *(check one)* ☐ is included in the Total Monthly Periodic Rent ☐ is not included in the Total Monthly Periodic Rent and you must pay these bills separately.
☐ If flat rate (4) is selected, the current flat rate is $ ______ per month.
☐ If any allocation (5-10) and maximum rate (11) is selected, the maximum rate is $ ______ per month.
☐ The 3rd party billing company if applicable ______

d) **Sewer** service to your dwelling will be paid by you as follows:
☐ directly to the utility provider. You must contract separately with the provider and obtain this service. The cost for this service is not included in the Total Monthly Periodic Rent.
☒ sewer bills will be billed by the service provider to us and then allocated to you based on the following formula(s): 8
The cost for this service is included in the Total Monthly Periodic Rent.
☐ If flat rate (4) is selected, the current flat rate is $ ______ per month.
☒ If any allocation (5-10) and maximum rate (11) is selected, the maximum rate is $ 35.00 per month.
☒ The 3rd party billing company if applicable Conservice

e) **Trash** service to your dwelling will be paid by you as follows:
☐ directly to the utility provider. You must contract separately with the provider and obtain this service. The cost for this service is not included in the Total Monthly Periodic Rent.
☒ trash bills will be billed by the service provider to us and then allocated to you based on the following formula(s): 10
The cost for this service is included in the Total Monthly Periodic Rent.
☐ If flat rate (4) is selected, the current flat rate is $ ______ per month.
☒ If any allocation (5-10) and maximum rate (11) is selected, the maximum rate is $ 30.00 per month.
☒ The 3rd party billing company if applicable Conservice

f) **Stormwater** service to your dwelling will be paid by you as follows:
☐ directly to the utility provider. You must contract separately with the provider and obtain this service. The cost for this service is not included in the Total Monthly Periodic Rent.
☐ stormwater bills will be billed by the service provider to us and then allocated to you based on the following formula(s): ______
The cost for this service is included in the Total Monthly Periodic Rent.
☐ If flat rate (4) is selected, the current flat rate is $ ______ per month.
☐ If any allocation (5-10) and maximum rate (11) is selected, the maximum rate is $ ______ per month.
☐ The 3rd party billing company if applicable ______


©2025, National Apartment Association, Inc. - 10/2025, Nevada

g) **Cable TV** service to your dwelling will be paid by you as follows:
- ☐ directly to the utility provider. You must contract separately with the provider and obtain this service. The cost for this service is not included in the Total Monthly Periodic Rent.
- ☒ cable tv bills will be billed by the service provider to us and then allocated to you based on the following formula(s): 4
  The cost for this service is included in the Total Monthly Periodic Rent.
  - ☒ If flat rate (4) is selected, the current flat rate is $ 105.00 per month.
  - ☐ If any allocation (5-10) and maximum rate (11) is selected, the maximum rate is $ ______ per month.
  - ☐ The 3rd party billing company if applicable ______

h) **Master Antenna** service to your dwelling will be paid by you as follows:
- ☐ directly to the utility provider. You must contract separately with the provider and obtain this service. The cost for this service is not included in the Total Monthly Periodic Rent.
- ☐ master antenna bills will be billed by the service provider to us and then allocated to you based on the following formula(s): ______
  The cost for this service is included in the Total Monthly Periodic Rent.
  - ☐ If flat rate (4) is selected, the current flat rate is $ ______ per month.
  - ☐ If any allocation (5-10) and maximum rate (11) is selected, the maximum rate is $ ______ per month.
  - ☐ The 3rd party billing company if applicable ______

i) **Internet** service to your dwelling will be paid by you as follows:
- ☐ directly to the utility provider. You must contract separately with the provider and obtain this service. The cost for this service is not included in the Total Monthly Periodic Rent.
- ☐ internet bills will be billed by the service provider to us and then allocated to you based on the following formula(s): ______
  The cost for this service is included in the Total Monthly Periodic Rent.
  - ☐ If flat rate (4) is selected, the current flat rate is $ ______ per month.
  - ☐ If any allocation (5-10) and maximum rate (11) is selected, the maximum rate is $ ______ per month.
  - ☐ The 3rd party billing company if applicable ______

j) (Other) Valet Trash service to your dwelling will be paid by you as follows:
- ☐ directly to the utility provider. You must contract separately with the provider and obtain this service. The cost for this service is not included in the Total Monthly Periodic Rent.
- ☒ bills will be billed by the service provider to us and then allocated to you based on the following formula(s): 4
  The cost for this service is included in the Total Monthly Periodic Rent.
  - ☒ If flat rate (4) is selected, the current flat rate is $ 25.00 per month.
  - ☐ If any allocation (5-10) and maximum rate (11) is selected, the maximum rate is $ ______ per month.
  - ☒ The 3rd party billing company if applicable Conservice

k) (Other) Water Heating service to your dwelling will be paid by you as follows:
- ☐ directly to the utility provider. You must contract separately with the provider and obtain this service. The cost for this service is not included in the Total Monthly Periodic Rent.
- ☒ bills will be billed by the service provider to us and then allocated to you based on the following formula(s): 8
  The cost for this service is included in the Total Monthly Periodic Rent.
  - ☐ If flat rate (4) is selected, the current flat rate is $ ______ per month.
  - ☒ If any allocation (5-10) and maximum rate (11) is selected, the maximum rate is $ 20.00 per month.
  - ☒ The 3rd party billing company if applicable Conservice

METERING/ALLOCATION METHOD KEY
"1" - Sub-metering of all of your water/gas/electric use
"2" - Calculation of your total water use based on sub-metering of hot water
"3" - Calculation of your total water use based on sub-metering of cold water
"4" - Flat rate per month
"5" - Allocation based on the number of persons residing in your dwelling unit
"6" - Allocation based on the number of persons residing in your dwelling unit using a ratio occupancy formula
"7" - Allocation based on square footage of your dwelling unit
"8" - Allocation based on a combination of square footage of your dwelling unit and the number of persons residing in your dwelling unit
"9" - Allocation based on the number of bedrooms in your dwelling unit
"10"- Other allocation method not listed
(Note: if method "10" is selected, a separate sheet will be attached describing the formula used)
"11"- Allocation with billing at maximum rate

2. If an allocation method is used, we or our billing company will calculate your allocated share of the utilities and services provided and all costs in accordance with state and local statutes. Under any allocation method, Resident may be paying for part of the utility usage in common areas or in other residential units as well as administrative fees. Both Resident and Owner agree that using a calculation or allocation formula as a basis for estimating total utility consumption is fair and reasonable, while recognizing that the allocation method may or may not accurately reflect actual total utility consumption for Resident. Where lawful, we may change the above methods of determining your allocated share of utilities and services and all other billing methods, in our sole discretion, and after providing written notice to you. More detailed descriptions of billing methods, calculations and allocation formulas will be provided upon request.

   If a flat fee method is used, Resident and Owner agree that the charges indicated in this Agreement represent a fair and reasonable amount for the service(s) provided and that the amount billed reflects the Owner's best good faith effort to capture the monthly per unit cost of the utility.

   If an allocation method is used in conjunction with a maximum rate, the monthly utility bill is being stated as a maximum amount for consistency purposes and ease of compliance with applicable law. Based on allocation, your monthly utility bill may be less than the maximum amount stated, and you will be responsible for that lesser amount. Based on allocation, your monthly utility bill may be more than the maximum amount stated, and in such cases, you will only be responsible for the maximum amount stated.

3. Utility bills included in the total monthly periodic rent must be paid with your payment of total monthly periodic rent, or, if such bill is billed by us directly or through our billing company, upon receipt of that bill. Your failure to pay any such utility bill constitutes a failure to pay your total monthly periodic rent, which is a material and substantial breach of the Lease. In the event of such breach, we will exercise all remedies available under the Lease and applicable law, including eviction for non-payment of rent.

4. Utility bills which are not included in the total monthly periodic rent must paid by the date indicated in the billing statement provided by us directly, or our billing company. Your failure to pay any such utility bill constitutes a material and substantial breach of the Lease. In the event of such breach, we will exercise all remedies available under the Lease and applicable law, including eviction for non-compliance with the terms of the Lease.

EOIR 30 of 92

027


©2025, National Apartment Association, Inc. - 10/2025, Nevada

5. You may be responsible for certain one-time fees associated with the creation and conclusion of utility billing accounts, as well as a monthly fee for the administration of the utility billing accounts during your tenancy. One-time fees are not included in the Total Monthly Periodic Rent Amount in the Lease; a monthly administrative billing fee, if indicated, is included in the Total Monthly Periodic Rent amount in the Lease. These fees are indicated below:

| | |
|---|---|
| New Account Fee: | $ 20.00 |
| Monthly Administrative Billing Fee: | $ 5.50 |
| Final Bill Fee: | $ 5.00 |

6. You will be charged for the full period of time that you were living in, occupying, or responsible for payment of rent or utility charges on the dwelling. If you breach the Lease, you will be responsible for utility charges for the time period you were obliged to pay the charges under the Lease, subject to our mitigation of damages. In the event you fail to timely establish utility services, we may charge you for any utility service billed to us for your dwelling and may charge a reasonable administration fee for billing for the utility service in the amount of $ 50.00 . Charges for utility services billed to us as a result of your failure to timely establish services, and the associated administration fee, are considered per-occurence charges and are not included in the total monthly periodic rent.

7. When you move out, you will receive a final bill which may be estimated based on your prior utility usage. This bill must be paid at the time you move out or it will be deducted from the security deposit.

8. We are not liable for any losses or damages you incur as a result of outages, interruptions, or fluctuations in utility services provided to the dwelling unless such loss or damage was the direct result of negligence by us or our employees. You release us from any and all such claims and waive any claims for offset or reduction of periodic rent or diminished rental value of the dwelling due to such outages, interruptions, or fluctuations.

9. You agree not to tamper with, adjust, or disconnect any utility sub-metering system or device. Violation of this provision is a material breach of your Lease and may subject you to eviction or other remedies available to us under your Lease, this Utility Addendum and at law.

10. You represent that all occupants that will be residing in the Unit are accurately identified in the Lease. You agree to promptly notify Owner of any change in such number of occupants.

11. You are responsible for all utilities stated in the Lease. In the event you request any additional utility services, a new utility is implemented and required to be provided to the dwelling by a public utility provider or pursuant to law, or this addendum fails to provide payment instructions on a utility for which you are responsible, the parties agree to amend this addendum and the Lease as needed to incorporate same.

12. This Addendum is designed for use in multiple jurisdictions, and no billing method, charge, or fee mentioned herein will be used in any jurisdiction where such use would be unlawful. If any provision of this addendum or the Lease is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this addendum or the Lease. Except as specifically stated herein, all other terms and conditions of the Lease shall remain unchanged. In the event of any conflict between the terms of this Addendum and the terms of the Lease, the terms of this Addendum shall control.

13. The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Utility Addendum and will supersede any conflicting provisions of this printed Utility Addendum and/or the Lease Contract.

Method 10: Equally divided among units. Billed trash expense may include, but is not limited to, actual trash invoices, internal trash-related expense, junk/bulky item pick up, equipment rental/repair/maintenance, trash consulting/management costs, trash contamination prevention, costs, valet trash, porter service trash-related cleaning costs (including trash chute cleaning/power washing), odor control, trash auditing costs, shared savings, organic waste sorting/disposal/composting, green waste sorting/disposal, pet waste cleanup/supplies and recycling charges.

| | |
|---|---|
| Resident Signature *Benjamin Moon* | Date 11/24/2025 |
| Resident Signature | Date |
| Resident Signature | Date |
| Resident Signature | Date |
| Resident Signature | Date |
| Resident Signature | Date |
| Management | Date |

EOIR 31 of 92

.028


© 2025, National Apartment Association, Inc.
Nevada/National Apartment Association Official Form, October 2025.

Uploaded on: 09/03/2026 at 04:14:27 PM (Pacific Daylight Time) Base City: ADL

# BED BUG ADDENDUM

Date: November 24, 2025
(when this Addendum is filled out)

NAA NATIONAL APARTMENT ASSOCIATION

***Please note: It is our goal to maintain a quality living environment for our residents. To help achieve this goal, it is important to work together to minimize the potential for any bed bugs in your dwelling or surrounding dwellings. This addendum contains important information that outlines your responsibility and potential liability with regard to bed bugs.***

**1. DWELLING UNIT DESCRIPTION.**
Unit No. 405, 3850 W. Nevso Dr
_(street address)_ in Las Vegas
_(city)_, Nevada, 89103 _(zip code)_.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: November 24, 2025
Owner's name: CRP/CALIDA PALMS VENTURE, LLC

Residents _(list all residents)_:
Benjamin Moon

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. PURPOSE.** This Addendum modifies the Lease Contract and addresses situations related to bed bugs _(cimex lectularius)_ which may be discovered infesting the dwelling or personal property in the dwelling. You understand that we are relying on your representations to us in this Addendum.

**4. INSPECTION AND INFESTATIONS.** By signing this addendum, you represent that you have inspected the dwelling prior to moving in, or prior to signing this addendum, and you did not find any evidence of bed bugs or a bed bug infestation.

You agree that you have read the information provided in this Addendum and that you are not aware of any infestation or presence of bed bugs in your current or previous dwellings, furniture, clothing, personal property, or possessions. You also acknowledge that you have fully disclosed to us any previous bed bug infestations or bed bug issues that you have experienced.

If you disclose to us a previous experience with bed bug infestations or other bed bug related issues, we can review documentation of the previous treatment(s) and inspect your personal property and possession to confirm the absence of bed bugs.

**5. ACCESS FOR INSPECTION AND PEST TREATMENT.** You must allow us and our pest control agents access to the dwelling at reasonable times to inspect for or treat bed bugs as allowed by law. You and your family members, occupants, guests, and invitees must cooperate and will not interfere with inspections or treatments. We have the right to select any licensed pest control professional to treat the dwelling and building. We can select the method of treating the dwelling, building and common areas for bed bugs. We can also inspect and treat adjacent or neighboring dwellings to the infestation even if those dwellings are not the source or cause of the known infestation. Unless otherwise prohibited by law, you are responsible for and must, at your own expense, have your own personal property, furniture, clothing and possessions treated according to accepted treatment methods established by a licensed pest control firm that we approve. You must do so as close as possible to the time we treated the dwelling. If you fail to do so, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract. You agree not to treat the dwelling for a bed bug infestation on your own.

**6. NOTIFICATION.** You must promptly notify us:
- of any known or suspected bed bug infestation or presence in the dwelling, or in any of your clothing, furniture or personal property.
- of any recurring or unexplained bites, stings, irritations, or sores of the skin or body which you believe is caused by bed bugs, or by any condition or pest you believe is in the dwelling.
- if you discover any condition or evidence that might indicate the presence or infestation of bed bugs, or of any confirmation of bed bug presence by a licensed pest control professional or other authoritative source.

**7. COOPERATION.** If we confirm the presence or infestation of bed bugs, you must cooperate and coordinate with us and our pest control agents to treat and eliminate the bed bugs. You must follow all directions from us or our agents to clean and treat the dwelling and building that are infested. You must remove or destroy personal property that cannot be treated or cleaned as close as possible to the time we treated the dwelling. Any items you remove from the dwelling must be disposed of off-site and not in the property's trash receptacles. If we confirm the presence or infestation of bed bugs in your dwelling, we have the right to require you to temporarily vacate the dwelling and remove all furniture, clothing and personal belongings in order for us to perform pest control services. If you fail to cooperate with us, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract.

**8. RESPONSIBILITIES.** You may be required to pay all reasonable costs of cleaning and pest control treatments incurred by us to treat your dwelling unit for bed bugs. If we confirm the presence or infestation of bed bugs after you vacate your dwelling, you may be responsible for the cost of cleaning and pest control treatments. If we must move other residents in order to treat adjoining or neighboring dwellings to your dwelling unit, you may be liable for payment of any lost rental income and other expenses incurred by us to relocate the neighboring residents and to clean and perform pest control treatments to eradicate infestations in other dwellings. If you fail to pay us for any costs you are liable for, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract, and obtain immediate possession of the dwelling. If you fail to move out after your right of occupancy has been terminated, you will be liable for holdover rent under the Lease Contract.

**9. TRANSFERS.** If we allow you to transfer to another dwelling in the community because of the presence of bed bugs, you must have your personal property and possessions treated according to accepted treatment methods or procedures established by a licensed pest control professional. You must provide proof of such cleaning and treatment to our satisfaction.

EOIR 32 of 92


© 2023, National Apartment Association, Inc. - 11/2023, Nevada

**10. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**You are legally bound by this document. Please read it carefully.**

**Resident or Residents**
*(All residents must sign)*

Benjamin Moon

**Owner or Owner's Representative**
*(Signs below)*

**Date of Signing Addendum**

*You are entitled to receive an original of this Addendum after it is fully signed. Keep it in a safe place.*


© 2023, National Apartment Association, Inc. - 11/2023, Nevada

Bed bugs, with a typical lifespan of 6 to 12 months, are wingless, flat, broadly oval-shaped insects. Capable of reaching the size of an apple seed at full growth, bed bugs are distinguishable by their reddish-brown color, although after feeding on the blood of humans and warm-blooded animals—their sole food source—the bugs assume a distinctly blood-red hue until digestion is complete.

**Bed bugs don't discriminate**

Bed bugs increased presence across the United States in recent decades can be attributed largely to a surge in international travel and trade. It's no surprise then that bed bugs have been found time and time again to have taken up residence in some of the fanciest hotels and apartment buildings in some of the nation's most expensive neighborhoods.

Nonetheless, false claims that associate bed bugs presence with poor hygiene and uncleanliness have caused rental housing residents, out of shame, to avoid notifying owners of their presence. This serves only to enable the spread of bed bugs.

While bed bugs are, by their very nature, more attracted to clutter, they're certainly not discouraged by cleanliness.

Bottom line: bed bugs know no social and economic bounds; claims to the contrary are false.

**Bed bugs don't transmit disease**

There exists no scientific evidence that bed bugs transmit disease. In fact, federal agencies tasked with addressing pest of public health concern, namely the U.S. Environmental Protection Agency and the Centers for Disease Control and Prevention, have refused to elevate bed bugs to the threat level posed by disease transmitting pests. Again, claims associating bed bugs with disease are false.

**Identifying bed bugs**

*Bed bugs can often be found in, around and between:*

- Bedding
- Bed frames
- Mattress seams
- Upholstered furniture, especially under cushions and along seams
- Around, behind and under wood furniture, especially along areas where drawers slide
- Curtains and draperies
- Along window and door frames
- Ceiling and wall junctions
- Crown moldings
- Behind and around wall hangings and loose wallpaper
- Between carpeting and walls (carpet can be pulled away from the wall and tack strip)
- Cracks and crevices in walls and floors
- Inside electronic devices, such as smoke and carbon monoxide detectors
- Because bed bugs leave some persons with itchy welts strikingly similar to those caused by fleas and mosquitoes, the origination of such markings often go misdiagnosed. However, welts caused by bed bugs often times appear in succession and on exposed areas of skin, such as the face, neck and arms. In some cases, an individual may not experience any visible reaction resulting from direct contact with bed bugs.
- While bed bugs typically prefer to act at night, they often do not succeed in returning to their hiding spots without leaving traces of their presence through fecal markings of a red to dark brown color, visible on or near beds. Blood stains tend also to appear when the bugs have been squashed, usually by an unsuspecting host in their sleep. And, because they shed, it's not uncommon for skin casts to be left behind in areas typically frequented by bed bugs.

**Preventing bed bug encounters when traveling**

Because humans serve as bed bugs' main mode of transportation, it is extremely important to be mindful of bed bugs when away from home. Experts agree that the spread of bed bugs across all regions of the United States is largely attributed to an increase in international travel and trade. Travelers are therefore encouraged to take a few minutes upon arriving to their temporary destination to thoroughly inspect their accommodations, so as to ensure that any uninvited guests are detected before the decision is made to unpack.

Because bed bugs can easily travel from one room to another, it is also recommended that travelers thoroughly inspect their luggage and belongings for bed bugs before departing for home.

**Bed bug do's and don'ts**

- **Do not bring used furniture from unknown sources into your dwelling.** Countless bed bug infestations have stemmed directly from the introduction into a resident's unit of second-hand and abandoned furniture. Unless the determination can be made with absolute certainty that a piece of second-hand furniture is bed bug-free, residents should assume that the reason a seemingly nice looking leather couch, for example, is sitting curbside, waiting to be hauled off to the landfill, may very well be due to the fact that it's teeming with bed bugs.
- **Do address bed bug sightings immediately.** Rental housing residents who suspect the presence of bed bugs in their unit must immediately notify the owner.
- **Do not attempt to treat bed bug infestations.** Under no circumstance should you attempt to eradicate bed bugs. Health hazards associated with the misapplication of traditional and non-traditional, chemical-based insecticides and pesticides poses too great a risk to you and your neighbors.
- **Do comply with eradication protocol.** If the determination is made that your unit is indeed playing host to bed bugs, you must comply with the bed bug eradication protocol set forth by both your owner and their designated pest management company.


© 2023, National Apartment Association, Inc. - 11/2023, Nevada

# MOLD INFORMATION AND PREVENTION ADDENDUM

*Becomes part of Lease Contract*

NATIONAL APARTMENT ASSOCIATION

***Please note: It is our goal to maintain a quality living environment for our residents. To help achieve this goal, it is important to work together to minimize any mold growth in your dwelling. That is why this addendum contains important information for you, and responsibilities for both you and us.***

**1. DWELLING DESCRIPTION.**
3850 W. Nevso Dr
*(street address),* 405 *(unit no. if applicable)* in Las Vegas *(city)*, Nevada, 89103 *(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: November 24, 2025
Owner's name: CRP/CALIDA PALMS VENTURE, LLC

Residents *(list all residents)*:
Benjamin Moon

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. ABOUT MOLD.** Mold is found virtually everywhere in our environment—both indoors and outdoors and in both new and old structures. Molds are naturally occurring microscopic organisms which reproduce by spores and have existed practically from the beginning of time. All of us have lived with mold spores all our lives. Without molds we would all be struggling with large amounts of dead organic matter.

Mold breaks down organic matter in the environment and uses the end product for its food. Mold spores (like plant pollen) spread through the air and are commonly transported by shoes, clothing and other materials. When excess moisture is present inside a dwelling, mold can grow. A 2004 Federal Centers for Disease Control and Prevention study found that there is currently no scientific evidence that the accumulation of mold causes any significant health risks for person with normally functioning immune systems. Nonetheless, appropriate precautions need to be taken.

**4. PREVENTING MOLD BEGINS WITH YOU.** In order to minimize the potential for mold growth in your dwelling, you must do the following:

- Keep your dwelling clean—particularly the kitchen, the bathroom(s), carpets and floors. Regular vacuuming, mopping and using a household cleaner to clean hard surfaces is important to remove the household dirt and debris that harbor mold or food for mold. Immediately throw away moldy food.
- Remove visible moisture accumulation on windows, walls, ceilings, floors and other surfaces as soon as reasonably possible. Look for leaks in washing machine hoses and discharge lines—especially if the leak is large enough for water to infiltrate nearby walls. Turn on any exhaust fans in the bathroom and kitchen *before* you start showering or cooking with open pots. When showering, be sure to keep the shower curtain *inside* the tub or fully close the shower doors. Also, the experts recommend that after taking a shower or bath, you: (1) wipe moisture off of shower walls, shower doors, the bathtub and the bathroom floor; (2) leave the bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated; and (3) hang up your towels and bath mats so they will completely dry out.
- Promptly notify us in writing about any air conditioning or heating system problems you discover. Follow our rules, if any, regarding replacement of air filters. Also, it is recommended that you periodically open windows and doors on days when the outdoor weather is dry (i.e., humidity is below 50 percent) to help humid areas of your dwelling dry out.
- Promptly notify us in writing about any signs of water leaks, water infiltration or mold. We will respond in accordance with state law and the Lease Contract to repair or remedy the situation, as necessary.
- Keep the thermostat set to automatically circulate air in the event temperatures rise to or above 80 degrees Fahrenheit.

**5. IN ORDER TO AVOID MOLD GROWTH,** it is important to prevent excessive moisture buildup in your dwelling. Failure to promptly pay attention to leaks and moisture that might accumulate on dwelling surfaces or that might get inside walls or ceilings can encourage mold growth. Prolonged moisture can result from a wide variety of sources, such as:

- rainwater leaking from roofs, windows, doors and outside walls, as well as flood waters rising above floor level;
- overflows from showers, bathtubs, toilets, lavatories, sinks, washing machines, dehumidifiers, refrigerator or A/C drip pans or clogged up A/C condensation lines;
- leaks from plumbing lines or fixtures, and leaks into walls from bad or missing grouting/caulking around showers, tubs or sinks;
- washing machine hose leaks, plant watering overflows, pet urine, cooking spills, beverage spills and steam from excessive open-pot cooking;
- leaks from clothes dryer discharge vents (which can put lots of moisture into the air); and
- insufficient drying of carpets, carpet pads, shower walls and bathroom floors.

**6. IF SMALL AREAS OF MOLD HAVE ALREADY OCCURRED ON *NON-POROUS* SURFACES** (such as ceramic tile, formica, vinyl flooring, metal, wood or plastic), the federal Environmental Protection Agency (EPA) recommends that you first clean the areas with soap (or detergent) and water, let the surface dry, and then within 24 hours apply a pre-mixed, spray-on-type household biocide, such as Lysol Disinfectant®, Pine-Sol Disinfectant® (original pine-scented), Tilex Mildew Remover® or Clorox Cleanup®. (Note: Only a few of the common household cleaners will actually kill mold). Tilex® and Clorox® contain bleach which can discolor or stain. **Be sure to follow the instructions on the container.** Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface.

Always clean and apply a biocide to an area 5 or 6 times larger than any visible mold because mold may be adjacent in quantities not yet visible to the naked eye. A vacuum cleaner with a high-efficiency particulate air (HEPA) filter can be


© 2024, National Apartment Association, Inc. - 3/2024, Nevada

used to help remove non-visible mold products from *porous* items, such as fibers in sofas, chairs, drapes and carpets—provided the fibers are completely dry. Machine washing or dry cleaning will remove mold from clothes.

7. **DO NOT CLEAN OR APPLY BIOCIDES TO:** (1) visible mold on *porous surfaces*, such as sheetrock walls or ceilings, or (2) *large areas* of visible mold on *non-porous* surfaces. Instead, notify us in writing, and we will take appropriate action.

8. **COMPLIANCE.** Complying with this addendum will help prevent mold growth in your dwelling, and both you and we will be able to respond correctly if problems develop that could lead to mold growth. If you have questions regarding this addendum, please contact us at the management office or at the phone number shown in your Lease Contract.

**If you fail to comply with this Addendum, you can be held responsible for property damage to the dwelling and any health problems that may result. We can't fix problems in your dwelling unless we know about them.**

9. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**Resident or Residents**
*(All residents must sign here)*

Benjamin Moon

**Owner or Owner's Representative**
*(Signs here)*

**Date of Lease Contract**

November 24, 2025

EOIR 36 of 92

033



© 2024, National Apartment Association, Inc. - 3/2024, Nevada

LEASE CONTRACT BUY-OUT AGREEMENT

NATIONAL APARTMENT ASSOCIATION

**1. DWELLING UNIT DESCRIPTION.**
Unit No. **405**, **3850 W. Nevso Dr** *(street address)* in **Las Vegas** *(city)*, Nevada, **89103** *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **November 24, 2025**
Owner's name: **CRP/CALIDA PALMS VENTURE, LLC**

Residents *(list all residents)*:
**Benjamin Moon**

**3. PURPOSE OF AGREEMENT.** The purpose of this Buy-Out Agreement is to give you the right to buy out of your Lease Contract early—subject to any special provisions in paragraph 9 below. In order to buy out early, your notice must be signed by all residents listed in paragraph 1 of the Lease Contract and you must comply with all provisions of this Buy-Out Agreement.

**4. BUY-OUT PROCEDURES.** You may buy out of the Lease Contract prior to the end of the lease term and cut off all liability for paying rent for the remainder of the lease term *if all of the following occur:*

(a) you give us written notice of buy-out at least **60** days prior to the new termination date (i.e., your new move-out date), which *(check one)* ☐ must be the last day of a month or ☒ may be during a month;
(b) you specify the new termination date in the notice, i.e., the date by which you'll move out;
(c) you are not in default under the Lease Contract on the date you give us the notice of buy-out;
(d) you are not in default under the Lease Contract on the new termination date (move-out date);
(e) you move out on or before the new termination date and do not hold over;
(f) you pay us a buy-out fee (consideration) of $ **3270.00**;
(g) you pay us the amount of any concessions you received when signing the Lease Contract; and
(h) you comply with any special provisions in paragraph 9 below.

**5. WHEN PAYABLE.** The buy-out fee in paragraph 4(f) is due and payable no later than **1** days after you give us your buy-out notice. The total dollar amount of any concessions regarding rent or other monetary lease obligations for the entire lease term is $ **500.00** and is due and payable on the same day as the buy-out fee, subject to any special provisions in paragraph 9 regarding the amount, calculation method, or payment date.

**6. SHOWING UNIT TO PROSPECTIVE RESIDENTS.** After you give us notice of buy-out, the Lease Contract gives us the right to begin showing your unit to prospective residents and telling them it will be available immediately after your new termination date.

**7. COMPLIANCE ESSENTIAL.** Our deposit of all amounts due under paragraphs 4(f) and 4(g) constitutes our approval of the new termination date stated in your notice of buy-out. If you fail to comply with any of the procedures or requirements in this agreement after we deposit such monies, your buy-out right and this agreement will be voided automatically; and (1) any amounts you have paid under this agreement will become part of your security deposit, and (2) the lease will continue without buy-out. Then, if you move out early, you are subject to all lease remedies, including reletting fees and liability for all rents for the remainder of the original lease term.

**8. MISCELLANEOUS.** If moving out by the new termination date becomes a problem for you, contact us. An extension may be possible if we have not already relet the dwelling unit to a successor resident. We and any successor residents who may be leasing your unit will be relying on your moving out on or before the new termination date. Therefore, you may not hold over beyond such date without our written consent—even if it means you have to make plans for temporary lodging elsewhere. "Default" as used in paragraphs 4(c) and 4(d) of this agreement means default as defined in the Lease Contract. You will continue to be liable for any damages and any sums accruing and unpaid prior to the new termination date.

**9. SPECIAL PROVISIONS.** Your right of buy-out *(check one)* ☐ is or ☒ is not limited to a particular fact situation. If limited, buy-out may be exercised only if the following facts (see below) occur and any described documents are furnished to us. Any special provisions below will supersede any conflicting provision of this printed agreement. Any false statements or documents presented to us regarding buy-out will automatically void your right to buy-out of the Lease Contract. The special provisions are:

**Resident or Residents**
*[All residents must sign]*

*Benjamin Moon*

**Owner or Owner's Representative**
*[signs below]*

**Date of Lease Contract**
**November 24, 2025**

EOIR 37 of 92

Exh. 2 - Adm.



034

© 2019, National Apartment Association, Inc. - 1/2019, Nevada

# LEASE CONTRACT ADDENDUM FOR SATELLITE DISH OR ANTENNA

NATIONAL APARTMENT ASSOCIATION

Under a Federal Communications Commission (FCC) order, you as our resident have a right to install a transmitting or receiving satellite dish or antenna on the leased dwelling, subject to FCC limitations. We as a rental housing owner are allowed to impose reasonable restrictions relating to such installation. You are required to comply with these restrictions as a condition of installing such equipment. This addendum contains the restrictions that you and we agree to follow.

1. **DWELLING UNIT DESCRIPTION.** Unit No. 405, 3850 W. Nevso Dr _(street address)_ in Las Vegas _(city)_, Nevada, 89103 _(zip code)_.

2. **LEASE CONTRACT DESCRIPTION.** Lease Contract Date: November 24, 2025
Owner's name: CRP/CALIDA PALMS VENTURE, LLC

Residents _(list all residents)_:
Benjamin Moon

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

3. **NUMBER AND SIZE.** You may install 1 satellite dish(es) or antenna(s) on the leased premises. A satellite dish may not exceed one meter (3.3 feet) in diameter. Antennas that only transmit signals or that are not covered by 47 CFR § 1.4000 are prohibited.

4. **LOCATION.** Your satellite dish or antenna must be located: (1) inside your dwelling; or (2) in an area outside your dwelling such as a balcony, patio, yard, etc. of which you have exclusive use under your lease. Installation is not permitted on any parking area, roof, exterior wall, window, window sill, fence or common area, or in an area that other residents are allowed to use. A satellite dish or antenna may not protrude beyond the vertical and horizontal space that is leased to you for your exclusive use.

5. **SAFETY AND NON-INTERFERENCE.** Your installation: (1) must comply with all applicable ordinances and laws and all reasonable safety standards; (2) may not interfere with our cable, telephone or electrical systems or those of neighboring properties; (3) may not be connected to our telecommunication systems; and (4) may not be connected to our electrical system except by plugging into a 110-volt duplex receptacle. If the satellite dish or antenna is placed in a permitted outside area, it must be safely secured by one of three methods: (1) securely attaching it to a portable, heavy object such as a small slab of concrete; (2) clamping it to a part of the building's exterior that lies within your leased premises (such as a balcony or patio railing); or (3) any other method approved by us in writing. No other methods are allowed. We may require reasonable screening of the satellite dish or antenna by plants, etc., so long as it does not impair reception.

6. **SIGNAL TRANSMISSION FROM EXTERIOR DISH OR ANTENNA TO INTERIOR OF DWELLING.** You may not damage or alter the leased premises and may not drill holes through outside walls, door jams, window sills, etc. If your satellite dish or antenna is installed outside your dwelling (on a balcony, patio, etc.), the signals received by it may be transmitted to the interior of your dwelling only by the following methods: (1) running a "flat" cable under a door jam or window sill in a manner that does not physically alter the premises and does not interfere with proper operation of the door or window; (2) running a traditional or flat cable through a pre-existing hole in the wall (that will not need to be enlarged to accommodate the cable); (3) connecting cables "through a window pane," similar to how an external car antenna for a cellular phone can be connected to inside wiring by a device glued to either side of the window—without drilling a hole through the window; (4) wireless transmission of the signal from the satellite dish or antenna to a device inside the dwelling; or (5) any other method approved by us in writing.

7. **SAFETY IN INSTALLATION.** In order to assure safety, the strength and type of materials used for installation must be approved by us. Installation must be done by a qualified person or company approved by us. Our approval will not be unreasonably withheld. An installer provided by the seller of the satellite dish or antenna is presumed to be qualified.

8. **MAINTENANCE.** You will have the sole responsibility for maintaining your satellite dish, antenna and all related equipment.

9. **REMOVAL AND DAMAGES.** You must remove the satellite dish or antenna and all related equipment when you move out of the dwelling. In accordance with the Lease Contract, you must pay for any damages and for the cost of repairs or repainting caused by negligence, carelessness, accident or abuse which may be reasonably necessary to restore the leased premises to its condition prior to the installation of your satellite dish, antenna or related equipment. You will not be responsible for normal wear.

10. **LIABILITY INSURANCE. You must take full responsibility for the satellite dish, antenna and related equipment. If the dish or antenna is installed at a height that could result in injury to others if it becomes unattached and falls, you must provide us with evidence of liability insurance (if available) to protect us against claims of personal injury and property damage to others, related to your satellite dish, antenna and related equipment.** The insurance coverage must be $ 100000.00, which is an amount reasonably determined by us to accomplish that purpose. Factors affecting the amount of insurance include height of installation above ground level, potential wind velocities, risk of the dish/antenna becoming unattached and falling on someone, etc.


© 2019, National Apartment Association, Inc. - 1/2019, Nevada

**11. SECURITY DEPOSIT.** An additional security deposit of $ 0.00 will be charged. We *(check one)* ☒ will consider or ☐ will not consider this additional security deposit a general security deposit for all purposes. The security deposit amount in the Security Deposit paragraph of the Lease Contract *[check one]* ☐ does or ☒ does not include this additional deposit amount. Refund of the additional security deposit will be subject to the terms and conditions set forth in the Lease Contract regardless of whether it is considered part of the general security deposit.

This additional security deposit is required to help protect us against possible repair costs, damages, or failure to remove the satellite dish, antenna and related equipment at time of move-out. Factors affecting any security deposit may vary, depending on: (1) how the dish or antenna is attached (nails,screws, lag bolts drilled into walls); (2) whether holes were permitted to be drilled through walls for the cable between the satellite dish and the TV; and (3) the difficulty and cost repair or restoration after removal, etc.

**12. WHEN YOU MAY BEGIN INSTALLATION.** You may start installation of your satellite dish, antenna or related equipment only after you have: (1) signed this addendum; (2) provided us with written evidence of the liability insurance referred to in paragraph 10 of this addendum; (3) paid us the additional security deposit, if applicable, in paragraph 11; and (4) received our written approval of the installation materials and the person or company that will do the installation, which approval may not be unreasonably withheld.

**13. MISCELLANEOUS.** If additional satellite dishes or antennas are desired, an additional lease addendum must be executed.

**14. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**Resident or Residents**
*[All residents must sign here]*

Benjamin Moon

**Owner or Owner's Representative**
*[signs here]*

**Date of Lease Contract**

November 24, 2025


© 2019, National Apartment Association, Inc. - 1/2019, Nevada

# COMMUNITY POLICIES, RULES AND REGULATIONS ADDENDUM

NATIONAL APARTMENT ASSOCIATION
We Lead the Way Home

*This addendum is incorporated into the Lease Contract (the "Lease") identified below and is in addition to all the terms and conditions contained in the Lease. If any terms of this Addendum conflict with the Lease, the terms of this Addendum shall be controlling:*

*Property Owner:* CRP/CALIDA PALMS VENTURE, LLC

*Resident(s):* Benjamin Moon

*Unit No (if applicable):/ Address:* #405, 3850 W. Nevso Dr, Las Vegas, NV 89103

*Lease Date:* 11/24/2025

**I. GENERAL CONDITIONS FOR USE OF DWELLING PROPERTY AND RECREATIONAL FACILITIES.**

Resident(s) permission for use of all common areas, Resident amenities, and recreational facilities (together, "Amenities") located at the Dwelling Community is a privilege and license granted by Owner, and not a contractual right except as otherwise provided for in the Lease. Such permission is expressly conditioned upon Resident's adherence to the terms of the Lease, this Addendum, and the Community rules and regulations ("Rules") in effect at any given time, and such permission may be revoked by Owner at any time for any lawful reason. In all cases, the most strict terms of either the Lease, this Addendum, or the Community Rules shall control. Owner reserves the right to set the days and hours of use for all Amenities and to change the character of or close any Amenity based upon the needs of Owner and in Owner's sole and absolute discretion, without notice, obligation or recompense of any nature to Resident. Owner and management may make changes to the Rules for use of any Amenity at any time in accordance with State statute.

**Additionally, Resident(s) expressly agrees to assume all risks of every type, including but not limited to risks of personal injury or property damage, of whatever nature or severity, related to Resident's use of the amenities at the Community. Resident(s) agrees to hold Owner harmless and release and waive any and all claims, allegations, actions, damages, losses, or liabilities of every type, whether or not foreseeable, that Resident(s) may have against Owner and that are in any way related to or arise from such use. This provision shall be enforceable to the fullest extent of the law.**

**THE TERMS OF THIS ADDENDUM SHALL ALSO APPLY TO RESIDENT(S)' OCCUPANTS, AGENTS AND INVITEES, TOGETHER WITH THE HEIRS, ASSIGNS, ESTATES AND LEGAL REPRESENTATIVES OF THEM ALL, AND RESIDENT(S) SHALL BE SOLELY RESPONSIBLE FOR THE COMPLIANCE OF SUCH PERSONS WITH THE LEASE, THIS ADDENDUM, AND COMMUNITY RULES AND REGULATIONS, AND RESIDENT(S) INTEND TO AND SHALL INDEMNIFY AND HOLD OWNER HARMLESS FROM ALL CLAIMS OF SUCH PERSONS AS DESCRIBED IN THE PRECEDING PARAGRAPH. The term "Owner" shall include the Management, officers, partners, employees, agents, assigns, Owners, subsidiaries and affiliates of Owner.**

**II. POOL.** This Community ☒ **DOES;** ☐ **DOES NOT** have a pool. When using the pool, Resident(s) agrees to the following:

- Residents and guests will adhere to the rules and regulations posted in the pool area and Management policies.
- All Swimmers swim at their own risk. Owner is not responsible for accidents or injuries.
- For their safety, Residents should not swim alone.
- Pool hours are posted at the pool.
- No glass, pets, or alcoholic beverages are permitted in the pool area. Use paper or plastic containers only.
- Proper swimming attire is required at all times and a swimsuit "cover up" should be worn to and from the pool
- No running or rough activities are allowed in the pool area. Respect others by minimizing noise, covering pool furniture with a towel when using suntan oils, leaving pool furniture in pool areas, disposing of trash, and keeping pool gates closed.
- Resident(s) must accompany their guests.
- Resident(s) must notify Owner any time there is a problem or safety hazard at the pool.

**IN CASE OF EMERGENCY DIAL 911**

**III. FITNESS CENTER.** This Community ☒ **DOES;** ☐ **DOES NOT** have a fitness center. When using the fitness center, Resident agrees to the following:

- Residents and guests will adhere to the rules and regulations posted in the fitness center and Management policies.
- The Fitness Center is not supervised. Resident(s) are solely responsible for their own appropriate use of equipment.
- Resident(s) shall carefully inspect each piece of equipment prior to Resident's use and shall refrain from using any equipment that may be functioning improperly or that may be damaged or dangerous.
- Resident(s) shall immediately report to Management any equipment that is not functioning properly, is damaged or appears dangerous, as well any other person's use that appears to be dangerous or in violation of Management Rules and Policies.
- Resident(s) shall consult a physician before using any equipment in the Fitness Center and before participating in any aerobics or exercise class, and will refrain from such use or participation unless approved by Resident's physician.
- Resident(s) will keep Fitness Center locked at all times during Resident's visit to the Fitness Center.
- Resident(s) will not admit any person to the Fitness Center who has not registered with the Management Office.
- Resident(s) must accompany guests, and no glass, smoking, eating, alcoholic beverages, pets, or black sole shoes are permitted in the Fitness Center.

Card # issued: (1) ______ (3) ______ (5) ______
(2) ______ (4) ______ (6) ______

EOIR 40 of 92

037


© 2025, National Apartment Association, Inc. - 7/2025, Nevada

**IV. PACKAGE RELEASE.** This Community ❑ **DOES;** ☒ **DOES NOT** accept packages on behalf of Residents.

***For communities that do accept packages on behalf of its Residents:***
Resident(s) gives Owner permission to sign and accept any parcels or letters sent to Resident(s) through UPS, Federal Express, Airborne, United States Postal Service or the like. Resident agrees that Owner does not accept responsibility or liability for any lost, damaged, or unordered deliveries, and agrees to hold Owner harmless for the same.

**V. BUSINESS CENTER.** This Community ❑ **DOES;** ☒ **DOES NOT** have a business center.
Resident(s) agrees to use the business center at Resident(s) sole risk and according to the Rules and Regulations posted in the business center and Management policies. Owner is not responsible for data, files, programs or any other information lost or damaged on Business Center computers or in the Business Center for any reason. No software may be loaded on Business Center computers without the written approval of Community Management. No inappropriate, offensive, or pornographic images or files (in the sole judgment of Owner) will be viewed or loaded onto the Business Center computers at any time. Residents will limit time on computers to ____________ minutes if others are waiting to use them. Smoking, eating, alcoholic beverages, pets, and any disturbing behavior are prohibited in the business center. Smoking, eating, alcoholic beverages, pets, and any disturbing behavior are prohibited in the business center.

**VI. AUTOMOBILES/BOATS/RECREATIONAL VEHICLES.** The following policies are in addition to those in the Lease, and may be modified by the additional rules in effect at the Community at any given time:
- Only ___1___ vehicle per licensed Resident is allowed.
- All vehicles must be registered at the Management office.
- All vehicles not registered with the Management Office, considered abandoned, or violating the Lease, the Parking Addendum or the Community Rules, in the sole judgment of Management, will be towed at vehicle owner's expense and in accordance with the notice requirements contained in applicable statute.
- Notwithstanding this, any vehicle parked in a space reserved for another resident and clearly marked as such, illegally parked in a fire lane, handicapped space, or otherwise posing an imminent threat of causing a substantial adverse effect on the health, safety or welfare of other residents, will immediately be towed, without notice, at the vehicle owner's expense.
- The washing of vehicles is not permitted on the property unless specifically allowed in designated area.
- Any on property repairs and/or maintenance of any vehicle must be with the prior written permission of the Management.
- Recreational vehicles, boats or trailers may only be parked on the property with Management's permission (in Management's sole discretion), and must be registered with the Management Office and parked in the area(s) designated by Management.

**VII. FIRE HAZARDS.** In order to minimize fire hazards and comply with city ordinances, Resident shall comply with the following:
- Residents and guests will adhere to the Community rules and regulations, and other Management policies concerning fire hazards, which may be revised from time to time.
- No person shall knowingly maintain a fire hazard.
- **Grills, Barbeques, and any other outdoor cooking or open flame devices will be used only on the ground level and will be placed a minimum of ___24___ feet from any building.** Such devices will not be used close to combustible materials, tall grass or weeds, on exterior walls or on roofs, indoors, on balconies or patios, or in other locations which may cause fires.
- **Fireplaces:** Only firewood is permitted in the fireplace. No artificial substances, such as Duraflame® logs are permitted. Ashes must be disposed of in metal containers, after ensuring the ashes are cold.
- Flammable or combustible liquids and fuels shall not be used or stored (including stock for sale) in dwellings, near exits, stairways breezeways, or areas normally used for the ingress and egress of people. This includes motorcycles and any apparatus or engine using flammable or combustible liquid as fuel.
- No person shall block or obstruct any exit, aisle, passageway, hallway or stairway leading to or from any structure.
- Resident(s) are solely responsible for fines or penalties caused by their actions in violation of local fire protection codes.

**VIII. EXTERMINATING.** Unless prohibited by statute or otherwise stated in the Lease, Owner may conduct extermination operations in Residents' dwelling several times a year and as needed to prevent insect infestation. Owner will notify Residents in advance of extermination in Residents' Dwelling, and give Resident instructions for the preparation of the Dwelling and safe contact with insecticides. Residents will be responsible to prepare the Dwelling for extermination in accordance with Owner's instructions. If Residents are unprepared for a scheduled treatment date Owner will prepare Residents' dwelling and charge Residents accordingly. Residents must request extermination treatments in addition to those regularly provided by Owner in writing. **Residents agree to perform the tasks required by Owner on the day of interior extermination to ensure the safety and effectiveness of the extermination. These tasks will include, but are not limited to, the following:**
- Clean in all cabinets, drawers and closets in kitchen and pantry.
- If roaches have been seen in closets, remove contents from shelves and floor.
- Remove infants and young children from the dwelling.
- Remove pets or place them in bedrooms, and notify Owner of such placement.
- Remove chain locks or other types of obstruction on day of service.
- Cover fish tanks and turn off their air pumps.
- Do not wipe out cabinets after treatment.

In the case of suspected or confirmed bed bug infestation, resident will agree to the following:
- Resident will wash all clothing, bed sheets, draperies, towels, etc. in extremely hot water.
- Resident will thoroughly clean, off premises, all luggage, handbags, shoes and clothes hanging containers.
- Resident will cooperate with Owner's cleaning efforts for all mattresses and seat cushions or other upholstered furniture, and will dispose of same if requested.

**RESIDENTS ARE SOLELY RESPONSIBLE TO NOTIFY OWNER IN WRITING PRIOR TO EXTERMINATION OF ANY ANTICIPATED HEALTH OR SAFETY CONCERNS RELATED TO EXTERMINATION AND THE USE OF INSECTICIDES**

**IX. DRAPES AND SHADES.** Drapes or shades installed by Resident, when allowed, must be lined in white and present a uniform exterior appearance.


© 2025, National Apartment Association, Inc. - 7/2025, Nevada

**X. WATER BEDS.** Resident shall not have water beds or other water furniture in the dwelling without prior written permission of Owner.

**XI. BALCONY or PATIO.** Balconies and patios shall be kept neat and clean at all times. No rugs, towels, laundry, clothing, appliances or other items shall be stored, hung or draped on railings or other portions of balconies or patios. No misuse of the space is permitted, including but not limited to, throwing, spilling or pouring liquids or other items, whether intentionally or negligently, over the balconies or patios.

**XII. SIGNS.** Resident shall not display any signs, exterior lights or markings on dwelling. No awnings or other projections shall be attached to the outside of the building of which dwelling is a part. You have the right to engage in the display of religious or cultural items, provided such display is in accordance with applicable law and any permissible and reasonable restrictions on the placement and manner of the display that we may have adopted. We may ask you to remove or relocate displays that are not in compliance with applicable law or our permissible restrictions. You acknowledge that a failure to remove or relocate non-compliance displays shall be a breach of the Lease.

**XIII. SATELLITE DISHES/ANTENNAS.** You must complete a satellite addendum and abide by its terms prior to installation or use.

**XIV. WAIVER/SEVERABILITY CLAUSE.** No waiver of any provision herein, or in any Community rules and regulations, shall be effective unless granted by the Owner in a signed and dated writing. If any court of competent jurisdiction finds that any clause, phrase, or provision of this Part is invalid for any reason whatsoever, this finding shall not effect the validity of the remaining portions of this addendum, the Lease Contract or any other addenda to the Lease Contract.

**XV. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

I have read, understand and agree to comply with the preceding provisions.

| | | | |
|---|---|---|---|
| *Benjamin Moon* | 11/24/2025 | | |
| Resident | Date | Resident | Date |
| Resident | Date | Resident | Date |
| Resident | Date | Resident | Date |
| Owner Representative | | Date | |

EOIR 42 of 92

039



© 2025, National Apartment Association, Inc. - 7/2025, Nevada

# LEASE ADDENDUM FOR RENT CONCESSION OR OTHER RENT DISCOUNT

NAA NATIONAL APARTMENT ASSOCIATION

**1. DWELLING UNIT DESCRIPTION.**
Unit No. 405, 3850 W. Nevso Dr (street address) in Las Vegas (city), Nevada, 89103 (zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: November 24, 2025
Owner's name: CRP/CALIDA PALMS VENTURE, LLC

Residents *(list all residents)*:
Benjamin Moon

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. CONCESSION/DISCOUNT AGREEMENT.** As consideration for your agreement to remain in your dwelling and to fulfill your Lease obligations throughout the full term of your Lease, you will receive the following rent Concession and or Discount. *[Check all that apply]*

☐ **One-Time Concession.** You will receive a One-Time Concession off the rent indicated in the Rent and Charges paragraph of the Lease Contract in the total amount of $ 0.00. This Concession will be credited to your rent due for the month(s) of: ______.

☐ **Monthly Discount/Concession.** The rent indicated in the Rent and Charges paragraph of the Lease Contract includes a Monthly Discount of $ 0.00 per month off of the suggested rental rate for your dwelling.

☒ **Other Discount/Concession.** You will receive the following discount off the rent indicated in the Rent and Charges paragraph of the Lease Contract:
$ 500.00. Reason for discount/concession below:
$500.00 gift card per renewal special

☐ **Non-Monetary Concession.** You will receive the following non-monetary concession during the term of the Lease.

**4. CONCESSION CANCELLATION AND CHARGE-BACK.** The concession and discounts indicated above are provided to you as an incentive and with the understanding that you will fulfill your obligations under the Lease Contract through the entire term of your Lease.

If your lease is terminated early due to your default (for example, if you abandon the premises without paying rent or are evicted), this Concession/Discount Agreement will be immediately terminated, and you will be required to immediately repay to the Owner the amounts of all *[Check all that apply]*

☒ Concessions
☒ Discounts

that you have actually received for the months you resided in the Premises, and without further notice from us.

**5. MARKET RENT.** The market rent for this dwelling is the rent stated in the NAA Lease Contract. You acknowledge that the market rent is a fair representation of what the specific dwelling would actually rent for at the time the Lease Contract was negotiated and executed, and is reflective of the rent for a similar dwelling at comparable properties.

**6. SPECIAL PROVISIONS.** The following special provisions control over any conflicting provisions of this printed Addendum form or the Lease Contract.

The concession charge back only applies to one-time concessions and monthly discounts/concessions pertaining to move-in or lease renewal concessions. A charge back does not apply for a customer service oriented concession which may be offered for various reasons during the current lease term. Customer service oriented concessions may include concessions offered for issue resolution or any other mid-lease concession that are not tied to a move-in or lease renewal concession.

**Resident or Residents**
*[All residents must sign here]*

Benjamin Moon

**Owner or Owner's Representative**
*[signs here]*

**Date of Lease Contract**
November 24, 2025

040

EOIR 43 of 92

Exh. 2 - Adm.



© 2024, National Apartment Association, Inc. - 7/2024, Nevada

# LEASE ADDENDUM
## FOR REMOTE CONTROL, CARD, OR CODE ACCESS GATE
*Becomes part of Lease Contract*

NAA NATIONAL APARTMENT ASSOCIATION

**1. DWELLING DESCRIPTION.**
3850 W. Nevso Dr
*(street address)*, 405 *(unit no. if applicable)* in Las Vegas *(city)*, Nevada, 89103 *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: November 24, 2025
Owner's name: CRP/CALIDA PALMS VENTURE, LLC

Residents *(list all residents)*:
Benjamin Moon

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. REMOTE CONTROL/CARDS/CODE FOR GATE ACCESS.**

- ☐ **Remote control for gate access.** Each person who is listed as a resident on the lease will be given a remote control at no cost to use during his or her residency. Each additional remote control for you or other occupants will require a $ ____________ non-refundable fee.
- ☐ **Cards for gate access.** Each person who is listed as a resident on the lease will be given a card at no cost to use during his or her residency. Each additional card for you or other occupants will require a $ ____________ non-refundable fee.
- ☐ **Code for gate access.** Each resident will be given, at no cost, an access code (keypad number) for the pedestrian or vehicular access gates. It is to be used only during your residency. We may change the access code at any time and will notify you of any such changes.

**4. DAMAGED, LOST OR UNRETURNED REMOTE CONTROLS, CARDS OR CODE CHANGES.**

- ☐ If a remote control is lost, stolen or damaged, a $ ____________ fee will be charged for a replacement. If a remote control is not returned or is returned damaged when you move out, there will be a $ ____________ deduction from the security deposit.
- ☐ If a card is lost, stolen or damaged, a $ ____________ fee will be charged for a replacement card. If a card is not returned or is returned damaged when you move out, there will be a $ ____________ deduction from the security deposit.
- ☐ We may change the code(s) at any time and notify you accordingly.

**5. REPORT DAMAGE OR MALFUNCTIONS.** Please immediately report to the office any malfunction or damage to gates, fencing, locks or related equipment.

**6. FOLLOW WRITTEN INSTRUCTIONS.** We ask that you and all other occupants read the written instructions that have been furnished to you regarding the access gates. This is important because if the gates are damaged by you or other occupants, guests or invitees through negligence or misuse, you are liable for the damages under your lease, and collection of damage amounts will be pursued.

**7. PERSONAL INJURY AND/OR PERSONAL PROPERTY DAMAGE.** Except as specifically required by law, we have no duty to maintain the gates and cannot guaranty against gate malfunctions. We make no representations or guarantees to you concerning security of the community (if applicable). Any measures, devices,or activities taken by us are solely for the benefit of us and for the protection of our property and interests, and any benefit to you of the same is purely incidental. Anything mechanical or electronic is subject to malfunction. Fencing, gates or other devices will not prevent all crime. No security system or device is foolproof or 100 percent successful in deterring crime. Crime can still occur. Protecting residents, their families, occupants, guests and invitees from crime is the sole responsibility of residents, occupants and law enforcement agencies. You should first call 911 or other appropriate emergency police numbers if a crime occurs or is suspected. We are not liable to any resident, family member, guest, occupant or invitee for personal injury, death or damage/loss of personal property from incidents related to perimeter fencing, automobile access gates and/or pedestrian access gates, unless such injury, death, damage or loss was a direct result of negligence or intentional acts by us or our employees. We reserve the right to modify or eliminate security systems other than those statutorily required. You will be held responsible for the actions of any persons to whom you provide access to the community (if applicable).

**8. RULES IN USING VEHICLE GATES.**

- Always approach entry and exit gates with caution and at a very slow rate of speed.
- Never stop your car where the gate can hit your vehicle as the gate opens or closes.
- Never follow another vehicle into an open gate. Always use your card to gain entry.
- Report to management the vehicle license plate number of any vehicle that piggybacks through the gate.
- Never force the gate open with your car.
- Never get out of your vehicle while the gates are opening or closing.
- If you are using the gates with a boat or trailer, please contact management for assistance. The length and width of the trailer may cause recognition problems with the safety loop detector and could cause damage.
- Do not operate the gate if there are small children nearby who might get caught in it as it opens or closes.
- If you lose your card, please contact the management office immediately.
- Do not give your card or code to anyone else.
- Do not tamper with gate or allow your occupants to tamper or play with gates.



© 2024, National Apartment Association, Inc. - 3/2024, Nevada

9. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**Resident or Residents**
*[All residents must sign here]*

Benjamin Moon

**Owner or Owner's Representative**
*[signs here]*

**Date of Lease Contract**

November 24, 2025


© 2024, National Apartment Association, Inc. - 3/2024, Nevada

# LEASE ADDENDUM FOR INTRUSION ALARM

NAA NATIONAL APARTMENT ASSOCIATION We Lead the Way Home

**1. DWELLING UNIT DESCRIPTION.** Unit No. 405, 3850 W. Nevso Dr (*street address*) in Las Vegas (*city*), Nevada, 89103 (*zip code*).

**2. LEASE CONTRACT DESCRIPTION.** Lease Contract Date: November 24, 2025

Owner's name: CRP/CALIDA PALMS VENTURE, LLC

Residents (*list all residents*):

Benjamin Moon

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. INTRUSION ALARM.** Your dwelling is equipped with an intrusion alarm. It must not be considered a guaranty of safety or security. You should at all times take precautions as if the intrusion alarm were malfunctioning. You acknowledge that the security of you and your family, occupants, and guests are your responsibility alone. Your use of the alarm system is (*check one*) ☐ required or ☒ optional. You are responsible for all false alarm charges for your dwelling.

**4. PERMIT FROM CITY.** You (*check one*) ☒ do or ☐ do not have to obtain a city permit for activation and use of the intrusion alarm. If you do, the phone number to call is ______________, and it is your responsibility to obtain the permit. You also will be responsible for any fines due to excessive false alarms.

**5. FOLLOW INSTRUCTIONS.** You agree to use reasonable care in operating the alarm and to follow the written instructions, rules and procedures furnished to you by us. Instructions ☐ are attached or ☐ will be provided to you when you move in.

**6. ALARM COMPANY.** You (*check one*) ☒ will or ☐ will not have to make arrangements with an independent alarm company to activate and maintain the alarm system. You (*check one*) ☒ may choose your own alarm company or ☐ are required to use ______________ as your alarm company. The alarm system is repaired and maintained by Resident/Alarm Co.

**7. ENTRY BY OWNER.** Upon activation of the alarm system, you must immediately provide us (management) with your security code and any special alarm system instructions for lawful entry into the unit when no one is there, as authorized in your Lease Contract. You must reimburse us for any expenses we incur in entering your dwelling, when those expenses are due to your failure to provide the foregoing information.

**8. REPAIRS OR MALFUNCTIONS.** If the intrusion alarm malfunctions, you agree to (*check one*) ☒ contact your intrusion alarm company immediately for repair or ☐ contact us immediately for repair. The cost of repair will be paid by (*check one*) ☒ you or ☐ us.

**9. NO WARRANTY.** We make no guarantees or warranties, express or implied, concerning the alarm system. All guarantees and warranties are expressly disclaimed. Crime can and does occur despite the best security measures. Anything electronic or mechanical in nature will malfunction from time to time. We are absolutely not responsible for malfunction of the alarm, unless such malfunction was a direct result of negligence or intentional acts by us or our employees.

**10. LIABILITY.** We are not liable to you, your guests or other occupants for any injury, damage or loss resulting from the alarm or any malfunction of the alarm, unless such injury, damage, or loss was a direct result of negligence or intentional acts by us or our employees. It is recommended that you purchase insurance to cover casualty loss of your property, including loss by theft.

**11. EMERGENCIES.** Always call 911 or law enforcement authorities or emergency medical services in the event of a crime or emergency. Then contact us. We are not required to answer the alarm, but we do have the right to enter and cut off the alarm to minimize annoyance to neighbors when it malfunctions or is not timely cut off.

**12. ENTIRE AGREEMENT.** We've made no promises or representations regarding the alarm system except those in this addendum.

**13. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

If property does not provide pre-installed alarm systems, the resident may choose to utilize a wireless alarm system. Resident is not permitted to drill or cut into wall at any time. Please contact the City office for permit requirements.

**Resident or Residents**
[*All residents must sign here*]

Benjamin Moon

**Owner or Owner's Representative**
[*signs here*]

**Date of Lease Contract**

November 24, 2025

EOIR 46 of 92

043

Exh. 2 - Adm.



© 2019, National Apartment Association, Inc. - 1/2019, Nevada

# NO-SMOKING ADDENDUM

NATIONAL APARTMENT ASSOCIATION

Date: November 24, 2025
(when this Addendum is filled out)

*All use of any tobacco product involving smoking, burning, or combustion of tobacco is prohibited in any portion of the apartment community. You are entitled to receive an original of this No-Smoking Addendum after it is fully signed. Keep it in a safe place.*

1. **DWELLING UNIT DESCRIPTION.**
Unit No. 405, 3850 W. Nevso Dr *(street address)* in Las Vegas *(city)*, Nevada, 89103 *(zip code)*.

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: November 24, 2025
Owner's name: CRP/CALIDA PALMS VENTURE, LLC

Residents *(list all residents)*:
Benjamin Moon

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

3. **DEFINITION OF SMOKING.** Smoking refers to any use or possession of a cigar, cigarette, e-cigarette, hookah, vaporizer, or pipe containing tobacco or a tobacco product while that tobacco or tobacco product is burning, lighted, vaporized, or ignited, regardless of whether the person using or possessing the product is inhaling or exhaling the smoke from such product. The term tobacco includes, but is not limited to any form, compound, or synthesis of the plant of the genus Nicotiana or the species N. tabacum which is cultivated for its leaves to be used in cigarettes, cigars, e-cigarettes, hookahs, vaporizers, or pipes. Smoking also refers to use or possession of burning, lighted, vaporized, or ignited non-tobacco products if they are noxious, offensive, unsafe, unhealthy, or irritating to other persons.

4. **SMOKING ANYWHERE INSIDE BUILDINGS OF THE APARTMENT COMMUNITY IS STRICTLY PROHIBITED.** All forms and use of burning, lighted, vaporized, or ignited tobacco products and smoking of tobacco products inside any dwelling, building, or interior of any portion of the apartment community is strictly prohibited. Any violation of the no-smoking policy is a material and substantial violation of this Addendum and the Lease Contract.

The prohibition on use of any burning, lighted, vaporized, or ignited tobacco products or smoking of any tobacco products extends to all residents, their occupants, guests, invitees and all others who are present on or in any portion of the apartment community. The no-smoking policy and rules extend to, but are not limited to, the management and leasing offices, building interiors and hallways, building common areas, dwellings, club house, exercise or spa facility, tennis courts, all interior areas of the apartment community, commercial shops, businesses, and spaces, work areas, and all other spaces whether in the interior of the apartment community or in the enclosed spaces on the surrounding community grounds.

Smoking of non-tobacco products which are harmful to the health, safety, and welfare of other residents inside any dwelling or building is also prohibited by this Addendum and other provisions of the Lease Contract.

5. **SMOKING OUTSIDE BUILDINGS OF THE APARTMENT COMMUNITY.** Smoking is permitted only in specially designated areas outside the buildings of the apartment community. Smoking must be at least 99 feet from the buildings in the apartment community, including administrative office buildings. If the previous field is not completed, smoking is only permitted at least 25 feet from the buildings in the apartment community, including administrative office buildings. The smoking-permissible areas are marked by signage.

Smoking on balconies, patios, and limited common areas attached to or outside of your dwelling ☐ is ☒ is not permitted.

The following outside areas of the community may be used for smoking: NONE

Even though smoking may be permitted in certain limited outside areas, we reserve the right to direct that you and your occupants, family, guests, and invitees cease and desist from smoking in those areas if smoke is entering the dwellings or buildings or if it is interfering with the health, safety, or welfare or disturbing the quiet enjoyment, or business operations of us, other residents, or guests.

6. **YOUR RESPONSIBILITY FOR DAMAGES AND CLEANING.** You are responsible for payment of all costs and damages to your dwelling, other residents' dwellings, or any other portion of the apartment community for repair, replacement, or cleaning due to smoking or smoke related damage caused by you or your occupants, family, guests, or invitees, regardless of whether such use was a violation of this Addendum. Any costs or damages we incur related to repairs, replacement, and cleaning due to your smoking or due to your violation of the no-smoking provisions of the Lease Contract are in excess of normal wear and tear. Smoke related damage, including but not limited to, the smell of tobacco smoke which permeates sheetrock, carpeting, wood, insulation, or other components of the dwelling or building is in excess of normal wear and tear in our smoke free apartment community.

7. **YOUR RESPONSIBILITY FOR LOSS OF RENTAL INCOME AND ECONOMIC DAMAGES REGARDING OTHER RESIDENTS.** You are responsible for payment of all lost rental income or other economic and financial damages or loss to us due to smoking or smoke related damage caused by you or your occupants, family, guests, or invitees which results in or causes other residents to vacate their dwellings, results in disruption of other residents' quiet enjoyment, or adversely affects other residents' or occupants' health, safety, or welfare.

8. **LEASE CONTRACT TERMINATION FOR VIOLATION OF THIS ADDENDUM.** We have the right to terminate your Lease Contract or right of occupancy of the dwelling for any violation of this No-Smoking Addendum. Violation of the no-smoking provisions is a material and substantial default or violation of the Lease Contract. Despite the termination of the Lease Contract or your occupancy, you will remain liable for rent through the end of the Lease Contract term or the date on which the dwelling is re-rented to a new occupant, whichever comes first. Therefore, you may be responsible for payment of rent after you vacate the leased premises even though you are no longer living in the dwelling.



© 2019, National Apartment Association, Inc. - 1/2019, Nevada

**9. EXTENT OF YOUR LIABILITY FOR LOSSES DUE TO SMOKING.** Your responsibility for damages, cleaning, loss of rental income, and loss of other economic damages under this No-Smoking Addendum are in addition to, and not in lieu of, your responsibility for any other damages or loss under the Lease Contract or any other addendum.

**10. YOUR RESPONSIBILITY FOR CONDUCT OF OCCUPANTS, FAMILY MEMBERS, AND GUESTS.** You are responsible for communicating this community's no-smoking policy and for ensuring compliance with this Addendum by your occupants, family, guests, and invitees.

**11. THERE IS NO WARRANTY OF A SMOKE FREE ENVIRONMENT.** Although we prohibit smoking in all interior parts of the apartment community, there is no warranty or guaranty of any kind that your dwelling or the apartment community is smoke free. Smoking in certain limited outside areas is allowed as provided above. Enforcement of our no-smoking policy is a joint responsibility which requires your cooperation in reporting incidents or suspected violations of smoking. You must report violations of our no-smoking policy before we are obligated to investigate and act, and you must thereafter cooperate with us in prosecution of such violations.

This is an important and binding legal document. By signing this Addendum you are agreeing to follow our no-smoking policy and you are acknowledging that a violation could lead to termination of your Lease Contract or right to continue living in the dwelling. If you or someone in your household is a smoker, you should carefully consider whether you will be able to abide by the terms of this Addendum.

**12. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

NON-SMOKING PROPERTY

**Resident or Residents**
*(All residents must sign here)*

Benjamin Moon

**Owner or Owner's Representative**
*(Sign here)*

EOIR 48 of 92

Exh. 2 - Adm.

...045



© 2019, National Apartment Association, Inc. - 1/2019, Nevada

# RESIDENT PARKING ADDENDUM

*Becomes part of Lease Contract*

NATIONAL APARTMENT ASSOCIATION
We Lead the Way Home

Date: **November 24, 2025**
(when this Addendum is filled out)

**1. DWELLING DESCRIPTION.**
**3850 W. Nevso Dr**
*(street address),* **405** *(unit no. if applicable)* in **Las Vegas** *(city)*, Nevada, **89103** *(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **November 24, 2025**
Owner's name: **CRP/CALIDA PALMS VENTURE, LLC**

Residents *(list all residents)*:
**Benjamin Moon**

The term of this Parking Addendum is as follows: Begins on ______, ______ and ending on ______, ______.

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**RESIDENT AND OWNER AGREE AS FOLLOWS:**

**3.** You agree to properly register all vehicles with management. If you get a new or replacement vehicle you must notify us and complete a revised agreement.

**4.** If you are provided with a parking tag or sticker it must be properly installed and prominently displayed in the location and manner we require.

**5.** Unless your vehicle(s) has been assigned a specific space(s) you may park in any available space(s) in the parking areas, with the exception of spaces reserved for a particular use or any marked handicap space, unless you possess a government issued handicap decal or similar signage.

**6.** If you are assigned a specific parking space(s) we shall assign you the space(s) and retain the right to change assigned spaces at our sole discretion.

**7.** You understand and accept that we have the right at any time to tow vehicles that are in violation of this Addendum, the terms of the Lease, or Rules, from any parking space on property, subject to the notice requirements contained in applicable statute.

**8.** You agree to use parking spaces in accordance with the terms of the Lease and Rules.

**9.** Any vehicles which are improperly parked or are in violation of this addendum, the terms of the Lease or Rules will be towed at your expense. You agree that we shall not be liable to you for damages related to the physical towing nor any consequential damages you may incur through loss of use of the vehicle(s).

**10.** You understand that we will not be held liable for any damage or theft that may occur while your vehicle(s) is parked on any part of the property. Upon signing this agreement you knowingly accept the risk of parking any vehicle(s) on the property.

**11.** Any action by you, any occupant, guest, or visitor that violates this addendum shall constitute a violation of the Lease Contract.

**12.** You understand and agree that any judgment of possession entered against you shall be a judgment for possession of any parking spaces which you are entitled to under this addendum. Once such judgment is rendered and executed upon you, you shall immediately remove all vehicles from the property parking areas. If you fail to remove your vehicle(s), we shall tow the vehicle(s) at your expense and in accordance with applicable statutes. You agree that we shall not be liable to you for damages related to the physical towing nor any consequential damages you may incur through loss of use of the vehicle(s).

**COST FOR PARKING**
Resident agrees to pay $ ______ monthly or a one-time fee of $ ______ per vehicle. Monthly parking fees are included in the total monthly periodic rent stated in the Lease. If no amount is filled in parking shall be free for properly registered and authorized vehicles.

Resident understands and accepts that all-parking rights and privileges will immediately be revoked in the case that Resident is **30** days delinquent in paying the required parking fee.

Resident agrees to pay $ **100.00** NSF fee for all checks returned for non-sufficient funds. Resident agrees that unpaid parking fees shall become additional periodic rent pursuant to the Lease Contract. Resident agrees that we are permitted to pursue any remedy contained in the Lease Contract or under applicable statute for your non-payment of these parking fees.

**VEHICLE INFORMATION:**

**Vehicle 1**
Make: **Tesla**
Model & Year: **Model Y-2023**
State: **NV**
License Plate: **NY-557-567**
Permit Number:
Phone Number:
Parking Space:

**Vehicle 2**
Make:
Model & Year:
State:
License Plate:
Permit Number:
Phone Number:
Parking Space:

**Vehicle 3**
Make:
Model & Year:
State:
License Plate:
Permit Number:
Phone Number:
Parking Space:

EOIR 49 of 92

-.046



© 2025, National Apartment Association, Inc. - 10/2025, Nevada

13. SPECIAL PROVISIONS.

**Resident or Residents**
*(All residents must sign)*

Benjamin Moon

**Owner or Owner's Representative**
*(Signs below)*

**Date of Signing Addendum**


© 2025, National Apartment Association, Inc. - 10/2025, Nevada

# ADDENDUM REGARDING RECREATIONAL and MEDICAL MARIJUANA USE and LANDLORD'S COMMITMENT TO ENFORCEMENT OF CRIME FREE ADDENDUM

*Becomes part of Lease Contract*

NATIONAL APARTMENT ASSOCIATION

**1. DWELLING DESCRIPTION.**
3850 W. Nevso Dr
*(street address),* 405 *(unit no. if applicable)* in Las Vegas *(city)*, Nevada, 89103 *(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: November 24, 2025
Owner's name: CRP/CALIDA PALMS VENTURE, LLC

Residents *(list all residents)*:
Benjamin Moon

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3.** The Ballot Question 9, Medical Use of Marijuana (2000) and Nev. Rev. Stat. 453A permits the limited use of marijuana in specific and limited circumstances. However, this is not the case under federal law. Under federal law, specifically the Controlled Substances Act (CSA), marijuana is still categorized as a Schedule I substance. This means that under federal law, the manufacture, distribution, or possession of marijuana is strictly prohibited. Because the U.S. Department of Housing and Urban Development is controlled by the federal government, it agrees that the use of marijuana, whether prescribed for medical reasons or not, is a criminal offense and will not be protected under the fair housing laws. Therefore, management is not required to accommodate the use of marijuana by a tenant who is a current medical marijuana user. Disabled tenants who are registered medical marijuana users, however, should not feel discouraged to request reasonable accommodations if the need arises.

**4.** The Premises listed above follows and complies with federal law regarding marijuana use and is, and will continue to be, a drug free community. Possession, use, manufacture or sale of any illegal substance, including marijuana, or any use of marijuana by the tenant and/or guests will result in immediate termination. If you have any questions or concerns about this policy, please speak to management.

**5.** By signing below, the resident acknowledges his or her understanding of the terms and conditions as stated above, and his or her agreement to comply with those terms and conditions.

**6. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

| Resident or Residents *(sign here)* | Date of Signing Addendum |
| --- | --- |
| Benjamin Moon | 11/24/2025 |

| Owner or Owner's Representative *(signs here)* | Date of Signing Addendum |
| --- | --- |
| | |

EOIR 51 of 92

...048

Exh. 2 - Adm.

© 2024, National Apartment Association, Inc. - 3/2024, Nevada

# CRIME/DRUG FREE HOUSING ADDENDUM

*Becomes part of the Lease Contract*

NATIONAL APARTMENT ASSOCIATION

1. **DWELLING DESCRIPTION.**
3850 W. Nevso Dr
*(street address)*, 405 *(unit no. if applicable)* in Las Vegas *(city)*, Nevada, 89103 *(zip code)*.

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: November 24, 2025
Owner's name: CRP/CALIDA PALMS VENTURE, LLC

Residents *(list all residents)*:
Benjamin Moon

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

3. **ADDENDUM APPLICABILITY.** In the event any provision in this Addendum is inconsistent with any provision(s) contained in other portions of, or attachments to, the above-mentioned Lease Contract, then the provisions of this Addendum shall control. For purposes of this Addendum, the term "Premises" shall include the dwelling, all common areas, all other dwellings on the property or any common areas or other dwellings on or about other property owned by or managed by the Owner. The parties hereby amend and supplement the Lease Contract as follows:

4. **CRIME/DRUG FREE HOUSING.** Resident, members of the Resident's household, Resident's guests, and all other persons affiliated with the Resident:

A. Shall not engage in any illegal or criminal activity on or about the premises. The phrase, "illegal or criminal activity" shall include, but is not limited to, the following:

1. Engaging in any act intended to facilitate any type of criminal activity.
2. Permitting the Premises to be used for, or facilitating on the Premises any Criminal or drug related activity, by any member of the household or guest.
3. The unlawful manufacturing, selling, using, storing, keeping, purchasing or giving of an illegal or controlled substance or paraphernalia as defined in city, county, state or federal laws, including but not limited to the State of Nevada and/or the Federal Controlled Substances Act.
4. Violation of any federal drug laws governing the use, possession, sale, manufacturing and distribution of marijuana, regardless of state or local laws. (So long as the use, possession, sale, manufacturing and distribution of marijuana remains a violation of federal law, violation of any such federal law shall constitute a material violation of this rental agreement.)
5. Engaging in, or allowing, any behavior that is associated with drug activity, including but not limited to having excessive vehicle or foot traffic associated with Resident's dwelling.
6. Any breach of the Lease Contract that otherwise jeopardizes the health, safety, and welfare of the Owner, Owner's agents, or other Residents, or involving imminent, actual or substantial property damage.
7. Engaging in or committing any act that would be a violation of the Owner's screening criteria for criminal conduct or which would have provided Owner with a basis for denying Resident's application due to criminal conduct.
8. Engaging in any activity that constitutes waste, nuisance, or unlawful use.

B. AGREE THAT ANY VIOLATION OF THE ABOVE PROVISIONS CONSTITUTES A MATERIAL VIOLATION OF THE PARTIES' LEASE CONTRACT AND GOOD CAUSE FOR TERMINATION OF TENANCY. A single violation of any of the provisions of this Addendum shall be deemed a serious violation, and a material default, of the parties' Lease Contract. It is understood that a single violation shall be good cause for termination of the Lease Contract. Notwithstanding the foregoing comments, Owner may terminate Resident's tenancy for any lawful reason, and by any lawful method, with or without good cause.

5. **CRIMINAL CONVICTION NOT REQUIRED.** Unless otherwise provided by law, proof of violation of any criminal law shall not require a criminal conviction.

6. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

| **Resident or Residents** *(sign here)* | **Date of Signing Addendum** |
| --- | --- |
| Benjamin Moon | 11/24/2025 |

| **Owner or Owner's Representative** *(signs here)* | **Date of Signing Addendum** |
| --- | --- |
| | |

EOIR 52 of 92

Exh. 2 - Adm.



© 2023, National Apartment Association, Inc. - 10/2023, Nevada

049

# Addendum re Installation of Ring Doorbell or Peephole Camera

Addendum date: 11/24/2025

WHEREAS, Benjamin Moon ("Residents") has requested to alter the premises known as 405, 3850 W. Nevso Dr, Las Vegas, NV 89103, ("Subject Premises") in the following manner (collectively "Alteration"): **INSTALLATION OF RING DOOR BELL OR PEEPHOLE CAMERA**.

Elysian at the Palms ("Lessor") has authorized the implementation of the above request, pursuant to the terms and conditions set forth below. This Addendum shall amend the Lease Agreement between Lessor and Resident as set forth herein. The Lease Agreement, which remains valid and enforceable, is incorporated by reference as though fully set forth herein.

The Parties agree and understand that the Alteration is subject to the following conditions:

- The cost of the Alteration and returning the unit to its original condition (*at the request of Management*) will be at the sole expense of Resident.

- The Alteration shall be performed by a licensed and insured contractor. Resident shall inform Lessor of the name of the company and/or individual who will perform the Alteration prior to the commencement of the Alteration. Resident shall provide Lessor with the make and model of the alarm prior to installation. Resident will not proceed with the Alteration *without* written approval from Lessor prior to the commencement of the Alteration.

- *****RESIDENT UNDERSTANDS THAT THEY WILL BE REQUESTED TO DISABLE AND/OR REMOVE THE DEVICE SHOULD THERE BE ANY NEIGHBOR COMPLAINTS OR IF IT CAUSES A NUISANCE TO NEIGHBORING RESIDENTS. RESIDENT WILL NOT RECORD ANY RESIDENT OR GUEST IN ANY PRIVATE LOCATION*****

- Resident understands and agrees that Lessor is not in a position to prevent crime. In fact, Lessor does not promise, warrant or guarantee the safety or security of residents or their personal property against the criminal actions of other residents or third parties. Each resident has the responsibility to protect themselves and to maintain appropriate insurance to protect his or her belongings. Most importantly, all criminal acts should be promptly reported to the Police Department. Resident understands that the installation of an alarm does not heighten or change Lessor's duty in any way.

- Resident on behalf of himself/herself and his/her heirs, successors, executors, agents, attorneys and assigns hereby releases and forever discharges Lessor, its past and present owner(s), manager(s) and affiliated entity(ies), and their respective officers, directors, principals, employees, attorneys, insurers and agents from any and all liability for claims known or unknown arising from the installation, use of, and maintenance of the above-referenced Alteration.

- Resident hereby expressly agrees to indemnify, save, protect, defend and hold harmless Lessor from and against any and all claims, damages, suits, losses, payments and expenses, including reasonable attorneys' fees for any damages, allegations, claims, and/or demands relating to, caused by, or arising from the installation and maintenance of the above-referenced Alteration.

The signatories to this Agreement hereby represent and warrant that they are authorized to execute this Agreement on behalf of the entities named.

Resident: Benjamin Moon ______________ Resident: ______________

Resident: ______________ Resident: ______________

Resident: ______________ Resident: ______________

Owner/Representative: ______________ Date: ______________

# Valet Trash Lease Addendum

Elysian at the Palms Apartment #: 405

Valet trash service will be provided for each resident 5 days per week (Sunday - Thursday). The cost for trash collection is $25.00 per month. A container will be provided to each resident and must be used in conjunction with the valet service. Containers with bagged trash should be placed outside the front door only between the hours of 5pm - 7pm. All trash must be in bags and securely tied. Bags must be placed inside the container. No trash will be collected without the use of the container. No loose trash will be collected. All boxes must be broken down and flattened. After collection, residents are required to bring containers inside by 9am. Containers are the property of Elysian at the Palms. It is the responsibility of each resident to keep his or her container clean. There will be a $50.00 charge to the resident if an additional or replacement container is needed or if you take the container with you when you move out.

If any resident misses service on any of the designated nights, it is their responsibility to bring trash to the designated compactor or dumpster area or keep the trash inside his or her apartment until the next collection evening. Containers/trash may NOT be left out for any reason during non-designated times. If not complied with, resident will receive a warning. If after the first warning the resident is again in violation, his or her container will be removed and/or a fine of $75.00 per bag will be issued. Containers may be returned after a return fee is paid and with the resident's thorough understanding of the procedures for the service. If this problem continues beyond that, valet service for that resident will be terminated and disposing of trash will become the resident's responsibility.
We hope everyone will follow the rules to enjoy this amenity. By not following the rules for our community, you are in violation of your lease agreement and this will be handled accordingly.
We ask that everyone do their part in keeping our property clean and beautiful.

By signing this addendum you are stating that you are fully aware of the rules for the valet trash service and the penalties that may be incurred.

Benjamin Moon

Resident Name(s)
Apartment # 405

Benjamin Moon 11/24/2025
Resident Signature Date

Resident Signature Date

Resident Signature Date

Resident Signature Date

Resident Signature Date

Resident Signature Date

Authorized Agent for Owner Date

EOIR 55 of 92

052

# ADDENDUM PROHIBITING SHORT-TERM SUBLETTING OR RENTAL

NAA NATIONAL APARTMENT ASSOCIATION

1. **DWELLING UNIT DESCRIPTION.**
Unit No. 405, 3850 W. Nevso Dr (street address) in Las Vegas (city), Nevada, 89103 (zip code).

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: November 24, 2025
Owner's name: CRP/CALIDA PALMS VENTURE, LLC

Residents *(list all residents)*:
Benjamin Moon

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

3. **SHORT TERM SUBLEASE OR RENTING PROHIBITED.** Without limiting the prohibition in the Lease on subletting, assignment, and licensing, and without limiting any of our rights or remedies, this Addendum to the Lease further supplements and defines the requirements and prohibitions contained in the Lease Contract between you and us. You are hereby strictly prohibited from subletting, licensing, or renting to any third party, or allowing occupancy by any third party, of all or any portion of the dwelling, whether for an overnight use or duration of any length, without our prior written consent in each instance. This prohibition applies to overnight stays or any other stays arranged on Airbnb.com or other similar internet sites.

4. **PROHIBITION ON LISTING OR ADVERTISING DWELLING ON OVERNIGHT SUBLETTING OR RENTING WEBSITES.** You agree not to list or advertise the dwelling as being available for short term subletting or rental or occupancy by others on Airbnb.com or similar internet websites. You agree that listing or advertising the dwelling on Airbnb.com or similar internet websites shall be a violation of this Addendum and a breach of your Lease Contract.

5. **VIOLATION OF LEASE AGREEMENT.** Your Lease Contract allows for use of your dwelling as a private residence only and strictly prohibits conducting any kind of business in, from, or involving your dwelling unless expressly permitted by law. Separately, your Lease Contract prohibits subletting or occupancy by others of the dwelling for any period of time without our prior written consent. Permitting your dwelling to be used for any subletting or rental or occupancy by others (including, without limitation, for a short term), regardless of the value of consideration received or if no consideration is received, is a violation and breach of this Addendum and your Lease Contract.

6. **REMEDY FOR VIOLATION.** Any violation of this Addendum constitutes a material violation of the Lease Contract, and as such we may exercise any default remedies permitted in the Lease Contract, including termination of your tenancy, in accordance with local law. This clause shall not be interpreted to restrict our rights to terminate your tenancy for any lawful reason, or by any lawful method.

7. **RESIDENT LIABILITY.** You are responsible for and shall be held liable for any and all losses, damages, and/or fines that we incur as a result of your violations of the terms of this Addendum or the Lease Contract. Further, you agree you are responsible for and shall be held liable for any and all actions of any person(s) who occupy your dwelling in violation of the terms of this Addendum or the Lease Contract, including, but not limited to, property damage, disturbance of other residents, and violence or attempted violence to another person. In accordance with applicable law, without limiting your liability you agree we shall have the right to collect against any renter's or liability insurance policy maintained by you for any losses or damages that we incur as the result of any violation of the terms of this Addendum.

8. **SEVERABILITY.** If any provision of this Addendum or the Lease Contract is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Addendum or the Lease Contract. The court shall interpret the lease and provisions herein in a manner such as to uphold the valid portions of this Addendum while preserving the intent of the parties.

9. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**Resident or Residents**
*(All residents must sign)*

*Benjamin Moon*

**Owner or Owner's Representative**
*(Signs below)*

**Date of Signing Addendum**

EOIR 56 of 92

Exh. 2 - Adm. 99 053

© 2019, National Apartment Association, Inc. - 1/2019, Nevada

# PHOTO, VIDEO, AND STATEMENT RELEASE ADDENDUM

NATIONAL APARTMENT ASSOCIATION

**1. DWELLING UNIT DESCRIPTION.**
Unit No. 405, 3850 W. Nevso Dr (street address) in Las Vegas (city), Nevada, 89103 (zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: November 24, 2025
Owner's name: CRP/CALIDA PALMS VENTURE, LLC

Residents *(list all residents)*:
Benjamin Moon

Occupants *(list all occupants)*:

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. PURPOSE OF ADDENDUM.** By signing this Addendum, you, without payment or other consideration, agree to grant us permission to use your likeness in photographs, videos and/or other electronic and/or digital reproductions, including voice, in any and all of our publications, including, without limitation, any website entries, advertising websites, social media websites, and any other marketing materials. For purposes of this addendum, photographs, videos, written comments, statements, and other digital reproductions will hereinafter be collectively referred to as "media."

A. CONSENT FOR MINOR OCCUPANTS. By signing this Addendum, if any minor occupants are named above, you further certify that you are the parent, or legal guardian of the minor occupant(s) named above, and you, without payment or other consideration, agree to grant us permission to use their likeness in photographs, videos and/or other electronic and/or digital reproductions, including voice, in any and all of our publications, including, without limitation, any website entries, advertising websites, social media websites, and any other marketing materials. For purposes of this addendum, photographs, videos, written comments, statements, and other digital reproductions will hereinafter be collectively referred to as "media."

**4. PHOTO AND VIDEO RELEASE.** You hereby grant us and our agents and affiliates (collectively, the "Released Parties") permission and a license to take, use, reuse, and publish the likeness of you and any minor occupants in all photographs or other electronic and/or digital media in any and all of our publications, including, without limitation, any website entries, advertising websites, and any other marketing materials. You understand and agree that these materials will become the property of the Released Parties and will not be returned. You agree to irrevocably authorize the Released Parties to edit, alter, copy, exhibit, publish, or distribute this media for any lawful purpose whatsoever including, without limitation, promotional and advertising uses. You waive the right to inspect or approve the finished product, including any written or electronic copy, wherein your likeness appears now or in the future. In addition, you waive any right to payment, royalties, or any other compensation arising or related to the use of the media.

**5. CONSENT TO USE YOUR NAME, LIKENESS, WRITTEN COMMENTS, AND STATEMENTS.** You are expressly agreeing to allow us to post your name, picture, written comments, and statements, and/or the names, pictures, written comments and statements of any minor occupants in any and all of our publications, including, without limitation, any website entries, advertising websites, social media websites, and any other marketing materials. You hereby grant the Released Parties permission and a license to use, reproduce, and publish any media on its website, social media platforms, or in other marketing-related materials, whether in electronic or print form.

**6. RELEASE OF LIABILITY.** You hereby release, hold harmless, and forever discharge us from any claims or causes of actions including, without limitation, any and all claims for libel or violation of any right of publicity or privacy, related to our use of the media in any and all of our publications, including any website entries, advertising websites, social media websites, and any other marketing material so long as the claim or cause of action does not result from our intentional misconduct or gross negligence. This consent and release shall be binding upon you and your heirs, legal representatives and assigns.

**7. REVOCATION.** You have the right to revoke your consent to our use of your name, picture, video, voice, written comments, or statement, and/or the name, picture, video, voice, written comments, or statement of any minor occupants, by written notice to us.

**8. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

EOIR 57 of 92

:054


© 2019, National Apartment Association, Inc. - 1/2019, Nevada

| Resident or Residents (All residents must sign) | Owner or Owner's Representative (signs below) |
| --- | --- |
| Benjamin Moon | |
| | Date of Signing Addendum |


© 2019, National Apartment Association, Inc. - 1/2019, Nevada

# REASONABLE MODIFICATIONS AND ACCOMMODATIONS POLICY

NAA NATIONAL APARTMENT ASSOCIATION

**1. DWELLING UNIT DESCRIPTION.**
Unit No. 405, 3850 W. Nevso Dr (street address) in Las Vegas (city), Nevada, 89103 (zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: November 24, 2025
Owner's name: CRP/CALIDA PALMS VENTURE, LLC

Residents *(list all residents)*:
Benjamin Moon

**3. EQUAL HOUSING OPPORTUNITY POLICY.** We provide rental housing on an equal opportunity basis. Consistent with this policy, we welcome persons with disabilities to our community and will not discriminate against any person because of his or her disability, or his or her association with anyone with a disability. In addition, we know that it may sometimes be necessary for persons with disabilities to be able to make modifications to their surroundings or to have accommodations made in our practices or procedures to enable them to fully enjoy and use their housing, and we have created the policy described herein to meet that need.

**4. PURPOSE OF POLICY.** A resident or applicant may be entitled under state and federal fair housing laws to a reasonable accommodation and/or reasonable modification when needed because of a disability of the resident, the applicant, and/or a person associated with a resident or applicant, such as a member of the household or frequent guest. The reasonable accommodation and/or reasonable modification must be necessary for the individual with the disability to have an equal opportunity to fully use and/or enjoy housing services offered to other residents and/or the individual dwelling unit. We will grant requests for accommodations or modifications that are reasonable and necessary because of a disability, would not impose an undue financial or administrative burden on our operations, and do not fundamentally alter the nature of services or resources we provide as part of our housing program.

**5. DEFINITIONS.**

A. **Disability.** The Federal Fair Housing Act defines a person with a disability to include: (1) individuals with a physical or mental impairment that substantially limits one or more major life activities; (2) individuals who are regarded as having such an impairment; or (3) individuals with a record of such an impairment.

B. **Reasonable Modifications.** A reasonable modification is a structural change made to existing premises, occupied or to be occupied, by a person with a disability, in order to afford such person full enjoyment of the premises. These are typically structural changes to interiors and exteriors of dwellings and to common and public use areas, which are necessary to accommodate a person with a disability. Depending on the nature of the request, reasonable modifications are typically granted at the expense of the person requesting them.

C. **Reasonable Accommodation.** A reasonable accommodation is a change, exception, or adjustment to a rule, policy, practice, or service that may be necessary for a person with a disability to have an equal opportunity to use and enjoy a dwelling, including public and common areas.

**6. REQUESTS FOR REASONABLE MODIFICATIONS.**

A. **Generally.** If you are a resident or an applicant (i) with a disability, or (ii) with someone associated with you who has a disability, you have the right to request a reasonable modification to your dwelling or the common areas, in accordance with fair housing laws, if such modifications may be necessary to allow you to have an equal opportunity to fully use and/or enjoy your dwelling.

B. **Reasonable Modification Expenses.** Expenses for reasonable modifications, and restoration expenses, if applicable, of such modifications, shall be allocated in accordance with state and federal fair housing laws.

C. **Permission Required, Evaluation of Disability.** If you would like to request a reasonable modification to your dwelling or the common areas of the community that is necessary because of a disability, you must first obtain permission from us. We prefer that you use the attached "Reasonable Accommodation and/or Modification to Rental Unit" form, but you are not required to use this form. If you would like or need assistance in completing this form, please let us know, and we will be glad to provide assistance. Whether you use our form or your own form of request, we will need to know what specific modification is being sought. In addition, if the disability or the disability-related need for the modification is not obvious, we may ask for information that is reasonably necessary to evaluate the disability-related need for the modification; however, we will only request information necessary to evaluate your request, and all information will be kept confidential.

D. **Reasonable Assurances.** Depending on the modification requested, we may require you to provide reasonable assurances that the modification will be done in a workmanlike manner and that any required building permits will be obtained. In some cases, any third-party retained to perform the modification may also have to be approved in writing by us, and be properly licensed and insured. During and upon completion of the modification, we may inspect the work in connection with our overall property management responsibilities. We will not increase your security deposit as a result of a modification request. However, when applicable, if you fail to restore the interior of the dwelling to its original condition, excluding normal wear and tear, at the end of the tenancy, we may assess the cost of restoration against your security deposit and/or final account upon move-out.

E. **Restoration Reimbursement.** At the end of your tenancy, you may be responsible to restore the interior of your dwelling to its pre-modification condition at your expense, depending on the nature of the modification. Again, depending on the modification, we may request that you deposit sufficient funds for that restoration in an interest bearing escrow account to ensure any required restoration can be completed. Regardless of modification, you will remain responsible to pay for damage to your dwelling in excess of ordinary wear and tear.

F. **Alternative Modification.** Depending on the circumstances, we may not be able to grant the exact modification you have requested and we may ask to discuss other alternatives with you.



© 2020, National Apartment Association, Inc. - 4/2020, Nevada

**7. REQUESTS FOR REASONABLE ACCOMMODATIONS.**

**A. Generally.** We will make reasonable accommodations in our rules, policies, practices, and/or services, to the extent that such accommodations may be reasonably necessary to give you, as a disabled person, an equal opportunity to fully use and enjoy your dwelling, and the public and common areas of the premises, and as otherwise required by law.

**B. Request for Accommodation, Evaluation of Disability.** If you would like a reasonable accommodation that is necessary because of a disability, please submit a request to us, preferably using the attached "Reasonable Accommodation and/or Modification to Rental Unit" form, but you are not required to use this form. If you would like or need assistance completing this form please let us know and we will be glad to provide assistance. Whether you use our form or your own form of request, we will need to know what accommodation is being sought. In addition, if the disability is not obvious, we may ask for information that is reasonably necessary to evaluate the disability-related need for the accommodation. We will only request information that is reasonably necessary for us to evaluate your request, and we will keep all information you provide confidential.

**C. Alternative Accommodation.** Depending on the circumstances, we may not be able to grant the exact accommodation you have requested and we may ask to discuss other alternatives with you.

**8. OWNER RESPONSIBILITY.** We will respond to all requests for a reasonable accommodation and/or modification in a timely manner. If we deny your request for a reasonable modification and/or accommodation, we will explain the reason for our denial and we will discuss with you whether there are alternative accommodations and/or modifications that we could provide that would meet your needs. We also are committed to entering into an interactive dialogue with you in relation to any request, and therefore agree to speak with you in relation to any request so that you have sufficient opportunity to provide us with any information you believe is relevant to our evaluation of your request for the modification(s) and/or accommodation(s).

**9. AMENDMENT TO POLICY.** This policy may be amended and updated at any time upon written notice to you. In addition, in the event of any conflict between this policy and/or state, local or federal law, the provisions of such law shall control.

If you have any questions about this policy, you should contact:

CRP/CALIDA PALMS VENTURE, L.L.C.

by writing or calling:

3850 West Nevso Drive Las Vegas, NV 89103

702.202.2440

**Resident or Residents**
*(All resident's must sign)*

Benjamin Moon

**Owner or Owner's Representative**
*(Signs below)*

**Date of Signing**

EOIR 60 of 92

Exh. 2 - Adm.

057



© 2020, National Apartment Association, Inc. - 4/2020, Nevada

# SUSTAINABLE LIVING ADDENDUM

NATIONAL APARTMENT ASSOCIATION

**1. DWELLING UNIT DESCRIPTION.**
Unit No. 405, 3850 W. Nevso Dr (*street address*) in Las Vegas (*city*), Nevada, 89103 (*zip code*).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: November 24, 2025
Owner's name: CRP/CALIDA PALMS VENTURE, LLC

Residents (*list all residents - leaseholders and occupants*):
Benjamin Moon

Occupants:

This Addendum constitutes an Addendum to the above-described Lease Contract for the above-described premises and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. PURPOSE OF ADDENDUM.** This Addendum will provide requirements and guidelines that are beneficial to improve the quality of the Community's social, environmental, and economic impact for all. All Residents are required to sign this Addendum.

**4. ENERGY EFFICIENCY.** The following are guidelines recommended to reduce overall energy consumption and reduce electricity/gas expenses.

**Thermostat Settings.** During the winter months, Energy.gov (https://www.energy.gov/)recommends setting your thermostat to 68°F while you are awake and setting it lower while you are asleep or away from home. Considerations should be made for extremely cold temperatures as to avoid freezing pipes.

During the summer months, with central air conditioning, Energy.gov recommends setting the thermostat to 78°F while you are occupying the apartment and need cooling and setting the thermostat higher while you are away. Energy.gov recommends that you set your thermostat at as high a temperature as comfortably possible and ensure humidity control if needed.

Please note that the thermostat settings listed above are only recommended guidelines and that the appropriate thermostat setting will depend upon weather conditions and the size and layout of your unit.

**Lighting and Light Bulbs.** Use natural light when possible. Consider replacing standard incandescent light bulbs with energy-saving compact fluorescent light bulbs (CFLs) or light-emitting diodes (LEDs).

**Appliances.** We strongly encourage the use of appliances that have the ENERGY STAR label or other energy-efficient labeling.

**Conserve Electricity.** Consider unplugging chargers for power tools, mobile phones, laptops, televisions, and other electronic devices when not in use, or when you plan to be away from the apartment for an extended period of time.

**5. WATER EFFICIENCY – REQUIREMENTS AND SUGGESTIONS.** The following requirements and suggestions will help reduce overall water consumption at the Community.

**Requirements.**

- Residents are required to report leaks to owner immediately to prevent damage, conserve water, and manage water/sewer costs.
- The apartment may come equipped with water saving fixtures and appliances, including, but not limited to, showerheads, toilets, faucets, dishwashers, and washing machines. Residents are required to receive written approval from us prior to replacing or altering any of these fixtures/appliances.

**Suggestions.**

- Every drop counts! Turn off water when shaving, washing hands, and brushing your teeth.
- When doing laundry, also consider only washing full loads. When washing small loads, be sure to use the appropriate water level setting.

**6. WASTE AND RECYCLING – REQUIREMENTS AND SUGGESTIONS.** The following requirements and suggestions will help reduce overall waste consumption and reduce waste expenses.

**Requirements.**

- All Residents are required to dispose of waste and recyclables in the appropriate containers in accordance with the Owner's Rules and Regulations, in addition to any applicable local ordinances.
- Per common practice, the following materials are generally not recyclable: Styrofoam, window glass and mirrors, electronic waste (TVs and computers), motor oil containers, yard waste, chemicals, cleaning products or solutions, chemical containers, shredded paper, plastic bags, ceramics or dishes, food waste, scrap metal, monitors.

**Suggestions.**

- For materials that are not recyclable, we recommend finding ways to reduce and reuse those items. Visit https://www.plasticfilmrecycling.org for additional information.
- We encourage you to contact your local Waste Industries branch or recycling center to find a list of accepted materials for your recycling center.

EOIR 61 of 92

058

Exh. 2 - Adm.



© 2025, National Apartment Association, Inc. - 3/2025, Nevada

7. **INDOOR ENVIRONMENT AND WELLNESS.** The following are guidelines which promote the quality of the indoor environment and wellness:

- This Community ❑ is ❑ is not a smoke-free environment. If the Community is a smoke-free environment, then no smoking or vaping is allowed anywhere in the Community, at any time. Smoking refers to any use or possession of a cigar, cigarette, e-cigarette, hookah, vaporizer, or pipe containing tobacco or a tobacco product while that tobacco or tobacco product is burning, lighted, vaporized, or ignited, regardless of whether the person using or possessing the product is inhaling or exhaling the smoke from such product. The term tobacco includes, but is not limited to any form, compound, or synthesis of the plant of the genus Nicotiana or the species N. tabacum which is cultivated for its leaves to be used in cigarettes, cigars, e-cigarettes, hookahs, vaporizers, or pipes. Smoking also refers to use or possession of burning, lighted, vaporized, or ignited non-tobacco products if they are noxious, offensive, unsafe, unhealthy, or irritating to other persons. Please refer to the No-Smoking Addendum for further information.
- Owner provides common area cleaning using products that have the Green Cleaning® seal or a similar green certification. Owner recommends that Residents also use like products in the cleaning of their units.

8. **SEVERABILITY.** If any provision of this Addendum to the Lease Contract is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Addendum to the Lease Contract. The court shall interpret the lease and provisions herein in a manner such as to uphold the valid portions of this Addendum to the Lease Contract while preserving the intent of the parties.

9. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**Resident or Residents**
*(All residents must sign)*

Benjamin Moon

**Owner or Owner's Representative**
*(signs below)*

**Date of Signing Addendum**

EOIR 62 of 92

.059



© 2025, National Apartment Association, Inc. - 3/2025, Nevada

# DAMAGE WAIVER PROGRAM/REQUIRED INSURANCE ADDENDUM TO LEASE AGREEMENT

1. This Addendum is attached to and becomes a part of the Residential Lease Agreement ("Agreement"). It supersedes any provision of the Agreement, and any other addendum to the Agreement, that relates to either your obligations to purchase insurance covering, or programs offered with respect to, your liability to the Landlord for damage to Landlord's property.

2. Lessee Liability. Lessee ("Resident" or "you") acknowledges that you may be personally liable to the Lessor ("Landlord" or "us") for the full cost of any damage or loss caused by the action or inaction of you, your occupants, or your guests to the property or premises ("Property") of the Lessor ("Landlord" or "we").

3. Lessee Obligation – Damage Waiver Program or Third-Party Insurance. To protect us in the event you damage our property, we require for the duration of this Agreement, including any renewals or extensions, that you either (i) are enrolled in our Damage Waiver Program ("DW Program"), which is described in Sec. 4 below, or (ii) maintain insurance providing at least $ 100,000 of coverage per occurrence for your legal liability for damage to the Lessor's property (this coverage is the Minimum Required Liability Insurance ("MRLI")), and provide evidence of the policy as described in Sec. 5 below.

4. Auto-Enrollment in the Damage Waiver Program at Inception. Upon execution of your lease you will automatically be enrolled in the DW Program at the rate of $ 15.00 per month in additional rent.

   Under the DW Program, we waive our right to charge or seek reimbursement from you for damages of up to $ 100,000 per occurrence to our property due to the negligent action or inaction of you or your occupants or guests for the following causes of loss: fire, smoke, explosion, backup or overflow of sewer, drain, or sump, water damage, and falling objects (the "Damage Waiver"). Some important points about the DW Program which Resident should understand are:

   - **The Damage Waiver is not insurance**. Through the DW Program, the Landlord is foregoing its right to charge or seek reimbursement from you for the damages described in this Sec. 4. You are responsible for damages due to other causes and for damages in excess of $ 100,000 per occurrence due to any cause.
   - Neither the DW Program nor any insurance maintained by the Landlord itself protects Resident's personal property (contents), additional living expenses, liability for personal or bodily injury to anyone, or liability to us for damages beyond those that are specifically waived in this Sec. 4. If you wish to obtain coverage for any of these potential liabilities, you may purchase such coverage from an insurance company at any time.
   - The DW Program may be more expensive than the cost of a Third-Party Policy.
   - Landlord is not required to offer the DW Program and may discontinue it at any time at our discretion.

5. Third Party Policy. Participation in the DW Program is not required. If you wish to satisfy your obligations to secure MRLI by purchasing an insurance policy from an insurer of your choice (a "Third Party Policy"), you may by doing each of the following:

   - Obtain a Third Party Policy satisfying the requirements of Sec. 3 from an insurance company you choose.
   - Name Confirm Insurance – [property] as an additional interest on the Third Party Policy
     - Obtain a Third Party Policy satisfying the requirements of Sec. 3 from an insurance company you choose.
     - Name Confirm Insurance – [property] as an additional interest on the Third Party Policy
       - If your third party insurer notifies additional interests by email, direct them to notify Confirm Insurance – [property] at the following address: info@confirminsurance.com
       - If your third party insurer notifies additional interests by physical mail, direct them to notify Confirm Insurance – [property] at the following address: Confirm Insurance – [property], P.O. Box 1159, Newport Beach, CA 92659
     - Submit a copy of the entire policy to https://portal.confirminsurance.com/ for review and approval
     - All policies must be resubmitted to https://portal.confirminsurance.com/ on or before the end date of the policy term to avoid auto-enrollment into the Damage Waiver Program.

   Upon determination that your Third Party Policy meets requirements, your enrollment in the DW Program shall cease in the next billing cycle.

6. **Auto-Enrollment in the DW Program Upon Non-Compliance.** If you provide evidence of a Third Party Policy that satisfies Sec. 3, and subsequently such policy lapses or ceases to meet our requirements, you may be automatically re-enrolled in the DW Program at the rate of $ 15.00 per month.

7. **DW Program Not Mandatory**. Enrollment in the DW Program is not mandatory. You may satisfy the MLRI requirement at any time by complying with Sec. 5.

8. In the event Resident is enrolled in the DW Program at any time, Resident agrees to pay Landlord the additional rent in addition to all other obligations in the Agreement. Resident understands that the DW Program will not cover anyone's personal property (contents), additional living expenses, liability for personal or bodily injury, or damages to Landlord's property beyond those specifically waived in Sec. 4.

Benjamin Moon
Lessee/Resident

11/24/2025
Date

Lessee/Resident

Date

Lessee/Resident

Date

Lessee/Resident

Date

Lessee/Resident

Date

Lessee/Resident

Date

Owner/Representative

Date

# UTILITY DATA SHARING ADDENDUM

**APARTMENT UNIT DESCRIPTION.** Apt. No. 405, 3850 W. Nevso Dr

(street address) in Las Vegas

(city), NV (state), 89103 (zip code).

**LEASE CONTRACT DESCRIPTION.** Lease Contract date: November 24, 2025

Owner's name: CRP/CALIDA PALMS VENTURE, LLC

Residents (list all residents): Benjamin Moon

This Utility Sharing Addendum is part of, and hereby incorporated by reference into, your Lease regarding the Property. In the event of a conflict between a provision in this Addendum and your lease, the terms of this Addendum shall control to the maximum extend allowed by law.

As used in this Addendum, the term "Lease" is interchangeable with "Lease Agreement" or any other title of the document governing your lease of your apartment. Similarly, as used in this Addendum, the term "Tenant" is interchangeable with "Resident" or "Occupant", and the term "Landlord" is interchangeable with the term "Owner" or "Management", in each case as such terms or other similar terms may be used for such parties in your Lease.

Tenant and all undersigned residents of the above-referenced unit acknowledge that Landlord may elect in its sole discretion to implement or conduct energy, water and/or waste efficiency and sustainability practices, studies or analyses regarding the Property and its tenants. In furtherance of same, Tenant and the undersigned residents agree to facilitate Landlord's collection, and the sharing with Landlord, as well as its designated contractors or agents, of any and all available or obtainable data regarding energy, water and/or waste utility usage and consumption in or related to the Unit or the Property during their occupancy of the Unit (the "Utility Data").

Tenant and the undersigned hereby agree and consent that any providers of utilities to the Unit or Property are hereby authorized to share Utility Data with Landlord or its designated contractors or agents.

Tenant agrees:

- To provide Landlord or its designated contractors or agents with access to all Utility Data.
- To take any further steps, execute forms or documents and provide approvals as necessary to authorize and allow utility providers to share Utility Data directly with Landlord and/or its designated contractors and agents, upon Landlord's request.
- That some personal data of Tenant or the undersigned residents may be processed in order to comply with applicable regulations.

Landlord agrees:

- To use the Utility Data solely for the purposes of monitoring, analyzing or improving energy, water and waste usage and/or efficiency within the Property, and as necessary to comply with applicable laws.
- To take reasonable steps to maintain the confidentiality of Tenant's Utility Data and comply with all applicable federal and state privacy laws.
- To take reasonable steps to ensure that Landlord's contractors and agents who are authorized to collect or use the Utility Data maintain the privacy and confidentiality thereof, and not use the Utility Data for any purpose other than as stated herein.

Please contact Landlord if you have any questions regarding this Addendum or the Utility Data.

THIS PAGE INTENTIONALLY LEFT BLANK

| **Resident(s)** (All residents must sign) | **Date of Signing Addendum** |
| --- | --- |
| Benjamin Moon | 11/24/2025 |
| | |
| | |
| | |
| | |
| | |

| **Owner or Owner's Representative** | **Date of Signing Addendum** |
| --- | --- |
| | |

Uploaded on: 09/03/2026 at 04:11:27 PM (Pacific Daylight Time) Base City: ADI

NV Energy

BENJAMIN MOON
3850 W NEVSO DR 3 405
LAS VEGAS, NV 89103



E A13 B13

**Account: 3000399573423934258**

## Electric Usage: RESIDENTIAL SERVICE - MULTI FAMILY

### Average Daily Electric Usage

| Last Year | vs. | This Month |
|---|---|---|
| 32 | Days Billed | 30 |
| 8.1 | kWh per Day | 5.5 |

Cost per day this month: $0.93

Your average daily electric consumption is **LESS** this month compared to last year -31%

### Usage in total electric kilowatt hours




**Amount Due By: Aug 28, 2026**

**$27.78**

*Amount will be withdrawn from your bank account on the due date.*

| | |
|---|---|
| Customer Number: | 3995734 |
| Premises Number: | 2393425 |
| **Billing Date:** | **Aug 12, 2026** |
| **Next Read Date:** | **Sep 08, 2026** |

## Account Summary

| | |
|---|---|
| Previous Account Balance | $41.39 |
| Payment - Jul 29, 2026 | $41.39 CR |
| Electric Charges | $27.78 |
| **Current Amount Due** | **$27.78** |

## Important Messages

Thank you for your payment. We look forward to serving you in the future.

## Meter Information

If NV Energy is unable to read your meter because of circumstances beyond control, you may be billed based on estimated usage for that billing period.

| Type | Service Period | Bill Days | Previous Read | Current Read | Mult. | Usage |
|---|---|---|---|---|---|---|
| **Meter Number:** CC036603016 | | | | | | |
| KWH | 07/08/26 to 08/07/26 | 30 | 16,521 | 16,687 | 1 | 166 |

## Charge Details

| | | | | |
|---|---|---|---|---|
| Electric Consumption | 166.000 | kWh x | 0.10732 | $17.82 |
| Temp. Green Power Financing | 166.000 | kWh x | 0.00053 | $0.09 |
| Renewable Energy Program | 166.000 | kWh x | 0.00052 CR | $0.09 CR |
| Energy Efficiency Charge | 166.000 | kWh x | 0.00193 | $0.32 |
| Natural Disaster Protection Plan | 166.000 | kWh x | 0.00029 | $0.05 |
| Expanded Solar Access Program Rate | 166.000 | kWh x | 0.00007 | $0.01 |
| Basic Service Charge | | | | $8.20 |
| Local Government Fee | | | 5% | $1.32 |
| Universal Energy Charge | 166.000 | kWh x | 0.00039 | $0.06 |
| **Total Electric Service Amount** | | | | **$27.78** |

**Customer Service: (702) 402-5555** or **(800) 331-3103** Toll Free 24/7, excluding holidays. Emergencies: **(702) 402-2900**
Para servicio en español **(702) 402-5554**. TDD/TYY: **711** - Hearing impaired service available 24/7 days a week.

NV Energy
PO Box 30150
Reno, NV 89520

| | |
|---|---|
| **Account Number:** | **3000399573423934258** |
| **Customer Number:** | **3995734** |
| **Service Address:** | **3850 W NEVSO DR 3 405 LAS VEGAS, NV 89103** |

**Amount Due By: Aug 28, 2026**
**$27.78**

**Do Not Send Payment**

*Thank you for being a paperless customer!*
*You can manage your account, see payment options, and sign up for programs.*

0321959-NVES365324-SO.NOPRIN-1130206008849

Your bank account will be drafted on 08/28/26 in the amount of $27.78.

BENJAMIN MOON
3850 W NEVSO DR UNIT 405
LAS VEGAS NV 89103-4072

89520

064







3000399573423934258 0000002778 0000002778 0 002

Uploaded on: 09/03/2026 at 04:14:27 PM (Pacific Daylight Time) Base City: AD



## Energy Saving Tips

**Be Smart. Save Energy.**

In warm months, set the thermostat between 78 to 80 degrees when home and 5 to 10 degrees warmer at night or when you are not home.

In cold months, set the thermostat to 68 degrees when home, and then back to 55 to 68 degrees when unoccupied.

Unplug your televisions while on vacation. Most new sets draw power even when turned off.

Install electrical outlet and switch plate insulation.

Vacuum your refrigerator coils underneath and in the back. Check that no obstructions are present as the coils need air space to work.

Make sure food is cooled and covered before it goes into the refrigerator.

Turn off lights, appliances and electronics such as a computer when not in use.

Use LED bulbs instead of incandescent ones. Regular bulbs use most of the electricity to generate heat, so use care when changing bulbs.

Online at nvenergy.com or call (844) 343-3719 | At any of our authorized Shop & Pay locations | By phone: (866) 793-0049 (debit/credit card) | By mail: PO Box 30150, Reno, NV 89520-3150

**Customer Assistance: Office Address- 6226 West Sahara Ave. Las Vegas, NV 89146**
**If you wish to dispute any bill, charge or service, please contact NV Energy Customer Service at: (702) 402-5555 or (800) 331-3103 Toll Free 24/7, excluding holidays we will promptly investigate the matter** However, to avoid termination of service, all charges must be paid during the investigation period. If you are not satisfied with our final decision, you may contact the Public Utilities Commission (702) 486-2600, Online at puc.nv.gov or at 9075 West Diablo Drive, Suite 250, Las Vegas, Nevada 89148.
Need additional hand-delivered notification for planned outages or 48-hour notification prior to a disconnection of the service for non-payment? If you or a permanent member of the household are dependent on life support equipment, electrically operated medical equipment, are disabled or age 62 or older, please call (702) 402-5555 or (800) 331-3103 to update your account information.
**Energy Assistance Programs:** are available and can help low-income customers pay their energy bills and/or weatherize their homes. Residential customers must meet income guidelines to qualify. For more information call (702) 486-1404 or visit dwss.nv.gov. For the Weatherization Assistance Program serving all of Nevada, visit https://housing.nv.gov/Programs/Weatherization/.
**Project REACH**: The NV Energy Foundation provides funding to support Project REACH, administered by United Way of Southern Nevada. The utility assistance programis provided to residential customers, age 62 and older who meet income guidelines. Project REACH is available to help pay a past-due energy bill once during a 12-month period. Project REACH is available until funds are exhausted.Call (702) 402-5200 or visit www.uwsn.org/projectreach for additional assistance or guidelines.

**Additional Information**
**Understanding Your Bill:** Your bill has a lot of information and terms you may not have heard before. For definitions of all charges and taxes, please visit www.nvenergy.com/home/customercare.
**Rules and Regulations:** Rules, regulations, and rate schedules are available for public inspection at nvenergy.com/rates.
**Payments & Due Date:** Bills for service are rendered and due monthly by the due date. Your bill becomes past due on the next meter read date, at which time a 1.5% late fee is applied. All payments made by check authorize NV Energy to initiate an electronic debit. Checks will not be returned and funds may be withdrawn the same day. Please make checks payable to NV Energy.
**Payment Arrangements:** If you have difficulty making a payment, we are here to help. Give us a call so we can review all the options available to assist you.
**Interruption in Service:** NV Energy may issue a termination of service notice and may require a security deposit for delinquent payments.
**Good Pay Forgiveness:** Life happens - payments get lost, transactions don't go through, time slips away. Whatever the reason, we understand. We forgive a missed payment one time for customers with excellent payment history, so you don't face possible service interruptions.

# Form 1040 U.S. Individual Income Tax Return 2025

Department of the Treasury—Internal Revenue Service

OMB No. 1545-0074 | IRS Use Only—Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2025, or other tax year beginning , 2025, ending , 20 | See separate instructions.

☐ Filed pursuant to section 301.9100-2 ☐ Combat zone ☐ Deceased Spouse
☐ Other

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| Benjamin | Moon | 203 70 9252 |
| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |
| | | |

| Home address (number and street). If you have a P.O. box, see instructions. | Apt. no. | |
|---|---|---|
| 3850 W Nevso Dr | 405 | Check here if your main home, and your spouse's if filing a joint return, was in the U.S. for more than half of 2025. ☒ |

| City, town, or post office. If you have a foreign address, also complete spaces below. | State | ZIP code |
|---|---|---|
| Las Vegas | NV | 891034072 |
| Foreign country name | Foreign province/state/county | Foreign postal code |
| | | |

**Presidential Election Campaign** Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. ☐ You ☐ Spouse

## Filing Status

Check only one box.

- ☒ Single
- ☐ Married filing jointly (even if only one had income)
- ☐ Married filing separately (MFS). Enter spouse's SSN above and full name here:
- ☐ Head of household (HOH)
- ☐ Qualifying surviving spouse (QSS)

If you checked the HOH or QSS box, enter the child's name if the qualifying person is a child but not your dependent:

☐ If treating a nonresident alien or dual-status alien spouse as a U.S. resident for the entire tax year, check the box and enter their name (see instructions and attach statement if required):

## Digital Assets

At any time during 2025, did you: (a) receive (as a reward, award, or payment for property or services); or (b) sell, exchange, or otherwise dispose of a digital asset (or a financial interest in a digital asset)? (See instructions.) . . ☐ Yes ☒ No

## Dependents

(see instructions)

If more than four dependents, see instructions and check here . . ☐

| | Dependent 1 | Dependent 2 | Dependent 3 | Dependent 4 |
|---|---|---|---|---|
| (1) First name | | | | |
| (2) Last name | | | | |
| (3) SSN | | | | |
| (4) Relationship | | | | |
| (5) Check if lived with you more than half of 2025 | (a) ☐ Yes (b) ☐ And in the U.S. | (a) ☐ Yes (b) ☐ And in the U.S. | (a) ☐ Yes (b) ☐ And in the U.S. | (a) ☐ Yes (b) ☐ And in the U.S. |
| (6) Check if | ☐ Full-time student ☐ Permanently and totally disabled | ☐ Full-time student ☐ Permanently and totally disabled | ☐ Full-time student ☐ Permanently and totally disabled | ☐ Full-time student ☐ Permanently and totally disabled |
| (7) Credits | ☐ Child tax credit ☐ Credit for other dependents | ☐ Child tax credit ☐ Credit for other dependents | ☐ Child tax credit ☐ Credit for other dependents | ☐ Child tax credit ☐ Credit for other dependents |

☐ Check if your filing status is MFS or HOH and you lived apart from your spouse for the last 6 months of 2025, or you are legally separated according to your state law under a written separation agreement or a decree of separate maintenance and you did not live in the same household as your spouse at the end of 2025.

## Income

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a Form W-2, see instructions.

Attach Sch. B if required.

| Line | Description | | Line | Amount |
|---|---|---|---|---|
| 1a | Total amount from Form(s) W-2, box 1 (see instructions) | | 1a | 100,240. |
| b | Household employee wages not reported on Form(s) W-2 | | 1b | |
| c | Tip income not reported on line 1a (see instructions) | | 1c | |
| d | Medicaid waiver payments not reported on Form(s) W-2 (see instructions) | | 1d | |
| e | Taxable dependent care benefits from Form 2441, line 26 | | 1e | |
| f | Employer-provided adoption benefits from Form 8839, line 31 | | 1f | |
| g | Wages from Form 8919, line 6 | | 1g | |
| h | Other earned income (see instructions). Enter type and amount: | | 1h | 0. |
| i | Nontaxable combat pay election (see instructions) | 1i | | |
| z | Add lines 1a through 1h | | 1z | 100,240. |
| 2a | Tax-exempt interest | 2a | 2b b Taxable interest | 683. |
| 3a | Qualified dividends | 3a | 3b b Ordinary dividends | |
| c | Check if your child's dividends are included in 1 ☐ Line 3a 2 ☐ Line 3b | | | |
| 4a | IRA distributions | 4a | 4b b Taxable amount | |
| c | Check if (see instructions) 1 ☐ Rollover 2 ☐ QCD 3 ☐ | | | |
| 5a | Pensions and annuities | 5a | 5b b Taxable amount | |
| c | Check if (see instructions) 1 ☐ Rollover 2 ☐ PSO 3 ☐ | | | |
| 6a | Social security benefits | 6a | 6b b Taxable amount | |
| c | If you elect to use the lump-sum election method, check here (see instructions) ☐ | | | |
| d | If you are married filing separately and lived apart from your spouse the entire year (see inst.), check here ☐ | | | |
| 7a | Capital gain or (loss). Attach Schedule D if required | | 7a | |
| b | Check if: ☐ Schedule D not required ☐ Includes child's capital gain or (loss) | | | |
| 8 | Additional income from Schedule 1, line 10 | | 8 | 5,428. |
| 9 | Add lines 1z, 2b, 3b, 4b, 5b, 6b, 7a, and 8. This is your **total income** | | 9 | 106,351. |
| 10 | Adjustments to income from Schedule 1, line 26 | | 10 | [illegible]066 |
| 11a | Subtract line 10 from line 9. This is your **adjusted gross income** | | 11a | 106,351. |

EOIR 69 of 92

## Tax and Credits

| Line | Description | | Amount |
|---|---|---|---|
| 11b | Amount from line 11a (adjusted gross income) | 11b | 106,351. |
| 12a | Someone can claim ☐ You as a dependent ☐ Your spouse as a dependent | | |
| b | ☐ Spouse itemizes on a separate return c ☐ You were a dual-status alien | | |
| d | **You:** ☐ Were born before January 2, 1961 ☐ Are blind | | |
| | **Spouse:** ☐ Was born before January 2, 1961 ☐ Is blind | | |
| e | **Standard deduction or itemized deductions** (from Schedule A) | 12e | 15,750. |
| 13a | Qualified business income deduction from Form 8995 or Form 8995-A | 13a | 0. |
| b | Additional deductions from Schedule 1-A, line 38 | 13b | |
| 14 | Add lines 12e, 13a, and 13b | 14 | 15,750. |
| 15 | Subtract line 14 from line 11b. If zero or less, enter -0-. This is your **taxable income** | 15 | 90,601. |
| 16 | **Tax** (see instructions). Check if any from Form(s): 1 ☐ 8814 2 ☐ 4972 3 ☐ ______ | 16 | 14,852. |
| 17 | Amount from Schedule 2, line 3 | 17 | |
| 18 | Add lines 16 and 17 | 18 | 14,852. |
| 19 | Child tax credit or credit for other dependents from Schedule 8812 | 19 | |
| 20 | Amount from Schedule 3, line 8 | 20 | |
| 21 | Add lines 19 and 20 | 21 | |
| 22 | Subtract line 21 from line 18. If zero or less, enter -0- | 22 | 14,852. |
| 23 | Other taxes, including self-employment tax, from Schedule 2, line 21 | 23 | 0. |
| 24 | Add lines 22 and 23. This is your **total tax** | 24 | 14,852. |

**Standard deduction for—**
- Single or Married filing separately, $15,750
- Married filing jointly or Qualifying surviving spouse, $31,500
- Head of household, $23,625
- If you checked a box on line 12a, 12b, 12c, or 12d, see inst.

## Payments and Refundable Credits

| Line | Description | | | | Amount |
|---|---|---|---|---|---|
| 25 | Federal income tax withheld from: | | | | |
| a | Form(s) W-2 | 25a | 12,715. | | |
| b | Form(s) 1099 | 25b | | | |
| c | Other forms (see instructions) | 25c | 0. | | |
| d | Add lines 25a through 25c | | | 25d | 12,715. |
| 26 | 2025 estimated tax payments and amount applied from 2024 return | | | 26 | |
| | If you made estimated tax payments with your former spouse in 2025, enter their SSN (see instructions): ______ | | | | |
| 27a | Earned income credit (EIC) | 27a | | | |
| b | Clergy filing Schedule SE (see instructions) ☐ | | | | |
| c | If you do not want to claim the EIC, check here ☐ | | | | |
| 28 | Additional child tax credit (ACTC) from Schedule 8812. If you do not want to claim the ACTC, check here ☐ | 28 | | | |
| 29 | American opportunity credit from Form 8863, line 8 | 29 | | | |
| 30 | Refundable adoption credit from Form 8839, line 13 | 30 | | | |
| 31 | Amount from Schedule 3, line 15 | 31 | | | |
| 32 | Add lines 27a, 28, 29, 30, and 31. These are your **total other payments and refundable credits** | | | 32 | |
| 33 | Add lines 25d, 26, and 32. These are your **total payments** | | | 33 | 12,715. |

If you have a qualifying child, you may need to attach Sch. EIC.

## Refund

| Line | Description | | Amount |
|---|---|---|---|
| 34 | If line 33 is more than line 24, subtract line 24 from line 33. This is the amount you **overpaid** | 34 | |
| 35a | Amount of line 34 you want **refunded to you.** If Form 8888 is attached, check here ☐ | 35a | |
| b | Routing number X X X X X X X X X c Type: ☐ Checking ☐ Savings | | |
| d | Account number X X X X X X X X X X X X X X X X X | | |
| 36 | Amount of line 34 you want **applied to your 2026 estimated tax** — 36: | | |

Direct deposit? See instructions.

## Amount You Owe

| Line | Description | | Amount |
|---|---|---|---|
| 37 | Subtract line 33 from line 24. This is the **amount you owe.** For details on how to pay, go to *www.irs.gov/Payments* or see instructions | 37 | 2,148. |
| 38 | Estimated tax penalty (see instructions) — 38: 11. | | |

## Third Party Designee

Do you want to allow another person to discuss this return with the IRS? See instructions. ☐ **Yes.** Complete below. ☒ **No**

Designee's name | Phone no. | Personal identification number (PIN)

## Sign Here

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Your signature | Date | Your occupation | If the IRS sent you an Identity Protection PIN, enter it here (see inst.) |
|---|---|---|---|
| | | Sr. Account Executive | |
| **Spouse's signature.** If a joint return, **both** must sign. | Date | Spouse's occupation | If the IRS sent your spouse an Identity Protection PIN, enter it here (see inst.) |
| Phone no. (301)693-5860 | Email address | | |

Joint return? See instructions. Keep a copy for your records.

## Paid Preparer Use Only

| Preparer's name | Preparer's signature | Date | PTIN | Check if: ☐ Self-employed |
|---|---|---|---|---|
| Firm's name Self-Prepared | | | Phone no. 067 | |
| Firm's address | | | Firm's EIN | |

EOIR 70 of 92

Exh. 2 - Adm.

113

Form W-2 Wage and Tax Statement 2025

Copy C, for employee's records

| Field | Value |
|---|---|
| c Employer's name, address, and ZIP code | ALEXANDER & TOM INC<br>3500 BOSTON ST STE 225<br>BALTIMORE MD 21224 |
| d Control number | 0031-18086228<br>0000000090 - STAFFE |
| Void | |
| Department of the Treasury - Internal Revenue Service | OMB No. 1545-0029 |
| b Employer identification number (EIN) | 52-1989386 |
| a Employee's social security number | 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 |
| 1 Wages, tips, other compensation | 100240.46 |
| 2 Federal income tax withheld | 12715.42 |
| 3 Social security wages | 104884.69 |
| 4 Social security tax withheld | 6502.85 |
| 5 Medicare wages and tips | 104884.69 |
| 6 Medicare tax withheld | 1520.83 |
| 7 Social Security Tips | |
| 8 Allocated Tips | |
| 10 Dependent care benefits | |
| 11 Nonqualified plans | |
| 12 See instructions for box 12 | D 4644.23 |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan: X |
| 14 Other | |
| e Employee's name, address, and ZIP code | BENJAMIN MOON<br>3850 W NEVSO DR<br>APT 405<br>LAS VEGAS NV 89103 |
| 15 State / Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

## Form W-2 Wage and Tax Statement 2025

Copy B, to be filed with employee's FEDERAL tax return

| Field | Value |
|---|---|
| c Employer's name, address, and ZIP code | ALEXANDER & TOM INC<br>3500 BOSTON ST STE 225<br>BALTIMORE MD 21224 |
| d Control number | 0031-18086228<br>0000000090 - STAFFE |
| Void | |
| Department of the Treasury - Internal Revenue Service | OMB No. 1545-0029 |
| b Employer identification number (EIN) | 52-1989386 |
| a Employee's social security number | 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 |
| 1 Wages, tips, other compensation | 100240.46 |
| 2 Federal income tax withheld | 12715.42 |
| 3 Social security wages | 104884.69 |
| 4 Social security tax withheld | 6502.85 |
| 5 Medicare wages and tips | 104884.69 |
| 6 Medicare tax withheld | 1520.83 |
| 7 Social Security Tips | |
| 8 Allocated Tips | |
| 10 Dependent care benefits | |
| 11 Nonqualified plans | |
| 12 See instructions for box 12 | D 4644.23 |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan: X |
| 14 Other | |
| e Employee's name, address, and ZIP code | BENJAMIN MOON<br>3850 W NEVSO DR<br>APT 405<br>LAS VEGAS NV 89103 |
| 15 State / Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

## Form W-2 Wage and Tax Statement 2025

| Field | Value |
|---|---|
| c Employer's name, address, and ZIP code | |
| d Control number | |
| Void | X |
| Department of the Treasury - Internal Revenue Service | OMB No. 1545-0029 |
| b Employer identification number (EIN) | |
| a Employee's social security number | |
| 1 Wages, tips, other compensation | |
| 2 Federal income tax withheld | |
| 3 Social security wages | |
| 4 Social security tax withheld | |
| 5 Medicare wages and tips | |
| 6 Medicare tax withheld | |
| 7 Social Security Tips | |
| 8 Allocated Tips | |
| 10 Dependent care benefits | |
| 11 Nonqualified plans | |
| 12 See instructions for box 12 | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | |
| 14 Other | |
| e Employee's name, address, and ZIP code | |
| 15 State / Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

## Form W-2 Wage and Tax Statement 2025

| Field | Value |
|---|---|
| c Employer's name, address, and ZIP code | |
| d Control number | |
| Void | X |
| Department of the Treasury - Internal Revenue Service | OMB No. 1545-0029 |
| b Employer identification number (EIN) | |
| a Employee's social security number | |
| 1 Wages, tips, other compensation | |
| 2 Federal income tax withheld | |
| 3 Social security wages | |
| 4 Social security tax withheld | |
| 5 Medicare wages and tips | |
| 6 Medicare tax withheld | |
| 7 Social Security Tips | |
| 8 Allocated Tips | |
| 10 Dependent care benefits | |
| 11 Nonqualified plans | |
| 12 See instructions for box 12 | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | |
| 14 Other | |
| e Employee's name, address, and ZIP code | |
| 15 State / Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

Uploaded on: 09/03/2026 at 04:14:27 PM (Pacific Daylight Time) Base City: ADL

# Form 1040 — Department of the Treasury—Internal Revenue Service
## U.S. Individual Income Tax Return 2024

OMB No. 1545-0074 | IRS Use Only—Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2024, or other tax year beginning ______, 2024, ending ______, 20____ | See separate instructions.

| | | |
|---|---|---|
| Your first name and middle initial: Benjamin | Last name: Moon | Your social security number: 203 70 9252 |
| If joint return, spouse's first name and middle initial: | Last name: | Spouse's social security number: |
| Home address (number and street). If you have a P.O. box, see instructions: 3850 W Nevso Dr | Apt. no.: 405 | **Presidential Election Campaign** Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. ☐ You ☐ Spouse |
| City, town, or post office. If you have a foreign address, also complete spaces below: Las Vegas | State: NV · ZIP code: 891034072 | |
| Foreign country name: | Foreign province/state/county: · Foreign postal code: | |

**Filing Status** — Check only one box.

☒ Single
☐ Married filing jointly (even if only one had income)
☐ Married filing separately (MFS)
☐ Head of household (HOH)
☐ Qualifying surviving spouse (QSS)

If you checked the MFS box, enter the name of your spouse. If you checked the HOH or QSS box, enter the child's name if the qualifying person is a child but not your dependent: ______

☐ If treating a nonresident alien or dual-status alien spouse as a U.S. resident for the entire tax year, check the box and enter their name (see instructions and attach statement if required): ______

**Digital Assets** — At any time during 2024, did you: (a) receive (as a reward, award, or payment for property or services); or (b) sell, exchange, or otherwise dispose of a digital asset (or a financial interest in a digital asset)? (See instructions.) ☐ Yes ☒ No

**Standard Deduction** — Someone can claim: ☐ You as a dependent ☐ Your spouse as a dependent
☐ Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness** You: ☐ Were born before January 2, 1960 ☐ Are blind **Spouse:** ☐ Was born before January 2, 1960 ☐ Is blind

**Dependents** (see instructions): If more than four dependents, see instructions and check here . . ☐

| (1) First name | Last name | (2) Social security number | (3) Relationship to you | (4) Child tax credit | (4) Credit for other dependents |
|---|---|---|---|---|---|
| | | | | ☐ | ☐ |
| | | | | ☐ | ☐ |
| | | | | ☐ | ☐ |
| | | | | ☐ | ☐ |

## Income

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.
If you did not get a Form W-2, see instructions.

| Line | Description | Box | Amount |
|---|---|---|---|
| 1a | Total amount from Form(s) W-2, box 1 (see instructions) | 1a | 95,846. |
| b | Household employee wages not reported on Form(s) W-2 | 1b | |
| c | Tip income not reported on line 1a (see instructions) | 1c | |
| d | Medicaid waiver payments not reported on Form(s) W-2 (see instructions) | 1d | |
| e | Taxable dependent care benefits from Form 2441, line 26 | 1e | |
| f | Employer-provided adoption benefits from Form 8839, line 29 | 1f | |
| g | Wages from Form 8919, line 6 | 1g | |
| h | Other earned income (see instructions) | 1h | 0. |
| i | Nontaxable combat pay election (see instructions) 1i | | |
| z | Add lines 1a through 1h | 1z | 95,846. |

Attach Sch. B if required.

| Line | Description | Box | | Line | Description | Box | Amount |
|---|---|---|---|---|---|---|---|
| 2a | Tax-exempt interest | 2a | | b | Taxable interest | 2b | |
| 3a | Qualified dividends | 3a | | b | Ordinary dividends | 3b | |
| 4a | IRA distributions | 4a | | b | Taxable amount | 4b | |
| 5a | Pensions and annuities | 5a | | b | Taxable amount | 5b | |
| 6a | Social security benefits | 6a | | b | Taxable amount | 6b | |

Standard Deduction for—
• Single or Married filing separately, $14,600
• Married filing jointly or Qualifying surviving spouse, $29,200
• Head of household, $21,900
• If you checked any box under *Standard Deduction*, see instructions.

| Line | Description | Box | Amount |
|---|---|---|---|
| c | If you elect to use the lump-sum election method, check here (see instructions) ☐ | | |
| 7 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ☐ | 7 | |
| 8 | Additional income from Schedule 1, line 10 | 8 | |
| 9 | Add lines 1z, 2b, 3b, 4b, 5b, 6b, 7, and 8. This is your **total income** | 9 | 95,846. |
| 10 | Adjustments to income from Schedule 1, line 26 | 10 | |
| 11 | Subtract line 10 from line 9. This is your **adjusted gross income** | 11 | 95,846. |
| 12 | **Standard deduction or itemized deductions** (from Schedule A) | 12 | 14,600. |
| 13 | Qualified business income deduction from Form 8995 or Form 8995-A | 13 | |
| 14 | Add lines 12 and 13 | 14 | 14,600. |
| 15 | Subtract line 14 from line 11. If zero or less, enter -0-. This is your **taxable income** | 15 | 81,246. |

**For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.** Form **1040** (2024)

**Tax and Credits**

| Line | Description | | Line | Amount |
|---|---|---|---|---|
| 16 | Tax (see instructions). Check if any from Form(s): 1 ☐ 8814 2 ☐ 4972 3 ☐ ______ | | 16 | 12,923. |
| 17 | Amount from Schedule 2, line 3 | | 17 | |
| 18 | Add lines 16 and 17 | | 18 | 12,923. |
| 19 | Child tax credit or credit for other dependents from Schedule 8812 | | 19 | |
| 20 | Amount from Schedule 3, line 8 | | 20 | |
| 21 | Add lines 19 and 20 | | 21 | |
| 22 | Subtract line 21 from line 18. If zero or less, enter -0- | | 22 | 12,923. |
| 23 | Other taxes, including self-employment tax, from Schedule 2, line 21 | | 23 | 0. |
| 24 | Add lines 22 and 23. This is your **total tax** | | 24 | 12,923. |

**Payments**

| Line | Description | Sub-line | Sub-amount | Line | Amount |
|---|---|---|---|---|---|
| 25 | Federal income tax withheld from: | | | | |
| a | Form(s) W-2 | 25a | 12,023. | | |
| b | Form(s) 1099 | 25b | | | |
| c | Other forms (see instructions) | 25c | | | |
| d | Add lines 25a through 25c | | | 25d | 12,023. |
| 26 | 2024 estimated tax payments and amount applied from 2023 return | | | 26 | |
| 27 | Earned income credit (EIC) No | 27 | | | |
| 28 | Additional child tax credit from Schedule 8812 | 28 | | | |
| 29 | American opportunity credit from Form 8863, line 8 | 29 | | | |
| 30 | Reserved for future use | 30 | | | |
| 31 | Amount from Schedule 3, line 15 | 31 | | | |
| 32 | Add lines 27, 28, 29, and 31. These are your **total other payments and refundable credits** | | | 32 | |
| 33 | Add lines 25d, 26, and 32. These are your **total payments** | | | 33 | 12,023. |

If you have a qualifying child, attach Sch. EIC.

**Refund**

| Line | Description | Sub-line | Sub-amount | Line | Amount |
|---|---|---|---|---|---|
| 34 | If line 33 is more than line 24, subtract line 24 from line 33. This is the amount you **overpaid** | | | 34 | |
| 35a | Amount of line 34 you want **refunded to you.** If Form 8888 is attached, check here ☐ | | | 35a | |
| b | Routing number XXXXXXXXX c Type: ☐ Checking ☐ Savings | | | | |
| d | Account number XXXXXXXXXXXXXXXXX | | | | |
| 36 | Amount of line 34 you want **applied to your 2025 estimated tax** | 36 | | | |

Direct deposit? See instructions.

**Amount You Owe**

| Line | Description | Sub-line | Sub-amount | Line | Amount |
|---|---|---|---|---|---|
| 37 | Subtract line 33 from line 24. This is the **amount you owe.** For details on how to pay, go to *www.irs.gov/Payments* or see instructions | | | 37 | 900. |
| 38 | Estimated tax penalty (see instructions) | 38 | | | |

**Third Party Designee**

Do you want to allow another person to discuss this return with the IRS? See instructions ☐ **Yes.** Complete below. ☒ **No**

Designee's name | Phone no. | Personal identification number (PIN)

**Sign Here**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Your signature | Date | Your occupation: Sr. Account Executive | If the IRS sent you an Identity Protection PIN, enter it here (see inst.)

Joint return? See instructions. Keep a copy for your records.

Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation | If the IRS sent your spouse an Identity Protection PIN, enter it here (see inst.)

Phone no. (301) 693-5860 | Email address

**Paid Preparer Use Only**

Preparer's name | Preparer's signature | Date | PTIN | Check if: ☐ Self-employed

Firm's name Self-Prepared | Phone no.

Firm's address | Firm's EIN

Go to *www.irs.gov/Form1040* for instructions and the latest information. BAA REV 03/20/25 Intuit.cg.cfp.sp Form **1040** (2024)

EOIR 73 of 92

Exh. 2 - Adm.



070

## Form W-2 Wage and Tax Statement 2024

Copy C, for employee's records

Department of the Treasury - Internal Revenue Service
OMB No. 1545-0008

| Box | Value |
|---|---|
| c Employer's name, address, and ZIP code | ALEXANDER & TOM INC<br>3500 BOSTON ST STE 225<br>BALTIMORE MD 21224 |
| d Control number | 0031-18086228<br>0000000090 - STAFFE |
| Void | |
| b Employer identification number (EIN) | 52-1989386 |
| a Employee's social security number | 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 |
| 13 Statutory employee | |
| 13 Retirement plan | X |
| 13 Third-party sick pay | |
| e Employee's name, address, and ZIP code | BENJAMIN MOON<br>3850 W NEVSO DR<br>APT 405<br>LAS VEGAS NV 89103 |
| 12 See instructions for box 12 | D 4307.67 |
| 14 Other | |
| 1 Wages, tips, other compensation | 95846.17 |
| 2 Federal income tax withheld | 12023.10 |
| 3 Social security wages | 100153.84 |
| 4 Social security tax withheld | 6209.54 |
| 5 Medicare wages and tips | 100153.84 |
| 6 Medicare tax withheld | 1452.23 |
| 7 Social Security Tips | |
| 8 Allocated Tips | |
| 10 Dependent care benefits | |
| 11 Nonqualified plans | |
| 15 State | |
| Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

## Form W-2 Wage and Tax Statement 2024

Copy B, to be filed with employee's FEDERAL tax return

Department of the Treasury - Internal Revenue Service
OMB No. 1545-0008

| Box | Value |
|---|---|
| c Employer's name, address, and ZIP code | ALEXANDER & TOM INC<br>3500 BOSTON ST STE 225<br>BALTIMORE MD 21224 |
| d Control number | 0031-18086228<br>0000000090 - STAFFE |
| Void | |
| b Employer identification number (EIN) | 52-1989386 |
| a Employee's social security number | 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 |
| 13 Statutory employee | |
| 13 Retirement plan | X |
| 13 Third-party sick pay | |
| e Employee's name, address, and ZIP code | BENJAMIN MOON<br>3850 W NEVSO DR<br>APT 405<br>LAS VEGAS NV 89103 |
| 12 See instructions for box 12 | D 4307.67 |
| 14 Other | |
| 1 Wages, tips, other compensation | 95846.17 |
| 2 Federal income tax withheld | 12023.10 |
| 3 Social security wages | 100153.84 |
| 4 Social security tax withheld | 6209.54 |
| 5 Medicare wages and tips | 100153.84 |
| 6 Medicare tax withheld | 1452.23 |
| 7 Social Security Tips | |
| 8 Allocated Tips | |
| 10 Dependent care benefits | |
| 11 Nonqualified plans | |
| 15 State | |
| Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

## Form W-2 Wage and Tax Statement 2024

Department of the Treasury - Internal Revenue Service
OMB No. 1545-0008

| Box | Value |
|---|---|
| c Employer's name, address, and ZIP code | |
| d Control number | |
| Void | X |
| b Employer identification number (EIN) | |
| a Employee's social security number | |
| 13 Statutory employee | |
| 13 Retirement plan | |
| 13 Third-party sick pay | |
| e Employee's name, address, and ZIP code | |
| 12 See instructions for box 12 | |
| 14 Other | |
| 1 Wages, tips, other compensation | |
| 2 Federal income tax withheld | |
| 3 Social security wages | |
| 4 Social security tax withheld | |
| 5 Medicare wages and tips | |
| 6 Medicare tax withheld | |
| 7 Social Security Tips | |
| 8 Allocated Tips | |
| 10 Dependent care benefits | |
| 11 Nonqualified plans | |
| 15 State | |
| Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

## Form W-2 Wage and Tax Statement 2024

Department of the Treasury - Internal Revenue Service
OMB No. 1545-0008

| Box | Value |
|---|---|
| c Employer's name, address, and ZIP code | |
| d Control number | |
| Void | X |
| b Employer identification number (EIN) | |
| a Employee's social security number | |
| 13 Statutory employee | |
| 13 Retirement plan | |
| 13 Third-party sick pay | |
| e Employee's name, address, and ZIP code | |
| 12 See instructions for box 12 | |
| 14 Other | |
| 1 Wages, tips, other compensation | |
| 2 Federal income tax withheld | |
| 3 Social security wages | |
| 4 Social security tax withheld | |
| 5 Medicare wages and tips | |
| 6 Medicare tax withheld | |
| 7 Social Security Tips | |
| 8 Allocated Tips | |
| 10 Dependent care benefits | |
| 11 Nonqualified plans | |
| 15 State | |
| Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

Form **1040** Department of the Treasury—Internal Revenue Service
**U.S. Individual Income Tax Return** **2023** OMB No. 1545-0074 IRS Use Only—Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2023, or other tax year beginning ________, 2023, ending ________, 20 ____ See separate instructions.

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| Benjamin | Moon | 203 70 9252 |
| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |
| | | |

| Home address (number and street). If you have a P.O. box, see instructions. | | | Apt. no. |
|---|---|---|---|
| 3850 W Nevso Dr | | | 405 |
| City, town, or post office. If you have a foreign address, also complete spaces below. | State | ZIP code | |
| Las Vegas | NV | 891034072 | |
| Foreign country name | Foreign province/state/county | Foreign postal code | |

**Presidential Election Campaign** Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. ☐ You ☐ Spouse

**Filing Status** Check only one box.
☒ Single
☐ Married filing jointly (even if only one had income)
☐ Married filing separately (MFS)
☐ Head of household (HOH)
☐ Qualifying surviving spouse (QSS)
If you checked the MFS box, enter the name of your spouse. If you checked the HOH or QSS box, enter the child's name if the qualifying person is a child but not your dependent:

**Digital Assets** At any time during 2023, did you: (a) receive (as a reward, award, or payment for property or services); or (b) sell, exchange, or otherwise dispose of a digital asset (or a financial interest in a digital asset)? (See instructions.) ☐ Yes ☒ No

**Standard Deduction** **Someone can claim:** ☐ You as a dependent ☐ Your spouse as a dependent
☐ Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness You:** ☐ Were born before January 2, 1959 ☐ Are blind **Spouse:** ☐ Was born before January 2, 1959 ☐ Is blind

**Dependents** (see instructions): If more than four dependents, see instructions and check here ☐

| (1) First name Last name | (2) Social security number | (3) Relationship to you | (4) Child tax credit | (4) Credit for other dependents |
|---|---|---|---|---|
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld. If you did not get a Form W-2, see instructions.

| Line | Description | Box | Amount |
|---|---|---|---|
| 1a | Total amount from Form(s) W-2, box 1 (see instructions) | 1a | 30,163. |
| b | Household employee wages not reported on Form(s) W-2 | 1b | |
| c | Tip income not reported on line 1a (see instructions) | 1c | |
| d | Medicaid waiver payments not reported on Form(s) W-2 (see instructions) | 1d | |
| e | Taxable dependent care benefits from Form 2441, line 26 | 1e | |
| f | Employer-provided adoption benefits from Form 8839, line 29 | 1f | |
| g | Wages from Form 8919, line 6 | 1g | |
| h | Other earned income (see instructions) | 1h | 0. |
| i | Nontaxable combat pay election (see instructions) 1i | | |
| z | Add lines 1a through 1h | 1z | 30,163. |
| 2a | Tax-exempt interest 2a ____ b Taxable interest | 2b | |
| 3a | Qualified dividends 3a ____ b Ordinary dividends | 3b | |
| 4a | IRA distributions 4a ____ b Taxable amount | 4b | |
| 5a | Pensions and annuities 5a ____ b Taxable amount | 5b | |
| 6a | Social security benefits 6a ____ b Taxable amount | 6b | |
| c | If you elect to use the lump-sum election method, check here (see instructions) ☐ | | |
| 7 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ☐ | 7 | |
| 8 | Additional income from Schedule 1, line 10 | 8 | 77,233. |
| 9 | Add lines 1z, 2b, 3b, 4b, 5b, 6b, 7, and 8. This is your **total income** | 9 | 107,396. |
| 10 | Adjustments to income from Schedule 1, line 26 | 10 | |
| 11 | Subtract line 10 from line 9. This is your **adjusted gross income** | 11 | 107,396. |
| 12 | **Standard deduction or itemized deductions** (from Schedule A) | 12 | 79,673. |
| 13 | Qualified business income deduction from Form 8995 or Form 8995-A | 13 | |
| 14 | Add lines 12 and 13 | 14 | 79,673. |
| 15 | Subtract line 14 from line 11. If zero or less, enter -0-. This is your **taxable income** | 15 | 27,723. |

Attach Sch. B if required.

**Standard Deduction for—**
- Single or Married filing separately, $13,850
- Married filing jointly or Qualifying surviving spouse, $27,700
- Head of household, $20,800
- If you checked any box under *Standard Deduction*, see instructions.

**For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.** Form **1040** (2023)

EOIR 75 of 92



072

| | | | | | |
|---|---|---|---|---|---|
| **Tax and Credits** | 16 | **Tax** (see instructions). Check if any from Form(s): 1 ☐ 8814 2 ☐ 4972 3 ☐ | | 16 | 3,107. |
| | 17 | Amount from Schedule 2, line 3 | | 17 | 990. |
| | 18 | Add lines 16 and 17 | | 18 | 4,097. |
| | 19 | Child tax credit or credit for other dependents from Schedule 8812 | | 19 | |
| | 20 | Amount from Schedule 3, line 8 | | 20 | |
| | 21 | Add lines 19 and 20 | | 21 | |
| | 22 | Subtract line 21 from line 18. If zero or less, enter -0- | | 22 | 4,097. |
| | 23 | Other taxes, including self-employment tax, from Schedule 2, line 21 | | 23 | 0. |
| | 24 | Add lines 22 and 23. This is your **total tax** | | 24 | 4,097. |
| **Payments** | 25 | Federal income tax withheld from: | | | |
| | a | Form(s) W-2 | 25a 3,689. | | |
| | b | Form(s) 1099 | 25b | | |
| | c | Other forms (see instructions) | 25c 0. | | |
| | d | Add lines 25a through 25c | | 25d | 3,689. |
| If you have a qualifying child, attach Sch. EIC. | 26 | 2023 estimated tax payments and amount applied from 2022 return | | 26 | |
| | 27 | Earned income credit (EIC) No | 27 | | |
| | 28 | Additional child tax credit from Schedule 8812 | 28 | | |
| | 29 | American opportunity credit from Form 8863, line 8 | 29 | | |
| | 30 | Reserved for future use | 30 | | |
| | 31 | Amount from Schedule 3, line 15 | 31 | | |
| | 32 | Add lines 27, 28, 29, and 31. These are your **total other payments and refundable credits** | | 32 | |
| | 33 | Add lines 25d, 26, and 32. These are your **total payments** | | 33 | 3,689. |
| **Refund** | 34 | If line 33 is more than line 24, subtract line 24 from line 33. This is the amount you **overpaid** | | 34 | |
| | 35a | Amount of line 34 you want **refunded to you.** If Form 8888 is attached, check here ☐ | | 35a | |
| Direct deposit? See instructions. | b | Routing number XXXXXXXXX c Type: ☐ Checking ☐ Savings | | | |
| | d | Account number XXXXXXXXXXXXXXXXX | | | |
| | 36 | Amount of line 34 you want **applied to your 2024 estimated tax** | 36 | | |
| **Amount You Owe** | 37 | Subtract line 33 from line 24. This is the **amount you owe.** For details on how to pay, go to *www.irs.gov/Payments* or see instructions | | 37 | 408. |
| | 38 | Estimated tax penalty (see instructions) | 38 | | |

**Third Party Designee** — Do you want to allow another person to discuss this return with the IRS? See instructions ☐ **Yes.** Complete below. ☒ **No**

Designee's name | Phone no. | Personal identification number (PIN)

**Sign Here**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| | | | |
|---|---|---|---|
| Your signature | Date | Your occupation: Sr. Account Executive | If the IRS sent you an Identity Protection PIN, enter it here (see inst.) |
| Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation | If the IRS sent your spouse an Identity Protection PIN, enter it here (see inst.) |
| Phone no. (301)693-5860 | Email address | | |

Joint return? See instructions. Keep a copy for your records.

**Paid Preparer Use Only**

| | | | | |
|---|---|---|---|---|
| Preparer's name | Preparer's signature | Date | PTIN | Check if: ☐ Self-employed |
| Firm's name Self-Prepared | | | | Phone no. |
| Firm's address | | | | Firm's EIN |

Form W-2 Wage and Tax Statement 2023

**Copy C, for employee's records**

| Field | Value |
|---|---|
| c Employer's name, address, and ZIP code | ALEXANDER & TOM INC<br>3500 BOSTON ST STE 225<br>BALTIMORE MD 21224 |
| d Control number | 0031-18086228<br>0000000090 - STAFFE |
| Void | |
| Department of the Treasury - Internal Revenue Service | OMB No. 1545-0008 |
| b Employer identification number (EIN) | 52-1989386 |
| a Employee's social security number | 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 |
| 1 Wages, tips, other compensation | 30163.46 |
| 2 Federal income tax withheld | 3688.82 |
| 3 Social security wages | 30653.84 |
| 4 Social security tax withheld | 1900.54 |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan: X |
| e Employee's name, address, and ZIP code | BENJAMIN MOON<br>10050 CAPE MAY ST<br>LAS VEGAS NV 89141 |
| 12 See instructions for box 12 | D 490.38 |
| 14 Other | |
| 5 Medicare wages and tips | 30653.84 |
| 6 Medicare tax withheld | 444.48 |
| 7 Social Security Tips | |
| 8 Allocated Tips | |
| 10 Dependent care benefits | |
| 11 Nonqualified plans | |
| 15 State / Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

## Form W-2 Wage and Tax Statement 2023

**Copy B, to be filed with employee's FEDERAL tax return**

| Field | Value |
|---|---|
| c Employer's name, address, and ZIP code | ALEXANDER & TOM INC<br>3500 BOSTON ST STE 225<br>BALTIMORE MD 21224 |
| d Control number | 0031-18086228<br>0000000090 - STAFFE |
| Void | |
| Department of the Treasury - Internal Revenue Service | OMB No. 1545-0008 |
| b Employer identification number (EIN) | 52-1989386 |
| a Employee's social security number | 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 |
| 1 Wages, tips, other compensation | 30163.46 |
| 2 Federal income tax withheld | 3688.82 |
| 3 Social security wages | 30653.84 |
| 4 Social security tax withheld | 1900.54 |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan: X |
| e Employee's name, address, and ZIP code | BENJAMIN MOON<br>10050 CAPE MAY ST<br>LAS VEGAS NV 89141 |
| 12 See instructions for box 12 | D 490.38 |
| 14 Other | |
| 5 Medicare wages and tips | 30653.84 |
| 6 Medicare tax withheld | 444.48 |
| 7 Social Security Tips | |
| 8 Allocated Tips | |
| 10 Dependent care benefits | |
| 11 Nonqualified plans | |
| 15 State / Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

## Form W-2 Wage and Tax Statement 2023

| Field | Value |
|---|---|
| c Employer's name, address, and ZIP code | |
| d Control number | |
| Void | X |
| Department of the Treasury - Internal Revenue Service | OMB No. 1545-0008 |
| b Employer identification number (EIN) | |
| a Employee's social security number | |
| 1 Wages, tips, other compensation | |
| 2 Federal income tax withheld | |
| 3 Social security wages | |
| 4 Social security tax withheld | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | |
| e Employee's name, address, and ZIP code | |
| 12 See instructions for box 12 | |
| 14 Other | |
| 5 Medicare wages and tips | |
| 6 Medicare tax withheld | |
| 7 Social Security Tips | |
| 8 Allocated Tips | |
| 10 Dependent care benefits | |
| 11 Nonqualified plans | |
| 15 State / Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

## Form W-2 Wage and Tax Statement 2023

| Field | Value |
|---|---|
| c Employer's name, address, and ZIP code | |
| d Control number | |
| Void | X |
| Department of the Treasury - Internal Revenue Service | OMB No. 1545-0008 |
| b Employer identification number (EIN) | |
| a Employee's social security number | |
| 1 Wages, tips, other compensation | |
| 2 Federal income tax withheld | |
| 3 Social security wages | |
| 4 Social security tax withheld | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | |
| e Employee's name, address, and ZIP code | |
| 12 See instructions for box 12 | |
| 14 Other | |
| 5 Medicare wages and tips | |
| 6 Medicare tax withheld | |
| 7 Social Security Tips | |
| 8 Allocated Tips | |
| 10 Dependent care benefits | |
| 11 Nonqualified plans | |
| 15 State / Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

# Letter of Support

**For: Eunha Oh**

My name is Duan Kwon. I am a U.S. citizen and a pastor at a Christian church.

Eunha and I have built a relationship as pastor and congregant.

She is a beautiful soul who remains steadfast even amid the relentless temptations of evil, practices a life of service in the Lord's embrace, and always prays.

In the past, she generously helped with cleaning the church, organizing the prayer room, and teaching Korean to children. She has expressed how grateful she is for the opportunity to live in America. Her actions serve as a model for all the members and acquaintances.

I sincerely ask that you show compassion so that this beloved child of the Lord may return to the embrace of the Lord.

All of our church members and I will help Eunha so that she can faithfully participate in her court proceedings.

I will personally, together with all the members of our church, do our best to support and care for her so that she may successfully settle in this country, continue to live with a deep faith, and positively influence everyone around her.

Eunha Oh truly considers the United States her home, and we sincerely thank you for your time and consideration in this matter.

Sincerely,

Duan Kwon


UNITED STATES OF AMERICA
PERMANENT RESIDENT
Surname
KWON
Given Name
DUAN
Country of Birth
Korea
USCIS#
097-346-248
Category
E39
Date of Birth
18 NOV 1958
Sex
M
Card Expires:
06/03/35
Resident Since:
12/01/04

Uploaded on: 09/03/2026 at 04:14:27 PM (Pacific Daylight Time) Base City: ADL



UNIVERSAL LIFE CHURCH MINISTRIES

# Credentials of Ministry

THIS IS TO CERTIFY

Duan Kwon

*That The Bearer Hereof Has Been Ordained*

*On this day, the 13th of May, in the year 2025 and is officially recognized as a member of the Universal Life Church and has all rights and privileges to perform all duties of the ministry.*

CHAPLAIN, BR. MARTIN

# Declaration in Support of Eunha Oh

**To Whom It May Concern:**

My name is Andrew Chen, and I am writing in support of **Eunha Oh** and her request to be released from immigration detention.

I have known Eunha for approximately one year. I first met her through a mutual friend and since then I have had the opportunity to spend time with her whenever I visit Los Angeles.

During the time I have known Eunha, I have found her to be a kind, responsible, respectful, and dependable person. She always goes out of her way to make sure others are taken care of. When we go out, you can see the care and compassion she has towards both those she cares about and strangers alike.

Eunha has established meaningful relationships and connections in the United States. She has firmly integrated herself within her community from what I've seen. It seems she knows everybody around her and I have personally seen how important these relationships are to her.

I also know that Eunha has a serious immigration matter pending and that she intends to address it through the proper legal process. Based on my experience knowing her, I believe she will take her legal obligations seriously and attend any hearings, appointments, or other proceedings required of her.

If Eunha is released, I understand that she will need reliable support while her case proceeds. I am willing to provide emotional support or whatever it is that she needs to help make the process as smooth as possible.

I respectfully ask that Eunha be given the opportunity to continue her immigration case while living in the community rather than remaining detained.

I declare that the information in this letter is true and correct to the best of my knowledge.

Sincerely,

**Andrew Chen**

(510) 449-7756
Aug 27, 2026

PASSPORT
PASSEPORT
PASAPORTE

USA

UNITED STATES OF AMERICA



Type / Type / Tipo: P
Code / Code / Código: USA
Passport No. / No. du Passeport / No. de Pasaporte: 643908843

Surname / Nom / Apellidos
CHEN

Given Names / Prénoms / Nombres
ANDREW CHENG-FENG

Nationality / Nationalité / Nacionalidad
UNITED STATES OF AMERICA

Date of birth / Date de naissance / Fecha de nacimiento
24 Mar 1990

Place of birth / Lieu de naissance / Lugar de nacimiento
CALIFORNIA, U.S.A.

Sex / Sexe / Sexo
M

Date of issue / Date de délivrance / Fecha de expedición
21 Sep 2019

Authority / Autorité / Autoridad
United States
Department of State

Date of expiration / Date d'expiration / Fecha de caducidad
20 Sep 2029

Endorsements / Mentions Spéciales / Anotaciones
SEE PAGE 27

USA

<USACHEN<<ANDREW<CHENG<FENG<<<<<<<<<<<<<<<<
088439USA9003244M29[illegible]

# BIOGRAPHICAL INFORMATION

이 여권을 소지한 대한민국 국민이 아무 지장 없이 통행할 수 있도록 하여 주시고 필요한 모든 편의와 보호를 베풀어 주실 것을 관계자 여러분께 요청합니다.

대한민국 외교부 장관

The Ministry of Foreign Affairs of the Republic of Korea requests all whom it may concern to permit the bearer, a national of the Republic of Korea, to pass freely without delay or hindrance and to provide every possible assistance and protection in case of need.



여권 소지인의 서명
Signature of bearer eunha oh

여권 PASSPORT

대한민국 REPUBLIC OF KOREA



종류/Type: PM
국가코드/Country code: KOR
여권번호/Passport No.: M403S8898
성/Surname: OH
이름/Given names: EUNHA
한글 성명: 오은하
생년월일/Date of birth: 06 4월/APR 1987
성별/Sex: F
국적/Nationality: REPUBLIC OF KOREA
발행관청/Authority: MINISTRY OF FOREIGN AFFAIRS
발급일/Date of issue: 20 9월/SEP 2024
기간만료일/Date of expiry: 20 9월/SEP 2034



PMKOROH<<EUNHA<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<
M403S88980KOR8704061F3409202944 6989V20558266

# PHOTOGRAPHS













**CERTIFICATE OF SERVICE**

**RESPONDENT: EUNHA OH,**
**ALIEN No: 208-839-580**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am over the age of eighteen (18) and a resident of the State of California and am not a party to this action. My business address is: 617 S. Olive St., Suite 1000, Los Angeles, CA 90014.

On 09 / 03, 2026, I served the foregoing document described as

**RESPONDENTS EVIDENCE IN SUPPORT OF BOND REQUEST**

On the trial attorney in this action by ECAS and both parties are participating in ECAS

DEPARTMENT OF HOMELAND SECURITY
OFFICE OF CHIEF COUNSEL
10250 Rancho Road
Adelanto, CA 92301

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed at Los Angeles, California on 09/03, 2026.

Katherine Aguilar